# In The Matter Of:

*The Pike Company, Inc. vs.*
*Universal Concrete PRoducts, Inc.*

---

*Richard Merkhofer*
*January 07, 2020*

---

*Media Court Reporting*
*216 West Front Street*
*Media, PA  19063*
*610.566.0805  fax 610.566.0318*
*www.mediacourtreporting.com*

Original File 294413.c01_RICHARD MERKHOFER.TXT
Min-U-Script® with Word Index

```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF NEW YORK
 2

 3

 4  THE PIKE COMPANY, INC.,          :   NO. 6:17 cv-06365-
                                     :          EAW
 5                  Plaintiff        :
                                     :
 6           vs.                     :
                                     :
 7  UNIVERSAL CONCRETE PRODUCTS,     :
    INC.,                            :
 8                                   :
                    Defendant        :
 9

10  MARIST COLLEGE,                  :
                                     :
11                  Plaintiff        :
                                     :
12           vs.                     :
                                     :
13  UNIVERSAL CONCRETE PRODUCTS,     :
    INC.,                            :
14                                   :
                    Defendant        :
15  - - - - - - - - - - - - - - - -

16

17            DEPOSITION OF RICHARD MERKHOFER

18                     Taken at Universal Concrete
        Products, 400 Old Reading Pike, Pottstown,
19  Pennsylvania, on Tuesday, January 7th, 2020, commencing
       at 10:00 a.m. by Marcy J. Janowski, Registered
20         Professional Reporter and Notary Public.

21                        *  *  *

22

23

24
```

```
 1   APPEARANCES:

 2
                     PHILLIPS LYTLE, LLP
 3                   BY:  ERIN C. BOREK, ESQ.
                     One Canalside
 4                   125 Main Street
                     Buffalo, NY 14203-2887
 5                   -- For the Plaintiff

 6


 7
                     McNELLY LAW GROUP
 8                   BY:  ROBERT J. McNELLY, ESQ.
                          DAVID B. ERMINE, ESQ.
 9                   1033 Westlake Drive
                     Suite 300
10                   Berwyn, PA 19312
                     -- For the Defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
 1                         I N D E X

 2                         WITNESSES

 3

 4    All Witnesses:                          Page

 5

 6    RICHARD MERKHOFER for Examination by

 7

 8      MR. McNELLY                             4

 9

10

11

12                      E X H I B I T S

13

14    Exhibit No.            Description       Page

15

16    P-1                    Analysis          33

17

18

19

20

21

22

23

24
```

```
 1                    (It is stipulated by and between counsel
 2      for the respective parties that all objections except
 3      as to the form of the question are reserved until the
 4      time of trial, and the reading, signing, and sealing of
 5      the deposition transcript is waived.)
 6                              * * *
 7                    RICHARD MERKHOFER, having been duly
 8      sworn, was examined and testified as follows:
 9                              EXAMINATION
10      BY MR. McNELLY:
11      Q.      Good morning.
12      A.      Good morning.
13      Q.      My name is Rob McNelly.  I'm the attorney for
14      Universal Concrete Products and could you give us your
15      name and partially, I'm asking, you've already
16      introduced yourself, but I want to make sure I
17      pronounce your name correctly throughout the rest of
18      the deposition.
19      A.      It's Richard Merkhofer.
20      Q.      Merkhofer?
21      A.      Uh-hum.
22      Q.      And have you ever been deposed before?
23      A.      I have.
24      Q.      I saw your CV.  It sounds like you've been
```

1    involved in a number of matters where you may have been

2    acting as an expert and been deposed?

3    A.      Yes.

4    Q.      You understand what to do, the necessity for

5    verbal communication rather than shaking your head

6    or --

7    A.      Shaking my head, yes.

8    Q.      Like we're doing right now.

9    A.      Yes.

10   Q.      All right.  I've already been through your CV,

11   but could you just give me a brief description of your

12   current employment and what you do?

13   A.      Sure.  I work for Wagner, Hohns, Inglis,

14   Incorporated.  It has corporate offices in Mount

15   Laurel, New Jersey.  We have an office in Orlando, and

16   my current position is executive director.  I basically

17   run the Mount Laurel office.  We perform two basic

18   functions in the industry, one is claims resolution,

19   claims consulting and the other is CPM scheduling.

20            I've been with the copy for 44 years.

21   I started in 1975 in the scheduling group, did CPM

22   scheduling for about 20 years and then the other 20

23   years moved into construction claims, delay analysis,

24   loss of productivity, and damages.

1   Q.      All right.  As I went through your CV, I saw 21

2   pages of listings of projects you've been involved in

3   prior.  I'd like to start by asking you about some of

4   those.

5   A.      Sure.

6   Q.      And I've identified some that I think may be

7   connected to your current client and actually, before I

8   ask about those, could you tell us who is your current

9   client?

10  A.      My client is Pike out of Rochester, New York

11  working with their counsel Phillips Lytle.

12  Q.      So the first one I identified on page one is

13  the Marist, Poughkeepsie, New York project.  Is that

14  referring to your engagement in this litigation or did

15  you do anything else with regard to that Marist

16  project?

17  A.      I believe that refers to this one, but there

18  should be another one on there which I also worked on

19  phase two.

20  Q.      Okay.  And what was your work on phase two?

21  A.      Basically, the same as here, do an analysis of

22  delays on the project.

23  Q.      Just analysis of general delays or with regard

24  to a specific subcontractor?

```
 1    A.      Well, on both, to look at all delays, but focus

 2    on delays of the precast contractor.

 3    Q.      Okay.  And who was the precast contractor in

 4    that case?

 5    A.      Universal here and I think it's Tri-Krete on

 6    the other.

 7    Q.      Did you prepare a report with regard to the

 8    phase two is what you're calling it where Tri-Krete was

 9    the precast contractor?

10    A.      I did.

11    Q.      All right.  Did you submit that to anyone?

12    A.      I submitted for mediation.  It was a mediation

13    report.

14    Q.      Did you testify?

15    A.      Yes, I did.

16    Q.      Were you deposed in that case as well?

17    A.      No, I was not.

18    Q.      What were your findings with regard to that,

19    the delays in phase two?

20    A.      There was precast delays on that project as

21    well as there were here.

22    Q.      And in what way, what were the -- first of all,

23    what was the extent of those delays?

24    A.      I don't remember specifically.  I'd have to
```

1    look at the report, but there were delays in the

2    buildings due to the precast contractor.

3    Q.      Okay.  Were there any other delays on the

4    project other than those caused by the precast

5    contractor?

6    A.      Yes.

7    Q.      And who were they caused by?

8    A.      They were caused by others.  The building was

9    delayed initially just like it was on phase one.

10   Q.      And do you remember any of the others?

11   A.      I don't specifically.

12   Q.      Would you be able to provide that information?

13   A.      Yes.

14           MS. BOREK:  On the record, we're not the

15   attorneys in that case.  I don't know if it was for

16   settlement purposes only so I haven't seen the report,

17   and I don't know that we can get it or provide it.

18           MR. McNELLY:  Well, I'll just ask if he

19   knows about it and then we can deal later with whether

20   or not it's possible to get it.

21           MS. BOREK:  Uh-hum.

22   BY MR. McNELLY:

23   Q.      Did you determine in that second phase that any

24   delays were the result of anything that Pike did or

1  failed to do?

2  A.      Yeah.

3  Q.      And do you recall what those things were?

4  A.      Well, again, the building was delayed initially

5  so that delayed the precast contractor.

6  Q.      But did you attribute that to Pike itself as

7  the general contractor or to other subcontractors

8  working for Pike?

9  A.      Combination.  I don't remember specifically.

10  Q.      All right.  Now, Rochester Station, Rochester,

11  New York, that's on page two.  Do you recall that

12  project?

13  A.      I do.

14  Q.      What was that?

15  A.      It was a project for Pike.  It was a train

16  station right in Rochester and I provided a delay

17  analysis on delays that were caused on that project.

18  Q.      Okay.  Now, who retained you to work on that

19  project?

20  A.      Pike.

21  Q.      All right.  And what was the scope of your

22  work?  I think you just said it was a delay analysis?

23  A.      Correct.  I looked at the record, met with the

24  client, and performed a general delay analysis on where

```
 1    the delays occurred so Pike could negotiate with the

 2    owner for time extensions.

 3    Q.      For time extensions?

 4    A.      Uh-hum.

 5    Q.      Was there litigation involved in that case?

 6    A.      I don't believe there was.

 7    Q.      Okay.  And what determination did you make with

 8    regard to delays in that?

 9    A.      There were delays, variety of delays on the

10    project that delayed Pike.

11    Q.      Okay.  And I asked you this question before

12    with regard to the Poughkeepsie project so I'll ask it

13    again with each of these, whether or not you attributed

14    any of the delays to Pike and when I say that, I was, I

15    think there was some confusion as to whether or not we

16    meant other subcontractors that were hired by Pike or

17    Pike itself and when I say Pike itself, I mean design

18    or the overseeing of the subcontractors, that is

19    whether or not any of the subcontractors may have been

20    late or delayed as a result of something that Pike did

21    in creating the schedule, whether it's including the

22    architecture, that type of thing, so when I ask if you

23    attribute it to Pike, that's what I meant.  So I'll ask

24    you the same thing.
```

```
 1    A.      I understood your question to include a

 2    subcontractor, but it wouldn't include the designer

 3    because Pike was not necessarily the designer unless it

 4    wasn't a design-built project.

 5    Q.      Okay.  Then I'll ask that separately.

 6    A.      Right.

 7    Q.      So in the Rochester Station project, do you

 8    recall who you attributed the delays to?

 9    A.      Mostly the owner because that's where most of

10    the delays occurred.  There could have been some Pike

11    delays within, most projects have some combination of

12    both.

13    Q.      Were there any delays related to the architect

14    in that project or caused by the architect?

15    A.      I don't recall.

16    Q.      Do you recall who the architect was on that

17    project?

18    A.      I do not.

19    Q.      Cornell University, Ithica, New York, do you

20    recall that project?

21    A.      I do.

22    Q.      And who retained you to work on that project?

23    A.      Pike.

24    Q.      And what was your scope of work?
```

12

1    A.       Again, to look at the project as a whole and to

2    determine what delays occurred on the project,

3    specifically focusing on owner-caused delays so Pike

4    could go back to the owner and negotiate time

5    extensions.

6    Q.       Do you recall what your findings were in that

7    matter?

8    A.       The owner delayed the project.

9    Q.       Did you attribute any delays to any of the

10   other subcontractors?

11   A.       Probably.

12   Q.       You don't recall?

13   A.       I don't recall specifically how much, but there

14   was some Pike delay, subcontractor delay, sure.

15   Q.       What about the architect?

16   A.       I believe the architect did have his or her

17   hand in it.

18   Q.       Do you recall who the architect was?

19   A.       No.

20   Q.       Geneseo College stadium, Geneseo, new York, do

21   you recall that project?

22   A.       Vaguely.

23   Q.       We're getting to page six of your --

24   A.       As you go back, it gets older and older.

```
1   Q.      Yeah.  So do you recall who hired you to work
2   on that project?
3   A.      What's the name of the project?
4   Q.      G-E-N-E-S-E-O, Geneseo College.  It's a
5   stadium.
6               MS. BOREK:  Rob, are you looking at the
7   updated report?
8               MR. McNELLY:  I'm looking at the CV.
9   A.      Work experience, right?
10  Q.      Work experience section of the CV.
11              MS. BOREK:  My page six doesn't --
12              MR. McNELLY:  My pages may be incorrect.
13  I think that we did this list on the old report.
14              MS. BOREK:  Okay.  There it is.  It's on
15  our page eight of the updated report.
16  A.      I see it.  I don't recall anything about that
17  project for some reason, could be my age.
18  Q.      All right.  What about RIT Global Village in
19  Rochester, New York, do you remember that one?
20  A.      Vaguely.
21  Q.      Do you remember who hired you for that?
22  A.      I think it was Pike.
23  Q.      Do you remember what the scope of your work was
24  then?
```

```
 1   A.       Delay analysis.

 2   Q.       Do you recall who the adversary was in the

 3   delay analysis?

 4   A.       I don't.  It's a smaller project.  I don't

 5   remember.

 6   Q.       Now, Mercy Hospital, Buffalo, New York.

 7   A.       Okay.

 8   Q.       Do you recall that?

 9   A.       I do.

10   Q.       And who hired you on that?

11   A.       I think it was Pike.

12   Q.       Okay.  And do you recall what your scope of

13   work was?

14   A.       We took their CPM schedule and expanded it into

15   a more comprehensive, elaborate schedule and updated

16   it.

17   Q.       What was the purpose of doing that?

18   A.       To help the contractor plan, schedule the

19   project.

20   Q.       Do you recall if there was a dispute in that

21   matter?

22   A.       I worked with someone of my senior schedulers.

23   I don't think -- if it was, it was a minor one and we

24   resolved it.  It didn't get into any kind of mediation
```

1  or any kind of litigation.  A lot of projects that I
2  work on when we were involved in them on a real-time
3  basis we resolve the disputes as they come along.
4  Q.      And so it was not a delay analysis?
5  A.      No, it was, as it says review, revise, and
6  expand initial CPM schedule prepared by the contractor
7  so I worked with the scheduling consultant with WHI on
8  it.
9  Q.      The next one is Unity Park, Ridge Living Center
10 in Rochester.
11 A.      Okay.
12 Q.      Do you recall that one?
13 A.      Vaguely.
14 Q.      Do you recall who retained you?
15 A.      I don't.
16 Q.      What do you recall about it?
17 A.      Only that what it says, review, revise.  These
18 are projects I believe that I work with a senior
19 scheduling person, gave input and advisory, oversaw it,
20 but they did most of the work, the scheduling work at
21 that time.  It was back in 2009 so we're 11 years ago.
22 Q.      All right.  The next one is the Eastman Theater
23 in Rochester, New York.
24 A.      Yes.

```
 1    Q.       Do you recall that one?

 2    A.       I do because it's kind of an interesting

 3    project.

 4    Q.       It is?

 5    A.       Yeah.

 6    Q.       Who hired you for that one?

 7    A.       Pike.

 8    Q.       And what was interesting about it?

 9    A.       It was a theater that needed a major

10    renovation, and it was retaining the architecture and

11    things so it was a complicated job.

12    Q.       And what was your scope of work on that

13    project?

14    A.       We basically reviewed their baseline CPM

15    schedule and I provided them comments and help they

16    make changes to it so they could continue using it.  At

17    this period of time in 2006, '07 I was still doing some

18    scheduling as well as claims so I was kind of wearing

19    two hats.

20    Q.       Okay.  So this was not an adversarial?

21    A.       It was not, no.

22    Q.       The next one is Lowe's Hornell, Hornell, New

23    York.

24    A.       Uh-hum.
```

| | | |
|---|---|---|
| 1 | Q. | Do you recall that one? |
| 2 | A. | I do. |
| 3 | Q. | Who hired you on that? |
| 4 | A. | Pike. |
| 5 | Q. | And do you recall what your scope of work was? |
| 6 | A. | Same as before, reviewed their baseline |

7  schedule, actually, prepared their baseline schedule so

8  they can use it to update.

9  Q.      No adversary?

10  A.      No, not at all.

11  Q.      The next one is Lowe's Brockport, Brockport,

12  New York.

13  A.      Okay.

14  Q.      Do you recall that one?

15  A.      Not specifically, but it was the same kind of

16  thing.  I prepared the baseline schedule for the

17  contractor.

18  Q.      Do you think that was Pike as well?

19  A.      I don't know, maybe, but if it's in Rochester,

20  it's a good chance, but I did work for other

21  contractors in the area.  I don't recall.

22  Q.      Other than the projects that I just went

23  through, do you recall any other projects where you

24  were working for Pike?

```
 1   A.       Some, Albany Courthouse in Albany, New York.
 2   I'd have to go through the list and look at the list
 3   and refresh my memory, but I've worked on -- as you can
 4   see, I've worked on numerous projects for them.
 5   Q.       Do you recall what you did in the Albany
 6   project?
 7   A.       I did a delay analysis and then went through
 8   two mediations.
 9   Q.       And who is the adversary in that case?  Was it
10   a subcontractor or was it the owner?
11   A.       It was the county courthouse, Albany.
12   Q.       The owner?
13   A.       The owner, yeah, basically.
14   Q.       Do you recall who you determined was at fault
15   in that case or who -- when I say at fault, who caused
16   the delays that you were able to --
17   A.       Combination of the owner and the architect.
18   Q.       Do you recall who the architect was?
19   A.       I don't.
20   Q.       Do you recall what the issues with the
21   architect were?
22   A.       Not specifically.
23   Q.       Do any others stand out in your mind where you
24   were working for Pike and the adversary as not the
```

1    owner, but instead specific or multiple contractors?

2    A.      I'd have to look at my list, see if anything

3    comes to mind.  I can't think of any.

4    Q.      Okay.  I'd like to direct your attention back

5    to the Marist project.

6    A.      Okay.

7    Q.      So when did you first become aware of the

8    Marist project, either phase two, phase one or any of

9    this construction?

10   A.      Couple years ago when Pike contacted me to get

11   involved in the project.

12   Q.      Do you recall at what point in the construction

13   process you were contacted?

14   A.      Not specific.  I think the project was --

15   you're talking about this phase, correct?

16   Q.        Yeah.  Well, actually, I'm sorry.  I'm

17   talking about whichever the first contact was so when

18   you were first made aware of the project.  I assume it

19   was this phase because this was the first phase, but in

20   case it wasn't, I don't want to assume that so when

21   were you first made aware and what was the status?

22   A.      I'd have to look back at the record to see

23   exactly when I started it, but I think I might have

24   been involved in phase two, then jumped to phase one,

1    but they were both, one, I think phase one was close to

2    completing or completed and phase two was in progress.

3    Q.      Okay.  So your understanding is there was an

4    overlap between the two phases?

5    A.      I believe so.

6    Q.      And the phase -- so what did you first learn

7    about the project then?

8    A.      Well, my normal procedure would be to meet with

9    a client which I did and look at the record, go through

10   the project documents, and perform my analysis so I

11   learned from getting involved in it.

12   Q.      Before that, who was it that contacted you?

13   A.      Talking about again phase one?

14   Q.      No, talking about, I think we're talking about

15   phase two, that was the first contact you had.

16   A.      I don't remember specifically, recall, somebody

17   from Pike.

18   Q.      Is there somebody at Pike that you usually hear

19   from in those instances?

20   A.      Well, it could have been Bill Ketchen.  It

21   could have been Philip Tehan.  It could have been Dan

22   DeCarlo.  I don't recall who specifically contacted me.

23   I talked to them all the time.

24   Q.      Do you recall what they told you about the

```
 1   project when they first spoke with you?
 2   A.      Specifically, no, I don't remember.
 3   Q.      Were you immediately engaged?
 4   A.      As soon as they contacted me I was, yes.
 5   Q.      And did you issue an engagement letter or
 6   anything like that when you are engaged?
 7   A.      Usually, I do.  I'd have to check if I did it
 8   on this one, but probably.
 9   Q.      And it was with Pike?
10   A.      Correct.
11   Q.      So do you recall what the first thing you did
12   on the project was?
13   A.      Probably asked for documents, do a cursory
14   review, and then meet with the client.
15   Q.      Okay.  And do you recall what you learned
16   during that cursory review?
17   A.      Well, what I learned in the cursory review and
18   what I learned in the analysis is in my report.
19   Q.      Well, but I'm talking about phase two now
20   because assuming that your recollection is correct that
21   you were first contacted about phase two, do you recall
22   what you learned about phase two during that first
23   cursory review?
24   A.      Well, I learned some of the problems.  I was
```

```
 1    able to see the site, went to the job site.  I met with
 2    the project team so it was part of my initial
 3    investigation of what happened on the project.
 4    Q.      All right.  And at that point were you only
 5    investigating what happened on the phase two?
 6    A.      If I was engaged for phase two, I would only be
 7    looking at phase two.  If they engaged me for phase
 8    one, I did phase one.
 9    Q.      Okay.  But are you certain now that you were
10    engaged first for phase two?
11    A.      I don't remember.  I'd have to look at my
12    billings and I meant to do that.  I was going to go
13    back, look at the billings, but I didn't.
14    Q.      So you're not sure whether or not you were
15    engaged at the same time for phase one and phase two?
16    A.      No, I don't think it was at the same time.  My
17    recollection is I think I went, did phase two first,
18    then I dropped back and did phase one.
19    Q.      Okay.
20    A.      But that's my recollection.
21    Q.      When you started that, what did they tell you?
22    When you had your first meeting with them after you had
23    done your cursory review, what did they tell you they
24    thought the problems, that is Pike, your client, what
```

1    did they tell you they thought the problems were?

2    A.      Well, they indicated that the project was

3    behind schedule and they indicated that the panel

4    contractor caused delays to that and they wanted me to

5    analyze to see what the magnitude of those delays were.

6    Q.      Did you start that analysis?

7    A.      Did I start it?

8    Q.      At that point did you start that analysis?

9    A.      Yes.

10   Q.      And did you begin that analysis on phase two

11   prior to beginning to review the work on phase one?

12   A.      I don't know specifically.  I think I did.  I

13   think I did phase two first and then phase one.

14   Q.      Do you believe that you completed phase two

15   prior to beginning phase one?

16   A.      I don't know.  I'd have to look at the record.

17   Q.      Did your work and I'm asking partially because

18   I'm wondering whether or not your work on either one of

19   those phases affected your understanding of the delays

20   on the other or whether or not anything that was

21   occurring in phase two you believed also included in

22   phase one.

23          MS. BOREK:  Objection.  I just don't

24   understand the question.

```
 1                 MR. McNELLY:  Do you know what, now that
 2   I think about it, I don't understand it either so I'll
 3   ask it more simply and in parts.
 4   BY MR. McNELLY:
 5   Q.      I'll ask it this way.  In both phase one and
 6   phase two, did you make a determination that it was, in
 7   fact, the precast contractor that caused delays?
 8   A.      I did.
 9   Q.      Were there any other subcontractors that were
10   working on both phase one and phase two other than --
11   so we have -- we have two separate precast contractors
12   in phase one and phase two.
13   A.      Uh-hum.
14   Q.      Tri-Krete in two and Universal in one.  Those
15   things were different in your two analyses.
16   A.      Uh-hum.
17   Q.      Were there subcontractors that were the same in
18   both analyses?
19   A.      I don't remember, possibly, probably, but I
20   don't remember specifically.
21   Q.      Okay.  What about the architect, was the
22   architect the same in both?
23   A.      Yes.
24   Q.      And what about the contractor, general, it was
```

1   Pike in both, correct?

2   A.      Correct.

3   Q.      So you did one of these project analyses before

4   you did the other?

5   A.      I believe so.

6   Q.      Did you investigate whether or not any of the

7   other subcontractors that were common to both projects

8   created any of the delays?

9   A.      I determined on both projects that Pike and/or

10   their subcontractors caused a delay to the project and

11   it's in my analysis.

12   Q.      Both projects?

13   A.      Yes.

14   Q.      What about the architect?

15   A.      I don't recall -- well, I don't recall if there

16   was any specific impacts from the architect on any

17   project.

18   Q.      All right.  Now, so as to phase two, talking

19   about just that now, you completed an analysis and did

20   you provide that to your client?

21   A.      I -- right.  I prepared an analysis which

22   matriculated to a mediation report.

23   Q.      Okay.  Did you provide the analysis to your

24   client prior to creating the mediation report?

```
 1    A.       Yes.

 2    Q.       And did your client review that?

 3    A.       Yes.

 4    Q.       And did you make any changes after review by

 5    your client?

 6    A.       I made final changes after I finalized the

 7    report, but any discussions I had with the client would

 8    be part of the analysis.

 9    Q.       Okay.  And did your client recommend any

10    changes to the phase two report prior to you preparing

11    the final draft for mediation?

12    A.       I don't remember any specific comments.  I'm

13    sure I discussed the report with them and made sure

14    that it was accurate from a factual point of view.

15    Q.       And Pike was your client in that matter?

16    A.       Correct.

17    Q.       Not the law firm that was representing them

18    against Tri-Krete?

19    A.       Correct.

20    Q.       Did you provide the report, the draft report to

21    the attorneys representing Pike against Tri-Krete prior

22    to completing your final draft?

23    A.       I don't recall the sequence.  I produced a

24    mediation report and because the attorneys were
```

1    involved in mediation, I'd definitely give them the

2    report before the mediation.

3    Q.      Did you speak to them about the report before

4    the mediation?

5    A.      Absolutely.

6    Q.      Did you make any changes as a result of any of

7    the discussions that you had with them?

8    A.      Probably.

9    Q.      Do you recall what those were?

10   A.      Probably grammatical and things, sentence

11   structure because attorneys are word smiths.

12   Q.      Some of them, not me.

13   A.      We're architects.

14   Q.      All right.  So now, did you, you mentioned

15   earlier that you did testify as part of that mediation?

16   A.      Yes.

17   Q.      By the time that occurred, you had already or

18   had you already been involved in your review of phase

19   one?

20   A.      I don't recall.  I'd have to look at the

21   sequence of when things were occurring.  I can't tell

22   you specifically.

23   Q.      Well, do you recall when you started the work

24   on phase one?

```
 1   A.        No.

 2   Q.        Were you hired by Pike?

 3   A.        Yes.

 4   Q.        And what process did you employ to start your

 5   work on phase one?

 6   A.        I'd ask the client to send me documents,

 7   project document schedules, whatever to review, and

 8   then I'd meet with the client, people that built the

 9   project to review what happened on the project, answer

10   my questions, et cetera.

11   Q.        Okay.  And then I just ask you some questions

12   about how you dealt with your client, Pike, as far as a

13   draft report.  Did you prepare a draft report or an

14   analysis that was provided to your client before you

15   finalized your first report?

16   A.        I usually provide a draft report to the client

17   to review prior to finalizing the report, yes.

18   Q.        And did the client comment on that?

19   A.        Probably.

20   Q.        You don't recall?

21   A.        I don't recall specifically how they commented,

22   but they usually give you some comments.

23   Q.        Do you recall making any changes as a result of

24   the comments?
```

1    A.       I may have.  I don't recall.

2    Q.       And did you provide that to the law firm or any

3    of the lawyers representing Pike prior to finalizing

4    it?

5    A.       Absolutely.

6    Q.       Do you recall whether or not they recommended

7    any changes?

8    A.       I don't recall specifically.  They probably

9    commented on it.

10   Q.       Do you recall what the comments were?

11   A.       I don't.

12   Q.       Did you make any changes as a result of the

13   comments?

14   A.       I may have.

15   Q.       Do you know whether you did or not?

16   A.       I don't know specifically.

17   Q.       You produced -- since we're on those lines, you

18   produced an initial report and then a modified report

19   or an amended report?

20   A.       Correct.

21   Q.       Okay.  After you produced the initial report,

22   what was it that gave rise to your determination that

23   you were going to amend that report?

24   A.       Counsel for Pike, Phillips Lytle, asked me to.

```
 1   Q.      Okay.  And did they tell you why they'd like
 2   you to amend it?
 3   A.      Because the mediation as we all know was not
 4   successful and they are into litigation and they needed
 5   an expert report.
 6   Q.      Okay.  We're talking about phase one now,
 7   right?
 8   A.      We are.
 9   Q.      And what would be different about the expert
10   report as opposed to the report that you initially
11   submitted that was -- well, let me back up for a
12   second.
13                So the initial report that you prepared,
14   was that an expert report?
15   A.      No, it was not.  It was for mediation purposes
16   only.
17   Q.      Okay.  Are you aware that it was submitted as
18   part of the corporate discovery at the time that expert
19   reports were required to be submitted?
20   A.      I believe that was told to me, yes.
21   Q.      Okay.  Did you notify anybody that this was not
22   an expert report and should not be submitted?
23   A.      I did not.
24   Q.      Did you know at that time that it wasn't an
```

1  expert report?

2  A.      When I prepare a mediation report, I know as an

3  expert it's not an expert report.  What the attorneys

4  did in submitting the report as part of this process I

5  was not aware of that.  They did that and they told me

6  about it later.

7  Q.      Okay.  And then so you said a few minutes ago

8  that the thing that gave rise to you revising the

9  report was you were being contacted by the attorneys

10  saying you needed to revise the report.  Are you sure

11  that's what happened or are you now saying that you

12  became aware that it had been submitted as an expert

13  report and informed them that it wasn't?

14  A.      No.  No.

15  Q.      Which was it?

16  A.      I prepared a mediation report for the

17  mediation.  Since mediation failed and time went by,

18  Phillips Lytle contacted me and said we're moving on to

19  the litigation, we need an expert report so we need to

20  revise that report to make it an expert.

21  Q.      Okay.  And did you do that?

22  A.      Yes.

23  Q.      And what were the things that were in the

24  initial report that made it a mediation report versus

1   the or what things did you have to change to make it an

2   expert report?

3   A.      The two basic things that are different between

4   the mediation report and the expert report is when I

5   did the mediation report I did not have panel

6   production logs.  They were not available.  All I used,

7   could use was the payment requisitions to determine the

8   percentage of panel production and that was included in

9   the report.  It was very minimal amount of information.

10  That was number one, and number two, the damages were

11  taken out of the report.

12  Q.      Okay.  Why were they taken out of the report?

13  A.      Why were the damages taken out?

14  Q.      Yeah.

15  A.      Because as part of the mediation and it's

16  pretty common, my job is to present to the mediator as

17  much information as possible to help them understand

18  the case and mediate it.  The damages were provided by

19  Pike to me and all I did was put the damages in the

20  report.  I did not verify them.  I wasn't involved in

21  them.  They were just basically there so the mediator

22  could see it.  Because -- when it became an expert

23  report, I'm not testifying on any damage calculations.

24  It was agreed that we would take them out of the

1    report.

2    Q.      Okay.  One second.  I'm going to ask this be

3    marked as P-1.

4                     (Exhibit No. P-1, delay analysis, was

5    marked for identification.)

6    BY MR. McNELLY:

7    Q.      This is your amended report or what we're

8    calling your expert report?

9    A.      Thank you.

10   Q.      This is a report I downloaded from the link

11   that Erin sent to me earlier this week and I printed it

12   from there.  I assume it's complete and includes also

13   attached to this all of the exhibits which were

14   actually separate files so if you see anything in there

15   that is missing or as we talk about it, just let me

16   know.

17   A.      Okay.

18   Q.      I believe it's a true and correct copy of the

19   report that we were recently provided.

20   A.      If you pulled it off the link, it would be

21   correct.

22   Q.      All right.  Now, in your report you identify a

23   Pike baseline schedule.

24   A.      Yes.

34

```
1   Q.      And I think it has a date August 27.  I forget
2   the year, but does that sound right to you?
3   A.      Yes, 2015.
4   Q.      All right.  Was that included in the report?
5   A.      Yes.
6   Q.      All right.  And where is it in the report?
7   A.      I take that back.  I did not put the actual
8   schedule as an enclosure.
9   Q.      Okay.
10  A.      I thought I did.
11  Q.      Is that, in fact, the -- so since we don't have
12  it, I'll just call it your baseline schedule?
13  A.      Pike's baseline schedule.
14  Q.      Pike's baseline schedule?
15  A.      Correct.
16  Q.      And it's not included in the report, but is
17  this baseline schedule, in fact, the schedule that you
18  used to create or to make that determinations that you
19  used within your report?
20  A.      Yes.
21  Q.      Okay.  And where did you get that baseline
22  schedule?
23  A.      From Pike.
24  Q.      Okay.  Have you previously provided, was that
```

1   provided in the first report?

2   A.      Probably not because we just, like I said, the

3   two major changes I made were just the production and

4   the damages, so inadvertently didn't put that, I would

5   normally do that, put that in as an exhibit so I can

6   see it, but it is the official baseline schedule that

7   Pike used for the project.

8   Q.      Okay.  And do you recall whether or not that

9   was provided to us outside of your report?

10  A.      I think all the schedules were, the baseline

11  and all the updates, yeah.  It would be typical that we

12  would provide that to the other side or the other side

13  already have it.

14  Q.      Do you know how it would have been identified?

15  Did it have a title on it?  Did it have a cover page?

16  What was it called?

17  A.      It would have that data, it probably says

18  baseline on it.

19  Q.      So you think August 27th is the correct date?

20  A.      Oh, it is the correct date.

21  Q.      Do you have the year there?

22  A.      I'm sorry?

23  Q.      The year.  I only have August 27.

24  A.      2015.

1   Q.      Do you know who prepared that?

2   A.      Pike.

3   Q.      When you say Pike, is there somebody at Pike

4   that you know who prepares these schedules?

5   A.      Gloria Simonelli with probably some help from

6   their scheduling group in Rochester.

7   Q.      Did you have any planning part in preparing

8   that schedule back in 2015?

9   A.      I did not.

10  Q.      And did you review the schedule then and I'll

11  ask it this way with a little foundation.

12              As we went through your prior work for

13  Pike you mentioned that you had been retained a number

14  of times for Pike and I assume probably for other

15  contractors to review their schedules to assist them in

16  preparing them or to revise them and make them better.

17  A.      That is something that we do, yes.

18  Q.      You just said you didn't assist in the

19  preparation of that 2015 schedule, but after you

20  received it from Pike did you review it to determine

21  whether or not it was, I'm trying to think of the word

22  to use, appropriate or whether it was feasible?  Did

23  you do in this case a review of that schedule like you

24  did in some of those other projects to determine

```
 1    whether or not it could be improved or whether or not
 2    it needed changes?
 3    A.        No.
 4    Q.        And why didn't you do that?
 5    A.        Wasn't part of my scope.
 6    Q.        Okay.  But you were trying to determine whether
 7    or not delays were caused, right?
 8    A.        Correct.
 9    Q.        Wouldn't it be important in making that
10    determination to determine whether or not that base
11    schedule was, in fact, feasible?
12    A.        Not as part of mine.  The schedule was
13    provided, was produced by Pike on my understanding it
14    was provided to the owner and the architect which it
15    was accepted and it was used for the updating so it is
16    the baseline schedule.  It is what it is and I don't
17    have to do a delay analysis.  I don't have to verify
18    anything about the schedule.  What my analysis does is
19    it uses that as a starting basis and compares what Pike
20    actually did compared to that baseline.
21    Q.        So when you are engaged differently, that is to
22    assist a contractor with preparing or revising or
23    updating a schedule like that, what types of things do
24    you look for in your work?
```

1   A.      Well, we review the project with the
2   contractor.  We get the plans and specs and we look at
3   how the project is put together from a technical point
4   of view, making sure that the, all the activities are
5   tied together correctly, logically, that it doesn't
6   have things like open ends, the floats make sense, the
7   formats are correct, they've covered everything, and
8   make sure that all the basic elements are covered,
9   basically kind of a checkup to make sure it's a good
10  comprehensive schedule.
11  Q.      And why do you do that?
12  A.      Because the contractor asked us to do it and
13  they want a good schedule.
14  Q.      Well, from a professional standpoint, why would
15  somebody in your position -- why would your job exist,
16  that is if it wasn't comprehensive, if it didn't meet
17  those criteria that you just mentioned you were looking
18  for, what could happen?
19  A.      Well, let me answer the first question.  Why
20  they hire us is because the contractors, some of our
21  clients have scheduling groups that do their schedules,
22  some of them don't at all so we do their schedules.
23  The ones that have scheduling groups, they might be
24  busy, they might have too much work, it might be a

```
 1    difficult project and the people that are available
 2    don't necessarily have the expertise to take on a big
 3    project.  It could be a lot of different reasons, but
 4    we're called in on an as-needed basis to make sure that
 5    the schedule gets done on time and it's comprehensive.
 6    Q.      And what would happen if it wasn't?
 7    A.      Well, it -- you could speculate on what would
 8    happen.  If it's not, then the, when you go and try to
 9    use the schedule to build the project and you do the
10    updates, then you might run into problems with some of
11    the information that's in there and it has to be
12    corrected.
13    Q.      Like, what kind of problems?
14    A.      Well, if things are not logically tied together
15    correctly, if there are open ends, if there are just
16    technical problems with the schedule, it just makes it
17    more difficult to do the updates and they've got to be
18    corrected as you go along.
19    Q.      Could it result in delays?
20    A.      I don't understand your question.
21    Q.      Well, so if the schedule wasn't comprehensive
22    or if say the portion of the schedule relating to one
23    type of subcontractor didn't allow for sufficient time
24    for them to complete their job, would that affect the
```

1    ability of other subcontractors to complete their work

2    in accordance with the rest of the schedule?

3    A.      Well, best way for me to answer that, the

4    schedule doesn't cause delays, contractors cause

5    delays.  The schedule is just a, you might say a budget

6    or a tool to plan the work and if a contractor doesn't

7    do their work in a timely manner, it's the contractor

8    that delays the project and the schedule would reflect

9    that or could reflect that.

10   Q.      But how do you know that the schedule is

11   allocating sufficient time for each of the contractors

12   to do their work?

13   A.      That, the contractor that produces the schedule

14   has to do that analysis when you put your baseline

15   together to, so it reflects the proper duration of each

16   subcontractor.

17   Q.      Well, that's what I've been trying to get at

18   with all these questions, that Pike did prepare this

19   schedule and you didn't review it before you used it as

20   your base in your report and you don't know whether or

21   not Pike actually did that investigation to determine

22   whether or not they were allocating sufficient time for

23   all the subcontractors, correct?

24   A.      My understanding talking with Gloria that on

1   this project and on I would say all their projects it's

2   the protocol for the general contractor, in this case

3   Pike, when they produce the schedule, they provide that

4   schedule to the subcontractors so they can review it

5   and we can all agree, they can agree that it reflects

6   their intent to build the project.

7   Q.      But you don't know whether they did that or not

8   on this project?

9   A.      I believe they did.

10  Q.      And what makes you believe that they did?

11  A.      They told me they did, specifically with

12  Universal.

13  Q.      Well, see, I'm not talking about just Universal

14  because we were talking about the comprehensive idea

15  behind the entire schedule.

16  A.      Uh-hum.

17  Q.      What I'm focusing in on is the other

18  subcontractors that are on the site.

19  A.      Uh-hum.

20  Q.      And whether or not they may not have been able

21  to complete the work that they needed to complete even

22  through their own fault or because they weren't

23  allocated enough time, and I guess all I'm asking you

24  is you didn't investigate whether or not any of that

42

 1  occurred, did you?

 2  A.      I did.

 3  Q.      How did you investigate that?

 4  A.      When I did my analysis of the delays I did, in

 5  fact, find that there were Pike subcontractors that did

 6  not do their work on time and delayed the project and I

 7  put that in my report.

 8  Q.      Okay.  I'll get into -- thanks for mentioning.

 9  I'll get into some specifics about that in a little

10  bit.  I'm just focusing on that baseline.

11  A.      Uh-hum.

12  Q.      And did you do any other investigation with

13  regard to the baseline before you started the project?

14  A.      I did not.

15  Q.      And when you made the determinations as to

16  other subcontractors causing delay, was that all also

17  based on their failure to meet the baseline schedule?

18  A.      Correct.

19  Q.      Did you at all in any case determine that the

20  time allocated for any of the contractors in that

21  baseline schedule was insufficient?

22  A.      I did not do an analysis like that, no.

23  Q.      Now, were you involved in determining the extra

24  costs that were paid to the subcontractor Consigli?

```
 1   A.       No.

 2   Q.       You weren't.  Did you review that afterwards?

 3   A.       No.

 4   Q.       Do you know whether or not the same baseline

 5   schedule was used when the payment was calculated for

 6   them?

 7   A.       I do not know.

 8   Q.       All right.  With regard to the structural

 9   steel, did you make a determination that the structural

10   steel, either its fabrication or its erection were

11   delayed in any way?

12   A.       I made a determination not that the structure,

13   the building that needed to be put in place before

14   Universal started had delays associated with it.  The

15   structural steel could have been part of that.

16   Q.       Could have been or --

17   A.       Could have been.

18   Q.       Was it?

19   A.       I don't know.

20   Q.       Now, was the steel broken into or the steel

21   contract or the schedule for the steel broken into two

22   packages, one for fabrication and one for erection?

23   A.       Usually, that's the way it's scheduled, would

24   be put together, yes.
```

44

1    Q.      Do you recall if it was put together in this

2    one?

3    A.      That sounds familiar.

4    Q.      So first with regard to the fabrication

5    component of that, did you identify any delays in the

6    fabrication?

7    A.      No, I didn't have to.

8    Q.      Why not?

9    A.      Because if you look at my analysis, I'm sure

10   you have very closely, I don't have to identify

11   specific delays for any specific subcontractor when I'm

12   dealing with a case of Universal Precast.  What my

13   analysis does is it identifies any subcontractor delay

14   that occurred prior to Universal getting on the job.

15   Q.      Let me ask you a question in that regard

16   because I think I misunderstand when we spoke earlier

17   about your engagement.  When we first talked about

18   engagement in phase two, you said that you were engaged

19   to do a delay analysis to determine what delays were,

20   if any, occurred on the project.

21   A.      Uh-hum.

22   Q.      And then you said I believe that it was the

23   same engagement with regard to phase one.

24   A.      Correct.

1    Q.       To determine what delays.

2    A.       Uh-hum.

3    Q.       But I think now you just said that your

4    engagement here wasn't to determine all of the delays

5    on the project, just what delays were caused by

6    Universal; is that correct?

7    A.       Well, let me clarify that.  Initially, what

8    impacted the calculation on Universal's delays was any

9    delays preceding Universal's work, but I also looked at

10   all of the project on the as-built to see if there were

11   any other delays that were occurring on the project,

12   and I did look at all delays, but I didn't have to

13   initially break down steel, concrete or whatever if

14   they all would impact a start of Universal's work.

15   Q.       Okay.  What about delays that occurred during

16   Universal's work?

17   A.       I did look at those.

18   Q.       Okay.  And were any of those related to steel?

19   A.       I did not see anything related to steel then,

20   no.

21   Q.       And what about the steel erection?  You

22   mentioned that you did see delays in that regard?

23   A.       It was part of the structure so it could have

24   been part of the initial delay that I identify in the

1   report.

2   Q.      And what were those delays?

3   A.      The structure was delayed.  Pike had to provide

4   a structure in the first wing to allow Universal to

5   begin.  That includes you got to get the concrete

6   foundations and the steel up and the precast in place

7   so I identified Pike's subcontractor delays to that

8   point in time which impacted Universal's ability to

9   start their work.

10  Q.      And when you're using that methodology, do you

11  know how long it takes for say on building A, how long

12  it would take for Universal to be able to install all

13  those panels?

14  A.      Yes.  It's in the baseline schedule.

15  Q.      About how long do you think that is, do you

16  recall?

17  A.      Something like 26 days or 24 days or 29 days.

18  Q.      Is there any other work going on at that time?

19  A.      When the panels are going on?

20  Q.      Yeah.

21  A.      When Universal is installing panels?  Yeah,

22  they can get in, Pike can get into the building and

23  start their rough-in work.  They can start their, some

24  of their stud work possibly.

1   Q.      With regard to the structure and specifically

2   the steel fabrication, are you aware that when

3   Universal began installing the panels that the

4   structure still wasn't complete?

5   A.      It didn't have to be 100 percent complete.  It

6   had to be complete enough so they can start reasonably

7   installing the panels.

8   Q.      See, that's why I was focusing in on this idea

9   that the delays in steel and we talked about also the

10  delays in the concrete, what you're referring to as the

11  structure is that none of that matters except to the

12  extent that it delayed Universal's start.

13  A.      Uh-hum.

14  Q.      But wouldn't you agree that if Universal starts

15  because it's delayed a certain amount and then

16  Universal is able to start on a given date, if the rest

17  of the structure still isn't finished and Universal

18  only has 26 days allocated to install these panels,

19  that if there's still structural delay in the remainder

20  of the structure, Universal can't continue, so did you

21  investigate any delays by any of these other

22  contractors after the start date of Universal?

23  A.      Yes.

24  Q.      Okay.  What did you find?

1  A.      There weren't any because the point in time

2  when I do, where I calculate when the building is

3  complete is when the fifth floor precast is in place.

4  Where I got that point in time is the same point in

5  time where the baseline schedule shows Universal

6  starting and as I said before, you don't need to have

7  the structure 100 percent complete, but it's got to be

8  substantially complete enough to allow the precast

9  contractor to start and continue, and when I did that

10 analysis and looked at the as-built, the delays that

11 delayed Universal were already done.  There were no

12 other delays.

13 Q.      So you're saying there were no -- after

14 Universal started on building A and hung the first

15 precast panel, there were no additional delays that

16 caused them an inability to hang panels?

17 A.      Not that I'm aware of.

18 Q.      If you were made aware of delays by other

19 subcontractors, like steel, like other concrete, like

20 the roofing erection, things like that, would that

21 change your analysis?

22 A.      It would not change my analysis of the amount

23 of delay that Universal caused.  It would just be a

24 potential concurrent delay.

1    Q.      Well, but if Universal can't hang a panel, how

2    can you attribute -- if they can't hang a panel because

3    another contractor has made an error in the fabrication

4    or the erection of steel or of the slab or anything

5    else of the roof, how can you continue to attribute

6    that delay to Universal?

7    A.      You're making an incorrect assumption in your

8    analogy that there are delays in the structure.  You

9    used concrete, you used roof, you used steel that would

10   stop Universal from installing the panels.  When

11   Universal starts the panel construction on building A,

12   the point in time where I started that analysis, there

13   wasn't anything in the structure that would delay

14   Universal.

15   Q.      And how did you investigate that?

16   A.      I looked at the as-built schedule and discussed

17   it with Pike.

18   Q.      Did you discuss it with any of the other

19   contractors to determine whether or not they had, in

20   fact or needed to make any changes to allow for the

21   panels to be hung?

22   A.      What other contractors are you referring to?

23   Q.      Performance Concrete or the steel fabricator or

24   erector.

```
 1   A.       Okay.  Maybe you misunderstood my answer.  If
 2   you look at the as-built schedule, the point in time
 3   where Universal starts their panels, the steel and the
 4   concrete and the precast is complete enough per the
 5   baseline schedule to allow Universal to without any
 6   impact erect their panels.  There was no other delays
 7   in the structure that would have stopped Universal.
 8   Q.       All right.  Move on from that now.  Prior to
 9   the start of construction or start of Universal hanging
10   the first panel, what delays did you identify with
11   regard to the steel erection, steel erection?
12   A.       I didn't get into any detail on specifically
13   whether it was concrete, steel, fabrication, erection.
14   I didn't have to.  It didn't matter because we're not
15   charging that against Universal.  Pike and his
16   subcontractors per the baseline schedule had to provide
17   a building for Universal to hang their panels on and
18   they didn't.  They provided it late.  My analysis shows
19   that so I didn't have to get into any detail because it
20   doesn't matter to the analysis.
21   Q.       So how late did they provide it?
22   A.       On building A I think it was 44 days.
23   Q.       And at what point did they notify Universal
24   that it was going to be ready on the 44th day?
```

1   A.      I have no idea.

2   Q.      Are you aware of what occurs to manufacture the

3   concrete panel and move it from the location here to

4   Poughkeepsie, New York?

5   A.      I'm not sure I understand your question.

6   Q.      That it has to be manufactured, removed from

7   the manufacturing facility, you're aware of that?  I

8   should ask you, how much are you aware of the

9   manufacturing process for the concrete panel?

10  A.      I'm generally aware of the process.

11  Q.      Okay.  So it's manufactured?

12  A.      Uh-hum.

13  Q.      And then it's removed from the manufacturing

14  plant and stored.  Then do you understand it needs to

15  be loaded on to a truck?

16  A.      I do.

17  Q.      And then transported from here to Poughkeepsie,

18  New York?

19  A.      I understand that.

20  Q.      And then a crane needs to be, usually in most

21  cases a crane is rented or leased for a certain amount

22  of time?

23  A.      Correct.

24  Q.      And cranes are very expensive, you know that,

```
1    right?

2    A.      I do.

3    Q.      And so what I'm wondering is with a delay of 40

4    some days, when was it that Universal knew that they

5    would be able to start on that 45th day?

6    A.      I have no idea.  I would imagine they had

7    conversations with Pike on the progress and they had

8    meetings on a regular basis and they would discuss that

9    kind of thing.

10   Q.      Did you check on that at all to determine

11   whether or not they had those meetings and when

12   Universal was --

13   A.      I did not specifically analyze that kind of

14   information, no.

15   Q.      Would that have made a difference to you that

16   if Universal only found out a day or two before, would

17   you still charge against them those days where they

18   weren't hanging panels?

19   A.      Absolutely.  Absolutely, because if you look at

20   the baseline schedule it clearly shows that Universal

21   told Pike in their schedule and Pike's schedule shows

22   it that Universal always intended to manufacture and

23   have available all their panels before the erection

24   starts so the only thing that that delay would do would
```

1  cause them to store the panels a little bit longer.

2  Q.     So when was the first panel installed, do you

3  know?  You have 44 days of delay caused by, in your

4  conclusions caused by Pike subcontractors.  Do you know

5  when Universal installed the first panel?

6  A.     I do if you hand me my exhibit number two or

7  three or whatever it is.

8  Q.     It's attached to the back there.  All the

9  exhibits are together.

10          MS. BOREK:  Off the record.

11          (Discussion off the record.)

12  A.     I believe your question was when did Universal

13  start installing their panels?

14  Q.     Yeah.

15  A.     They started installing the panels on the south

16  wing on December 16.

17  Q.     And how does that compare to the 44-day delay?

18  A.     Well, if you look at my graphic which is number

19  two, I show that Pike's baseline schedule shows that

20  the south wing panels were planned to be started on

21  November 2nd.  They actually started on December 16th

22  and if you do that calculation, the panels and the

23  building because it's based upon when the building was

24  ready, the building wasn't ready for 44 calendar days

```
 1   after the plans start so, in other words --

 2   Q.      So what day would that be?

 3   A.      The 16th of December.

 4   Q.      Is that when Universal started?

 5   A.      Yes, so the building, when the building was

 6   ready for Universal to start, they start.

 7   Q.      When did the first delay occur?

 8   A.      The first delay occurred on the south building

 9   because it took them much longer to install the panels

10   on the south as well as any south, east or north, they

11   took longer to do all three buildings.

12   Q.      So when you say the south building, is that

13   what's also referred to as building A?

14   A.      It's actually -- it's wings actually.  Just, if

15   you look at enclosure number five, we gave you a little

16   key plan of the building.  Building A is made up of

17   three wings so it's really wing south, west, east wing,

18   but it all makes up building A.

19   Q.      And building B also has three wings?

20   A.      No.  Building B is one structure.

21   Q.      How does it compare in size to the other, to

22   building A?

23   A.      I'd have to do -- I don't know.

24   Q.      Back to that, when did the first delay by
```

1   Universal occur after the December 16th?

2   A.      The first delay occurred starting December 16th

3   and I put together -- let me answer your question.  The

4   delay started on 12/16.

5   Q.      Okay.  And what was that delay?

6   A.      It's the installation, it's the panel

7   production and installation of the panels for building

8   A.

9   Q.      Okay.  So did they begin installing panels on

10  December 16th?

11  A.      Yeah.

12  Q.      And then when did they deviate from the

13  schedule?

14  A.      Well, if you look at the graphic in enclosure

15  number two, if you look at the top of the graphic on

16  the baseline schedule from the time Universal was to

17  start their panels which was November 2nd, they were to

18  complete their panels on January 15th in 75 calendar

19  days and the graphic shows that.

20  Q.      Okay.

21  A.      If you look at the as-built, if you look at the

22  duration of the panel installation from December 16th

23  to May 19th is when they completed the north wing

24  panels that duration is 155 days.

1    Q.       You mean production days?

2    A.       I'm talking about production and installation.

3    Q.       Okay.  But aren't you only concerned about

4    installation?

5    A.       No, not at all.

6    Q.       Why?

7    A.       Because you can't install the panels on the

8    building unless they get to the site.

9    Q.       So that's what I'm wondering about.  When was

10   it that the first panel didn't get to the site which

11   caused a delay in installation?

12   A.       I don't know.

13   Q.       And I think you already said this, but let me

14   make sure I understand the answer because it's

15   different from my understanding.  Once Universal

16   started on December 16th to install panels, your

17   understanding is they were delayed in no way after that

18   on building A by the work of any other subcontractor or

19   Pike?

20   A.       I think the record shows that there could have

21   been some problems with modifying some of the panels in

22   the field.  There might have been some dimensional

23   errors going on in the field that had to be taken care

24   of and if you look at that particular instance, it

1    might appear to be a delay and it probably could have

2    been a delay in setting a particular panel on a

3    particular day, but my analysis focuses on that even

4    though that might have occurred, Universal in this case

5    took 80 calendar days longer to put the panels on the

6    building, to procure them and put the panels on the

7    building.

8    Q.      But you attributed all 80 additional calendar

9    days to Universal, right?

10   A.      Based upon my methodology, yes.

11   Q.      You didn't deduct from what you were charging

12   against Universal for any of those days?  You've, now

13   you've changed your testimony a little bit.  Before you

14   said there were no other delays after they were handed

15   the building on December 16th that affect their ability

16   to install panels.  Now you're saying there may have

17   been some issues out there with work that needed to be

18   done on the panels on site or measurement issues that

19   may have caused the problem with one panel here or

20   there.

21   A.      To clarify what I meant and I should have said

22   it this way, there were no critical path delays.

23   Q.      What do you mean by critical path delays?

24   A.      Critical path delays are delays that control

1    the ability to keep the project moving forward, not

2    impact the project completion date and those would be

3    the production and the panel installation.  Those other

4    issues that I determined that I mentioned there would

5    be fixing a panel in the field or whatever, they are

6    not on the critical path.  They are done during the

7    panel production and its installation.

8    Q.      Okay.  But if Universal is planning 26 days to

9    install these panels and they can't install a panel in

10   sequence on one day because of a problem with the steel

11   or a problem with something else, what are they

12   supposed to do about that?

13   A.      Move to another panel.

14   Q.      Out of sequence?

15   A.      Out of what sequence?

16   Q.      Out of the sequence that they've designed for

17   the panel installation.

18   A.      I'm not aware of any specific sequence that

19   Universal would have to use to install the panels based

20   upon their schedule.

21   Q.      You're not?

22   A.      No.

23   Q.      They didn't have a plan for which panel they

24   were going to start with?

```
 1   A.      They might have had a plan for internally on a
 2   sequence of panel installation, but based upon the
 3   schedule that they've produced and Pike put together,
 4   the panels can go on the building in any sequence that
 5   Universal plans and wants to do and if the panels are
 6   available, if you have a problem with one panel in one
 7   area, if all the panels are available, you just move
 8   over and do another panel while doing a two-hour fix or
 9   one-day fix, whatever it takes.  It's not impacting the
10   critical path.
11   Q.      Okay.  So with that understanding, you're
12   expecting that every single panel was on site?  Where
13   were they going to store all the panels?
14   A.      Never said that.  Every single panel or most
15   panels for the building would be available.
16   Q.      Well, if they are available here on the site,
17   I'm just going to talk through an occurrence and I'll
18   ask you first -- I'll go back to that.
19              Are you aware of any situations where
20   there was an error in the steel that caused Universal
21   not to be able to hang a particular panel?
22   A.      I probably read something like that, sure.
23   Q.      Okay.  And do you remember how many panels were
24   affected, how many different errors like that are you
```

1   aware of?

2   A.      I don't, I'm not aware of any specific number.

3   Q.      And are you aware of the number of panels that

4   were affected by any one of those changes?

5   A.      I'm not aware of how many were, no.

6   Q.      Okay.  So let's just assume it's one or let's

7   assume it's a section and Universal's plan for that day

8   is to install how many panels usually do you think on a

9   day?

10  A.      I don't know.

11  Q.      How many cranes are they using?

12  A.      Generally one.

13  Q.      So they plan to install a panel and they get

14  there in the morning and they get ready to install

15  that, right?  What do they do first, do you know?  They

16  load the panel up on the crane?

17  A.      You would have to pick the panel off the truck

18  or wherever it's landed and pick it up and put it on

19  the building.

20  Q.      Okay.  And how long does that take to get it

21  loaded and get it up and --

22  A.      I don't know.  I haven't done that analysis,

23  not very long.

24  Q.      So then what happens?  So you get this on the

```
 1   crane and you have a crane operator and everyone else
 2   that's been employed by Universal for the purpose of
 3   getting this hung and you get it to the building and
 4   there's an error, that is panel doesn't fit, which I
 5   think is one of the things that you may have read about
 6   happened.
 7   A.      Could have happened.
 8   Q.      Okay.  What do you do?
 9   A.      You make, Universal would make a decision, can
10   you put the panel in place and modify it.  It depends
11   on what the problem is, but if you have a problem with
12   that particular panel, if all the panels are available
13   for the building, then you just go to another panel and
14   while they are erecting the other panels you fix that
15   problem.
16   Q.      Well, ask you a little bit more about that.  So
17   how do you first determine because now we have a panel,
18   how much do these panels weigh, 50 tons or something
19   like that, hundred thousand pounds?
20   A.      I don't know.
21   Q.      Would you disagree with me if I said I thought
22   they weighed about a hundred thousand pounds?
23   A.      I don't know what they weigh.
24   Q.      So you have this panel hanging in the air and
```

```
 1   you have some guys hanging on the steel and they are
 2   trying to get it fit and it doesn't fit right away.
 3   how long do you think those guys spend trying to figure
 4   out why it isn't fitting?
 5   A.      They might have figured it out before they put
 6   the panel in place.
 7   Q.      Good point.  So did you investigate to find out
 8   whether or not that happened?
 9   A.      No.
10   Q.      So they take some time to determine whether or
11   not it's going to fit.
12   A.      Uh-hum.
13   Q.      And they probably look, is there a problem with
14   our panel that it's not fitting on the hangers or it's
15   not wide enough or long enough or high enough or it's
16   too long or too wide or too high, right?  You would
17   expect that would take some time and then they come to
18   a determination as to what they think it is.  What do
19   you think those guys that are hanging up there do once
20   they think they have a determination?
21   A.      They put the panel in place on the building and
22   modify it there or they bring it down and put it to the
23   side and go to the next panel so when they are fixing
24   the problem, you're erecting the other panels.
```

```
 1   Q.      So how much time should they be spending to
 2   determine whether or not it's a problem with the panel
 3   or the steel?
 4   A.      I have no idea how long.  I'm sure it varies
 5   how much time they took to determine it, but that time
 6   that they were taking to determine it and that time
 7   they are taking to do what you just described is not a
 8   critical path delay.
 9   Q.      So if they get that panel up there and it
10   doesn't fit and then later it's determined that it was
11   the fault of the steel erector or it was a design error
12   and that panel could not have been modified on site
13   immediately installed, they should not spend any time
14   trying to make that determination, as soon as it
15   doesn't work, they should just drop that panel, grab
16   another one, and go to the next panel?
17   A.      I didn't say that.
18   Q.      What would they do?
19   A.      As an erector, they have to determine whether
20   the panel can be put on the building and if it can be,
21   but it needs to be modified, that's an option.  If it
22   can't be put on the building, they would not erect it
23   and they would take it off their lift and go to the
24   next panel.
```

```
 1    Q.      Okay.  How much time should they spend making
 2    that determination?
 3    A.      I have no idea.
 4    Q.      Well, if it gets into the days and it's
 5    determined that the error that caused that delay was
 6    the steel fabricator or the erector or a concrete
 7    pourer, why would you still attribute that delay to
 8    Universal?
 9    A.      Because you're and I understand what you're
10    doing, you're trying to imply that this problem, this
11    panel going on the building is holding up the
12    production and delaying the project.  What it is doing
13    is it's momentarily stopping Universal from installing
14    this panel, so they have to make a determination, can
15    they land the panel and modify it on the building or if
16    they can't, they take the panel down, put it aside, and
17    go to the next panel.  What, let me finish, what we're
18    missing in your analysis is they couldn't go and grab
19    the next panel and the next panel and keep the
20    production going which is where the critical path is
21    because they didn't produce the panels fast enough.
22    Q.      So which day was it that they didn't have a
23    panel available to install when they met one of these
24    days by one of the other subcontractors?
```

```
 1    A.      I don't know.
 2    Q.      How many times did they not have a panel ready
 3    to install?
 4    A.      I don't know.
 5    Q.      Now, I'm going to question because this is
 6    hypothetical, question your conclusion, if they attempt
 7    to install a panel and it can't be installed because
 8    the structure is say, inches or feet too short to
 9    accept it, that is that panel is hanging over from the
10    area that's to be installed, how can they go and start
11    hanging another panel until they figure out whether or
12    not the problem is the panel is too wide or that the
13    structure is too short because if the panel is the
14    correct size and the structure is too short that means
15    that that would continue along the rest of the
16    building, up or down, side to side, correct?
17    A.       You just gave me a hypothetical.  It would
18    depend on the condition.  You're making it something
19    that it affects the whole building.  It could be a
20    simple connection.  It could be a simple cut the panel.
21    You'd have to look at each individual issue, but, but,
22    one of the things that, again, in your analysis you're
23    overlooking is if you look at both of my graphics, my
24    analysis and you look at the production of the panels,
```

```
 1   the production of the panels, if you compare it to what
 2   Universal planned, they took months and months and
 3   months longer to produce the panels and no matter how
 4   many little issues you have going on the building, you
 5   can resolve those issues, but you can't keep the
 6   project on schedule because you have no panels to put
 7   on the building.  You're taking too long to produce
 8   them.
 9   Q.      But the reason I'm asking you when it was that
10   there was a panel that was not available is because
11   these are not all the same panels, correct?
12   A.      Correct.
13   Q.      There's all sorts of different panels?
14   A.      Correct.
15   Q.      You don't know which panels were delayed, do
16   you?
17   A.      I did not do that specific analysis, no.
18   Q.      Okay.  Which means that even if there were a
19   delay in hanging or in producing a certain type of
20   panel, when we get to the point that we're talking
21   about here where there was a delay and you're saying
22   they should move on to something else --
23   A.      To another panel.
24   Q.      To another panel, you are not able to identify
```

1    a single instance where they didn't have a panel

2    available to hang.

3    A.        I don't have to look at a specific instance.

4    What I can look at is, again, I bring you back to my

5    analysis.  They were supposed to have all their panels

6    available, substantially all in place, fabricated,

7    ready to go when they started erection.  If you look at

8    the as-built schedule, they have taken months and

9    months longer and they did not have panels available to

10   erect on the building when they needed them so it

11   delayed the project.

12   Q.        When did they not have panels available to

13   erect on the building?

14   A.        All through the erection, all through the

15   production and erection.  Specifically by day I can't

16   tell you, but it certainly is very clear that if you

17   planned on having them all available before you started

18   and when you look at the as-built, when they started --

19   if you look at the south wing panels starting on

20   December 16th, if you look at the production of the

21   south wing panels, the pours aren't done until March

22   22nd and that doesn't even include the stone so how

23   could you finish installing the south wing if when you

24   start and you were supposed to have them all there

```
 1   before you started, you still don't have them all
 2   produced almost three months later.  You can't finish
 3   the south wing.  It's going to delay the critical path.
 4   Q.      And when did it delay the critical path?
 5   A.      During the erection of that, from December
 6   through March they could not enclose the south wing.
 7   If you can't enclose the building, you can't keep the
 8   drywall and you can't put the roof on and you can't
 9   finish interior finishes.
10   Q.      But if they can't install the panels --
11   A.      They can't --
12   Q.      In one particular day if you can't install the
13   panels, what difference does it make if you have all
14   the rest of them sitting back here at the storage yard?
15   A.      Because in this particular design Universal can
16   install the panels anywhere on the building.  They are
17   supported by the structure.
18   Q.      And what if there's errors in the structure?
19   A.      What if there's not?
20   Q.      But you know that there were.
21   A.      You have portrayed a situation where there are
22   errors all over the place.  My understanding reading
23   the record, there were a few instances that there could
24   have been a steel issue, there could have been a
```

1    dimension issue, but not any magnitude that would have

2    stopped Universal from installing these panels on the

3    building.

4    Q.      So how many of those issues were there?

5    A.      I don't know.

6    Q.      How do you know that they weren't to a

7    magnitude that stopped Universal from installing those?

8    A.      Because if you -- discussing it with Pike is

9    one thing, but I wasn't there, they were, but --

10   Q.      But Pike is suing Universal.  Of course, they

11   are --

12            MS. BOREK:  Objection.  Please let him

13   finish.

14   A.      My point is that even though you have these

15   errors and we don't know exactly how many, if you don't

16   have the panels there produced, you can't put the panel

17   on to find that there's an error there.  It's the

18   panels that's controlling the job.

19   Q.      So were all the panels supposed to be there on

20   site?

21   A.      It was supposed to be available before the

22   erection started per your client's schedule.

23   Q.      What do you mean by available?

24   A.      If you look at enclosure number two, if you

1    look at the UCP schedule that they submitted to Pike
2    there's a line there that says produced panels and they
3    are producing them from July 9th to the 26th.  That's
4    all three wings.  That's the entire building.  If you
5    look at the start of the panel, it's October 19th, so
6    they have 98 percent of the panels produced before we
7    even start and that, there was a purpose behind that
8    because the schedule required Universal to get the
9    wing, each wing enclosed and get the roof on so Pike
10   could continue the finish work so you needed all those
11   panels.
12   Q.      All right.  So but I was getting, what do you
13   mean, I was asking what do you mean by the word
14   available?
15   A.      Well, they would produce them and Universal
16   would have a plan to have them stored, whatever they
17   would to have them available to put on to the building.
18   That would be their means and methods.
19   Q.      So if we got to a point where they couldn't
20   install a particular panel one day and they needed to
21   move to a different area, are you suggesting that all
22   the different types of panels and all those panels
23   should have been available to install on any given day?
24   A.      Absolutely.

1   Q.      And where were they to be stored?

2   A.      That's their problem.  They are the panel

3   contractor.  They store them and they bring them to the

4   site as they need them.

5   Q.      Okay.  So your belief was it was Universal's

6   responsibility on December 16 when they started

7   construction to have all of the panels there on site or

8   ready to be installed at any given time?

9   A.      They would have to have the south wing panels

10  available so they can install them from November 2nd to

11  November 30th per their schedule.

12  Q.      All of them?

13  A.      Right, the south wing.

14  Q.      How many panels do you think go on the south

15  wing?

16  A.      I don't know.  I'd have to count them.

17  Q.      Do you have any idea?

18  A.      No.

19  Q.      All right.  And you're saying that it's just

20  Universal's responsibility to make sure any panel that

21  they need for anywhere on that south building was ready

22  and available to be installed on any given day when

23  they needed to change their plan sequence?

24  A.      Well, sure.  Let's use what you said before

1    about the procedure.  Universal shows up and the panels

2    show up at the site and they have a crane and they pick

3    the panel up and they put it on the building.  Well,

4    they would set the crane up on whatever elevation they

5    want on the south building and they would put the

6    panels up.  Well, those panels as you indicated before

7    are all different types of panels.  They are not all

8    the same, meaning that they would have to produce a

9    enough of the different types of panels to put it up on

10   the south, east, west, whatever part of the building

11   and then move the crane and keep going around, so based

12   upon their own schedule and based upon what I

13   understand is the types of panels that are here,

14   Universal would have to have enough panels so they

15   could accept their delivery and put them on the

16   building and that's the way they planned it.  If you

17   look at the as-built schedule, they didn't come

18   anywheres close to that.

19   Q.      And when they were forced to deviate from their

20   plan because of an error in size or shape or whatever

21   else occurred, what would they do then?

22   A.      You're talking about field deviation.  I'm

23   talking about producing the panels.  Keep in mind and

24   this sometimes can be confusing if you don't think

```
 1    about the process, the process is that Universal needs
 2    to build a form, pour the panel, put the brick on,
 3    bring it to the site, and they install it.  Okay.  For
 4    them to have an issue in the field as you mentioned,
 5    steel, whatever, dimension, they just can't get the
 6    panel on the building.  What has to happen for you to
 7    come to that conclusion, you have to have the panel
 8    there.  They didn't get the panels there.  They didn't
 9    produce them fast enough.
10    Q.     When weren't the panels there?
11    A.     When were they panels there?
12    Q.     When were the panels not there?  Which is the
13    first occurrence when there was a panel that wasn't
14    there to put on the building?
15    A.     Well, in building A the panels were there to
16    start, but when you go to building B, if you look at my
17    enclosure number three, the building was there, but
18    they didn't have any panels available to put on the
19    building.
20    Q.     Building B?
21    A.     Building B.
22    Q.     But in your report don't you only attribute 10
23    percent of the acceleration cost to building B?
24    A.     I don't, Pike does.
```

```
 1    Q.       Did you review that all?

 2    A.       The acceleration cost?

 3    Q.       Or the attribution of 90 percent versus 10

 4    percent between the two buildings.

 5    A.       I did not.

 6    Q.       But did you determine the delay as -- you did

 7    break that down, so what was the percentage of delay of

 8    Universal as to building A versus building B?

 9    A.       If you look at my, if you look at my

10    enclosures, you'll see it's 80 calendar days for

11    building A and a combination of 26, 38 for building B,

12    one is the start panel delay and one is a panel delay

13    on the installation.  Five-minute break?

14    Q.       Take as much time as you need.

15                     (Deposition briefly recessed.)

16    BY MR. McNELLY:

17    Q.       I'd like to redirect our attention to the

18    design, building design and/or the architect.  We were

19    talking about some of the delays that may have occurred

20    after panel installation started.  You've mentioned

21    something about panels that had to be modified on site.

22    Do you recall the specifics of that?

23    A.       No, I just recall that looking at the record

24    and some pictures that that, which is not unusual, that
```

1    some modification might need to be made here or there.

2    Q.      Were you aware of any other -- first, are you

3    aware of any complaints from Universal of delays in

4    receiving responses to questions from the architect or

5    from Pike regarding design issues?

6    A.      No, I did not get into the analysis of the

7    record.

8    Q.      Did you ever talk to anybody about that?

9    A.      No.

10   Q.      Well, if you were made aware that Universal was

11   unable to produce panels in the time frame that they

12   intended to produce those because they could not get

13   specifications from either Pike or from the architect,

14   would that change your opinions as to the production

15   delays?

16   A.      No.

17   Q.      Okay.  So if Universal were not able to get

18   design specifications and/or clarifications regarding

19   what, the way a panel was to be manufactured, how would

20   they manufacture the panel?

21   A.      Well, let me clear something up.  You're

22   getting into the analysis of entitlement, who shot who.

23   It wasn't my role in the project.  I did not analyze

24   any of the examples you just gave.  My job here was to

```
 1    quantify delays, Pike delays and Universal delays on
 2    the project, critical path delays.  Who's responsible
 3    for them I did not get into.  It wasn't part of my --
 4    Q.      So you determined that Universal was a certain
 5    number of days late in producing panels?
 6    A.      Correct.
 7    Q.      But you did not investigate why those panels
 8    were not produced?
 9    A.      I did not.
10    Q.      And, therefore, could be the fact that the
11    architect either was unable to or refused to provide
12    required specifications in order to allow for the
13    panels to be produced?
14    A.      I don't know that.
15    Q.      And that didn't matter to your analysis?
16    A.      It did not impact my scope because I was not
17    retained to figure out and analyze and evaluate that
18    kind of thing.  My job was to produce an analysis to
19    quantify the delay that Universal caused to the
20    project.
21    Q.      That the panels not being ready caused to the
22    project?
23    A.      The production and installation of the panels.
24    Q.      So with regard to the ultimate, with regard to
```

1    the party that would ultimately be responsible for the

2    delays, you didn't make that determination?

3    A.      I did not do a determination of entitlement.

4    No, I did not.

5    Q.      Okay.  I asked about Universal, whether or not

6    you were aware of any complaints about the architect.

7    You said no.  What about any of the other

8    subcontractors?  Are you aware that any of the other

9    subcontractors were complaining that the specifications

10   they received from the, received from the architect

11   were incorrect?

12   A.      No.

13   Q.      Did you investigate that at all?

14   A.      No, I did not.

15   Q.      What about anything else, response time from

16   the architect, did you ever hear about any of that?

17   A.      I did not analyze that.

18   Q.      But did you hear about it?

19   A.      Probably in my overall discussion we talked

20   about a lot of different things.  That allegation might

21   have come up, but, again, it's not part of my scope.

22   Q.      Okay.  Do you remember the allegation coming

23   up?

24   A.      No.

1   Q.      We just went through quite a while talking

2   about Universal, whether or not they were able to

3   install panels at a certain time, whether or not they

4   were ready to put other panels in a different location,

5   that kind of thing.  What were the problems with phase

6   two and Tri-Krete?

7   A.      The same basic problems, producing panels and

8   installing panels.  Again, I didn't get into any of the

9   entitlement on that one either.

10  Q.      Was Tri-Krete able to start installation of

11  their panels on the day that the original schedule

12  called for them to do so?

13  A.      I don't believe so.

14  Q.      Why were they not?

15  A.      The building wasn't ready.

16  Q.      Were the problems that caused the building not

17  to be ready on phase two the same types of problems

18  that caused it not to be ready on phase one?

19  A.      I don't think I got into that detail, but I

20  don't recall either way.

21  Q.      Do you recall how many days late it was?

22  A.      I don't.  I'd have to look at the report.

23  Q.      When they did hang, Tri-Krete hung their first

24  panels, at that point were all the panels produced and

1    ready for installation?

2    A.      I don't remember.  I'd have to look at the

3    report, the analysis.

4    Q.      Well, were they late in production?

5    A.      I think they were.

6    Q.      How long ago did you testify in the mediation?

7    A.      Year.

8    Q.      Was it a year ago that they had the mediation?

9    A.      Something like that, yeah.  Well, it was a

10   while ago.

11   Q.      You don't remember whether or not they were --

12   A.      I don't remember the specifics.

13   Q.      All right.  Did Tri-Krete make any claims with

14   regard to why they were late?

15   A.      Probably.

16   Q.      What were the claims they made?

17   A.      I don't recall.

18   Q.      You didn't take that into consideration?

19   A.      No.

20   Q.      Why not, for the same reasons you didn't take

21   into consideration the reasons why Universal was late?

22   A.      It wasn't part of my scope to analyze or defend

23   or opine on why Tri-Krete or Universal could be right

24   or wrong.  That was not my task.  My task was to

1   quantify the delay on the project.

2   Q.      Did you include damages, a damages calculation

3   in your report that you used in the Tri-Krete

4   mediation?

5   A.      Probably.

6   Q.      When you testified in the Tri-Krete mediation,

7   were you asked questions like the questions I was

8   asking you today about other subcontractors causing

9   delay?

10  A.      Probably.

11  Q.      Do you remember how you answered?

12  A.      The same way I answered it here.  I didn't

13  analyze the specifics of the delays that precluded the

14  panel contractor from starting its work and then when

15  the panel work began.  I've looked at the overall

16  project and see whether I saw any subcontractor delays

17  that might have contributed to the delay.

18  Q.      Once Tri-Krete started installation, did they

19  then later complain that they were unable to complete

20  installation as a result of other subcontractors or

21  design flaws?

22  A.      Don't recall.

23  Q.      You don't remember whether or not you were

24  questioned about that when you testified within the

1   last year?

2   A.      I don't recall specifically if I was asked that

3   question.

4   Q.      Well, instead of specifically that question,

5   any questions regarding whether or not there were

6   complaints about other subcontractors?

7   A.      Well, if that kind of subject came up just like

8   the architect or any of these other things that you're

9   bringing up, it wasn't me that would answer that

10  question.  It was the Pike people or the architect at

11  the mediation that would answer the questions because

12  they lived it.  They were there.  They know what

13  happened.

14  Q.      Were you there for the mediation?

15  A.      I was.

16  Q.      For more than just your testimony?

17  A.      I was there for the full mediation, yes.

18  Q.      So did you observe the testimony of others?

19  A.      I did.

20  Q.      Was the architect questioned by the attorneys

21  representing Tri-Krete?

22  A.      I don't recall whether there were direct

23  questions or they were there as support to support the

24  Pike people when they were answering questions.  I

```
 1   don't remember exactly how that went down because I
 2   attended both of them and the facts get confused
 3   because the buildings are so similar and the
 4   characters, the players are the same.
 5   Q.      When you say both of them, what do you mean
 6   both of them?
 7   A.      Well, Pike built both of them and they were
 8   both precast issues so you sometimes because they are
 9   so close and they are so similar you, I have to be
10   careful that I don't mix up the facts on both projects.
11   Q.      Okay.  But in both cases it was the precast
12   according to your analysis, it was the precast
13   contractor producer that caused the delays in the
14   project?
15   A.      They caused, they caused delay on the project,
16   yes.
17   Q.      Okay.  And in both instances you were, we
18   clarified this testimony before, in the phase two you
19   were hired to determine what delays were attributable
20   to Tri-Krete; is that correct?
21   A.      Tri-Krete and Pike.
22   Q.      And Pike?
23   A.      Uh-hum.
24   Q.      And that is because Pike was litigating with
```

```
 1   Tri-Krete over both contract payments and back charges
 2   and other costs that were caused by delay, correct?
 3   A.      They had a dispute with the panel contractor,
 4   yes.
 5   Q.      Okay.  But if we know that there were delays,
 6   for example, in the Tri-Krete case caused by the other
 7   contractors that caused Tri-Krete to start late, why
 8   weren't you or why wasn't Pike concerned about making
 9   sure that those subcontractors that caused the delay
10   were responsible for the delays?
11   A.      I don't understand your question.  You got to
12   rephrase that one.
13   Q.      Sorry.  We'll talk about Tri-Krete's case
14   first, phase two, since that's the one you started on
15   first.
16           You were hired to determine what delays
17   were caused by Tri-Krete and what delays were caused by
18   Pike?
19   A.      Uh-hum.
20   Q.      I believe you said before when you used the
21   term Pike in that instance you were referring to Pike
22   or any of the subcontractors hired by Pike?
23   A.      Sure, because most of the work is done by
24   subcontractors.  Pike I don't think self-performed very
```

```
 1    much of anything so yeah, it's always the

 2    subcontractors.

 3    Q.      But wasn't Tri-Krete also a subcontractor?

 4    A.      Yes.

 5    Q.      Okay.  So you did that analysis and you

 6    determined that Pike or sorry, Tri-Krete was not able

 7    to start on time as a result of other subcontractor's

 8    errors?

 9    A.      They were not able to start on time because the

10    building wasn't there, correct.

11    Q.      Okay.  So are you aware then what Pike did with

12    regard to those other subcontractors other than

13    Tri-Krete that caused delays in the project?

14    A.      Am I aware that Pike did what?

15    Q.      Whether or not they took any action against

16    those other subcontractors that caused those delays

17    that you determined Tri-Krete's ability to start on

18    time?

19    A.      I do not know that.

20    Q.      You work with Pike a lot?

21    A.      I do.

22    Q.      Do you know what they do in other instances?

23    A.      You'd have to ask Pike.  Every project is

24    different.
```

```
1    Q.      The thing that I don't understand is why does,

2    in those instances where you've identified delays of

3    over 40 days on, caused by either the architect or

4    certain subcontractors and then you identified delays

5    caused by Tri-Krete, why is it only Tri-Krete that Pike

6    back-charged and not any of those other subcontractors?

7    A.      I don't know.  You'd have to ask Pike.

8    Q.      You weren't involved in any of those

9    discussions?

10   A.      No.

11   Q.      And did you advise Pike?

12   A.      On what?

13   Q.      On issues relating to the project and timing.

14   A.      I'm not sure I understand the question.

15   Q.      Do you advise Pike as to your findings outside

16   of in this case Universal Concrete and in the Tri-Krete

17   case Tri-Krete?

18   A.      In this case, no.

19   Q.      Okay.  Back to those original delays related to

20   the structural steel and the concrete, the slab on

21   grade, I'll go just to the slab on grade first because

22   we didn't really talk about that yet, were you aware of

23   any delays with regard to that?

24   A.      I think there was a slab on grade delay in one
```

1  of the phases.  I don't recall which one.

2  Q.     Okay.

3  A.     One of those instances where the facts can move

4  back and forth between buildings.

5  Q.     And how do those delays affect the rest -- so

6  we have the structural steel delay and we think may

7  have had slab on grade delays.  How do they affect the

8  labor activities in the project?

9  A.     Well, first of all, let me correct you.  You

10  keep using the term structural steel.  For some reason

11  you're focusing on that contractor.  I did not identify

12  specific subcontractor delays that delayed Universal.

13  It doesn't matter.  What matters for the analysis is

14  that Universal couldn't start their panel installation

15  until the building was there so it doesn't matter who

16  caused the delay.  It matters that we don't charge

17  Universal for it because you can't, that kind of thing,

18  so that's why the, I approached it that way.  The slab

19  on grade issue was part of the analysis that would

20  include any of the structural delays that prevented the

21  contractor from moving forward.

22  Q.     All right.  Was there a stacking of activities

23  contemplated in the baseline schedule?

24  A.     Stacking of what activities?

1    Q.       Any different subcontractor activities, meaning

2    was there supposed to be, that time line have multiple

3    parallel or were there multiple parallel time lines

4    where you would have certain contractors doing things

5    at the same time?

6    A.       I'm sure there are.

7    Q.       All right.  And do you know which ones were

8    supposed to be occurring at the same time?

9    A.       I don't.

10   Q.       Were there any stacked or parallel activities

11   that were to be going on at the time that Universal was

12   installing their panels?

13   A.       Yeah.  As I said before, once the structure was

14   up when Universal was installing panels Pike could get

15   into the building and start to do what they call

16   rough-in work, rough-in MEP.

17   Q.       Anything else that was supposed to be going on?

18   A.       Stud work could start, some of it.

19   Q.       What about any work on the structure itself?

20   A.       The -- my answer was based upon the structure

21   basically being in place, that the steel, the precast,

22   anything that would allow the workers to get up on the

23   floors and start their interior rough-in work.

24   Q.       You mentioned that we were dealing with

1    building A's three wings?

2    A.        Correct.

3    Q.        And you determined that the structure was

4    complete and ready to have all the panels hung on a

5    particular date.  I may be naive in asking the

6    question, but with those three wings, why couldn't

7    Universal have started hanging panels on one of those

8    wings while the other two were being completed?

9    A.        Well, if I look at the schedule, it basically

10   shows, talk about building A, of course, that the wall

11   panels again were starting on November 2nd.  The

12   structural steel is more than 50 percent complete so

13   that's exactly the way it would happen.  They would

14   move from wing to wing to wing and the steel would be

15   put in place and get out far enough ahead because the

16   steel takes longer than panels so you want to make sure

17   that your steel contractor is out far enough ahead.

18   Q.        I misunderstood.  Before when I was asking

19   those questions, I was under the impression that you

20   said on whatever that date was, December 16, the entire

21   structure of building A was complete and that Universal

22   could hang all panels immediately.  Was that not the

23   case?

24   A.        No.  The south wing was complete so they could

1  work on the south wing.  That was the plan, to do the

2  south wing first.

3  Q.      And the entire south wing was complete?

4  A.      It appears to be, correct.

5  Q.      Okay.  Is there a phasing between -- so how is

6  the south wing connected to the two other wings?

7  A.      Well, again, if you look at the -- well,

8  clarify your question.  What do you mean how is that

9  connected?

10  Q.      How do you differentiate the end of the south

11  wing versus the end of either the other two wings?

12  A.      Well, if you look at the footprint in enclosure

13  number five, it lays it out and when Pike puts their

14  schedule together they called it south wing, north

15  wing, east wing and they would use a column line or

16  something to differentiate the pieces for scheduling

17  purposes.

18  Q.      Okay.  So when you said that the structure was

19  complete, you meant on December 16th all the structure

20  of the south wing to that column was complete?

21  A.      That's my understanding.

22  Q.      And then when was -- what was the next wing to

23  be, to have panels hung by Universal?

24  A.      On plan schedule it was the east wing.

1    Q.      And when was the east wing complete?

2    A.      I don't have that, the detail in my as-built,

3    but the as-built shows that the precast, I'm sorry,

4    that the structural steel was about 70 percent complete

5    on the south as a total and the last piece was, took

6    about another four weeks which is very similar to what

7    the plan was, so the structural steel moved ahead and

8    it was the initial delay that impacted Universal, but

9    the steel was able to be completed and the rest of the

10   structure be put up.  That's my understanding.

11   Q.      So was the east wing structure ready for

12   Universal on the date it was supposed to be?

13   A.      When it was supposed to be, no, but it was

14   ready based upon the initial delay in the north wing.

15   Q.      So the exact same amount of time elapsed as was

16   originally planned from the beginning of Universal's

17   installation to the date when the east wing should have

18   been ready?

19   A.      My understanding is that once the structure was

20   in place for the south wing, the structure, if you look

21   at the sequence of the work, the remaining steel would

22   become available on time to allow Universal to erect

23   the panels.

24   Q.      So do you know whether or not Universal was

1    ready to begin installing panels on the east wing the

2    day that it was originally planned to be ready?

3    A.      Sure, they'd be ready for it because under the

4    plan all the panels were available before any

5    installation started.

6    Q.      But that building wasn't ready on time either?

7    A.      On an as-built basis.  On an actual -- you

8    asked on an as-planned basis.

9    Q.      What about on an as-built basis?

10   A.      Yeah.  The structure was available -- after the

11   44 calendar day delay, my understanding is that the

12   structure was available from that point forward for the

13   panels to be put on the building.  They weren't

14   available, of course, but the building was available.

15   Q.      The wing was available?

16   A.      Uh-hum.

17   Q.      44 days after it was originally?

18   A.      You misunderstood me.

19   Q.      Yeah.

20   A.      There was a 44-calendar delay in the start of

21   the panels.  That's because the structure moved out 44

22   days, so when you delay the north wing, the first area

23   it delays everything by 44 days.  If you look at the

24   plan of installing panels in the south wing, then going

1    to the east wing and then going to the north wing as it

2    was scheduled, when you take into account the start of

3    the panels on December 16th and you look at how the

4    steel was completed, the steel would have been in place

5    to accept the panels based upon the way the job was

6    built.

7    Q.        But also 44 days later than --

8    A.        Absolutely.  Everything moves 44 days, correct.

9    Correct.

10   Q.        Do you know, we were talking about the idea of

11   stacking of activities or parallel activities.  Do you

12   know whether or not all the other subcontractors or

13   Pike complied with the schedule with regard to the

14   activities that were supposed to be going on at the

15   same time as Universal's assembly or installation?

16   A.        I didn't do any kind of specific analysis like

17   that, no.

18   Q.        Is there anything that could have been

19   occurring parallel to Universal's installation that

20   could have caused them any delay?

21   A.        I didn't see anything.  I saw that if you look

22   at the as-built schedule as soon as the building was

23   available, as they planned they got into the building

24   and they started their MEP work and some of their

1    limited stud work, but they followed the schedule so I

2    didn't see anything that would have caused additional

3    delay.

4    Q.      Okay.  Now, directing your attention to the

5    roofing, were there any issues with the roof trusses

6    and with the non-bearing sheathing?

7    A.      There could have been.  I remember reading

8    something about there was some issues on the roof.

9    Q.      Okay.  And when in sequence in comparison to

10   Universal's hanging of panels was, were those roof

11   trusses to be installed?

12   A.      The roof, the roof goes on.  The trusses are

13   part of the steel erection.  The roofing system, if

14   you're asking about that, goes on after the panels.

15   Q.      After the panel?

16   A.      After the panels.

17   Q.      And when were the -- let me ask you, what were

18   the problems with the roof trusses?

19   A.      I didn't get into that.

20   Q.      Well, what if the issues with the, with those

21   roof trusses impacted Universal's ability to hang the

22   top level panels?

23   A.      Then there might have been an issue.  I don't

24   know.  I didn't analysis that.

1    Q.      But if that would have been the case, wouldn't
2    that have affected the amount for the number of days
3    that you charged to Universal for delays?
4    A.      Not necessarily because there, if there's a
5    problem up there, the question is how did they deal
6    with the problem, were they able to work around the
7    problem, were they able to make modifications and the
8    key thing is what delayed Pike's ability to put the
9    roof on and to make the building tight.  That's the key
10   issue.
11   Q.      What was it?
12   A.      They couldn't put, finish the roof because the
13   panels were there.
14   Q.      But if your panels weren't there because they
15   couldn't be placed because of a problem with the roof
16   trusses, then shouldn't that portion of the delay be
17   charged to the contractor that was responsible for
18   those roof trusses?
19   A.      If that occurred, but I don't know that it
20   occurred.
21   Q.      But you wrote a report for litigation that
22   attributes all this delay to Universal.  You didn't
23   think that it was appropriate to investigate whether or
24   not they were actually responsible for that delay?

1  A.      Again, I did not, I was not charged on

2  analyzing the entitlement.  My analysis quantifies the

3  delays caused by Universal.

4  Q.      I understand what you're saying, that you are,

5  made a determination as to when the last panel was

6  installed?

7  A.      Uh-hum.

8  Q.      And that how many days that caused the next

9  thing to be delayed?

10  A.      Uh-hum.

11  Q.      Without regard to why the last paneling was not

12  installed until that date?

13  A.      Correct.

14  Q.      Okay.  Now, in the context of roof trusses,

15  what are the tails?

16  A.      I did not get into the analysis of the roof

17  trusses so I can't answer your question.

18  Q.      Well, in general, you have expertise in

19  construction and do you know what a tail is?

20  A.      I read something about what the tails are,

21  something to do with the connections and to the system.

22  I'd have to look at the drawings.

23  Q.      I don't mean just in this case, is the word

24  tail as it relates to roof trusses a common term of art

96

1    within the construction industry?

2    A.       It might be.  I'm not a structural steel

3    expert.

4    Q.       All right.  So you don't know whether or not it

5    was necessary to remove the tails that had originally

6    been installed?

7    A.       I didn't do that kind of analysis.

8    Q.       I understand.  I'm just going to go through my

9    questions.

10   A.       I got you, no problem.

11   Q.       Just answer no or I didn't review that.

12   A.       Right.

13   Q.       I understand that you may have already answered

14   that question in some other way, so I'm not trying to

15   antagonize you.

16   A.       Understood.

17   Q.       You just answer and I'll ask the questions,

18   then I'll get through my list and then we can go home.

19   A.       All right.  That's good.  That sounds like a

20   plan.

21   Q.       And so was it planned that the tails would need

22   to be removed?

23   A.       Didn't get into that analysis.

24   Q.       And if it wasn't planned, then why was it done

1   and how much time was involved?

2   A.      Didn't get into that analysis.

3   Q.      You may have reviewed this.  This is a little

4   bit different.  Was the roofer directed to permit an

5   overhang of the ice and water shield for additional

6   weather protection?

7   A.      Don't know.

8   Q.      If the roofer had been able to do that, would

9   that have mitigated weather infiltration?

10  A.      I don't know.

11  Q.      In a general situation, not when you review

12  this project, but do you know what an overhang of an

13  ice and water shield is, what that would mean on a

14  building?

15  A.      I understand that roofing contractors can do

16  certain things to mitigate delays to the roof and try

17  to get the building tight as possible.

18  Q.      Okay.  And if they would do some of those

19  things that are intended to mitigate weather

20  infiltration, is it your understanding that those

21  generally are effective?

22  A.      Sometimes they are, sometimes they are not.

23  Even though you try to do all these remedial things,

24  you still get water infiltration.

```
 1   Q.      Did you review the RFI file?
 2   A.      No.
 3   Q.      Why didn't you review that?
 4   A.      I did not, it wasn't my task to investigate the
 5   impact of RFIs in the entitlement regarding that.
 6   Q.      Now, Pike is charging Universal for all of the
 7   weather protection that was installed on the site.  Are
 8   you aware of that?
 9   A.      No.
10   Q.      You didn't review those damages?
11   A.      I was not involved in any of the damages.
12   Q.      Actually, a question I wanted to call your
13   attention to a second.  Page four of your new report,
14   first paragraph or the paragraph labeled introduction,
15   can you just read the last two sentences beginning with
16   Pike has provided?
17   A.      Pike has provided WHI with a tabulation of
18   Pike's and subcontractors' damages resulting from
19   delays caused by UCP.  These damages are included in
20   this report.
21   Q.      Are they included in the report?
22   A.      No.  That line should have been taken out when
23   we modified the report from the mediation report to an
24   expert report.
```

```
 1   Q.      Okay.  Now, even though they were not included
 2   in your report, they were included in your mediation
 3   report?
 4   A.      They were.
 5   Q.      So did you review them in conjunction with the
 6   preparation of the mediation report?
 7   A.      Did not.
 8   Q.      Why not?
 9   A.      I wasn't asked to.
10   Q.      So you don't have any opinion as to whether or
11   not any of those damages actually resulted from any of
12   these delays?
13   A.      Correct.
14   Q.      Or who was responsible for the delays and the
15   resulting damages?
16   A.      Correct.
17   Q.      So are you aware that Pike employees or other
18   subcontractors performed what I call a dry-in or
19   weatherproofing of the site, of the buildings?
20   A.      My understanding is they tried to dry-in the
21   building as soon as possible.
22   Q.      Are you familiar with whether they did a good
23   job drying it in?
24   A.      I didn't analyze whether they did or not.
```

```
 1    Q.      And are you aware that they were required to go

 2    back and redo a considerable portion of their work

 3    because it was faulty?

 4    A.      I didn't do that analysis.

 5    Q.      Were you aware of it?

 6    A.      I'm not aware of anything related to that.

 7    Q.      Okay.  And so you didn't modify any of the

 8    damages as a result of the work that had to be

 9    performed twice due to their own errors?

10    A.      I couldn't modify the damages because I had

11    nothing to do with the damages.

12    Q.      Did you ever have a case like this where you

13    are involved in calculating the damages that result,

14    that are the consequence of the delays?

15    A.      Yes.

16    Q.      When is the last time you did that?

17    A.      Within the last year or so probably on a few

18    projects.

19    Q.      Did you do that in the Tri-Krete matter?

20    A.      No.

21    Q.      You didn't have anything to do with those

22    damages?

23    A.      No.

24    Q.      If you were in a situation where you were
```

1    preparing damages and the request from the client was

2    that you include damages for all of the dry-in work and

3    you were made aware of that a large portion of the

4    dry-in work had to be done twice because of the failure

5    of the contractor that was doing the dry-in, would you

6    still charge that second portion of work to the

7    contractor that you believe caused the initial delay or

8    would you remove that?

9    A.       I don't know because you've got a hypothetical

10   there.  You have to look at the issue.  You have to

11   look at the contract.  You'd have to look at why it was

12   done the first, the second time.  There's a lot of

13   issues there that you'd have to take into account

14   before you make a determination of where you charge

15   damages.

16   Q.       Well, let's say it's just like I said.  I know

17   it's hypothetical, but you being an expert you're

18   permitted to opine and ask a hypothetical question.  So

19   let's say the contractor comes in to weatherproof the

20   building and we all agree that it has to be

21   weatherproofed because of contractor A and they

22   weatherproof the building, and then turns out that they

23   didn't do it right through no one's fault but the

24   individual who did the weatherproofing.  In that

```
 1   instance, would you still charge the entire cost of
 2   both efforts at weatherproofing to the contractor that
 3   originally caused the delay?
 4   A.      Even though I'm an expert as you say, I've been
 5   doing this for over 40 years, I've learned very early
 6   that I don't react to hypotheticals because there's too
 7   many variables.  I'd have to look at the contractors,
 8   the contracts, what everybody is doing before I can
 9   determine whether I should charge somebody for
10   something so I can't answer your question.
11   Q.      Well, when you determined that Universal caused
12   all of these delays, did you look at what everyone else
13   was doing and the contracts before you attributed all
14   of this delay to Universal?
15   A.      I, my analysis shows that Universal did not
16   perform per their contract schedule and that's what my
17   analysis is based upon.  What is in the contract and
18   other things going on doesn't matter.  Universal still
19   did not perform and as we said before, why,
20   entitlement, I did not get into.
21   Q.      Okay.  All right.  Do you know whether or not
22   the weather protection plan by Pike was submitted for
23   review and approval by the owner prior to beginning the
24   work?
```

```
 1    A.       I don't know.

 2    Q.       All right.  Did you review meeting minutes for

 3    the job, any meetings that were conducted with Pike,

 4    with Pike and the owner, with Pike and the

 5    subcontractors, between any of the subcontractors or

 6    anything on the site?

 7    A.       I don't believe so.

 8    Q.       And why didn't you do that?

 9    A.       Wasn't part of my scope.

10    Q.       Wouldn't information about what delays were

11    mentioned during meeting minutes help you to analyze

12    the cause of delays?

13    A.       If I was doing entitlement, yes, but I wasn't.

14    That was not part of my charge here.

15    Q.       How about any other meetings like a change

16    order meetings or anything like that, you also didn't

17    review any of that information?

18    A.       Did not.

19    Q.       For the same reason, it didn't affect your

20    scope?

21    A.       Correct.

22    Q.       All right.  What about look-ahead schedules?

23    A.       I did not.

24    Q.       But couldn't they have assisted you in
```

1  determining the things like when the delays were, when

2  someone was made aware of the delays, that kind of

3  thing?

4  A.     It didn't affect my analysis because my

5  analysis is based on a methodology of comparing the

6  as-plan to the as-built.  A look-ahead schedule is a

7  projection during the job which people, the contractor

8  is saying I think I can do this, I think I can do that.

9  My analysis isn't based upon what they thought they can

10 do, it's based upon what actually happened which is the

11 as-built.

12 Q.     Okay.  But that, the as-planned is that

13 schedule that is not included in the report, correct?

14 A.     It's not an enclosure of the report, but it's

15 part of my report.

16 Q.     How is it part of your report?

17 A.     It's referred to.  It's used as a basis for my

18 analysis as you've mentioned.

19 Q.     Okay.  And we didn't -- we were talking -- off

20 the record for a minute now.

21             (Discussion off the record.)

22 BY MR. McNELLY:

23 Q.     Did you review any third-party inspection

24 reports?

```
 1    A.      No.
 2    Q.      Do you know whether or not any inspections were
 3    required?
 4    A.      No.
 5    Q.      Do you know whether or not the failure to
 6    conduct inspections caused any delays?
 7    A.      No.
 8    Q.      Do you know whether the failure of any work
 9    from any other subcontractors during the installation
10    process by Universal Concrete caused any delays?
11    A.      I did look at the other contractor work that
12    occurred during the installation of Universal's work.
13    I did not see any delays caused by other contractors.
14    Q.      Why were you looking for that?
15    A.      For the issue of concurrent delay.
16    Q.      Okay.  I'll ask you that question again.  That
17    term may have gone past me, if it was mentioned before.
18    Did you determine that not just with regard to
19    inspections or failing inspections, but in any case was
20    there any other concurrent delay after Universal
21    started their installation of panels?
22    A.      I determined that I did not see any other
23    concurrent delay.
24    Q.      Of any kind?
```

```
1    A.       Correct.

2    Q.       So I had a note here which may be incorrect.   I

3    had a note here that said building A was completed to a

4    point to permit Universal Concrete Products to begin

5    erection of panels on November 2nd, 2015, but I think

6    that we've been talking about it actually being ready

7    on December 16th?

8    A.       Correct.

9    Q.       So it was December 16th?

10   A.       Yeah.  Let me check real quick.  I believe

11   you're right, building A December 16th.

12   Q.       Okay.  And then I have also a note that it took

13   75 days to erect the panels in building A?

14   A.       No.

15   Q.       What do you have there?

16   A.       It took 155 calendar days to erect the panels

17   in building A.

18   Q.       So when -- how many days should it have taken?

19   A.       It should have taken 75 calendar days.

20   Q.       So 75 calendar days.

21   A.       If you subtract those two numbers, that's how I

22   got the 80 calendar days of delay.

23   Q.       So from December 16th to 75 calendar days

24   without, where would that put us?  I had a calculation
```

```
 1    on date, but I had the date wrong.  I had November 19th
 2    as the, sorry, November 2nd as the start date.
 3    A.      I would say within a day or so, March 1st.
 4    Q.      March 1st.  It should have been done on March
 5    1st?
 6    A.      Correct.
 7    Q.      Now, Universal is being charged by Pike for all
 8    of the weatherproofing that occurred after the
 9    construction of the erection of the panels so when did
10    they actually finish the panels?
11    A.      Building A?
12    Q.      Yeah.
13    A.      May 19th.
14    Q.      So when was it necessary to install the
15    weatherproofing?
16    A.      I don't know.  I didn't do that analysis.
17    Q.      You didn't?
18    A.      I did not.
19    Q.      Not at all?
20    A.      Did not.
21    Q.      You don't know why the weatherproofing was
22    required, do you?
23    A.      No.
24    Q.      And then I assume that you did not investigate
```

1   at all the issues with installing the roof after the,

2   it was ready for the panels?

3   A.      I did not investigate the installation of the

4   roof, no.

5   Q.      Are you familiar with the delivering and/or

6   installation of concrete stairs by another contractor?

7   A.      No.

8   Q.      Did you ever hear or read anything about the

9   concrete stairs in building A being delivered late?

10  A.      Don't recall, and if I did, it wouldn't have

11  been an issue because it's normally not a critical path

12  item.

13  Q.      It's not?

14  A.      It's not.

15  Q.      So what if Universal couldn't install panels

16  because the concrete stairs weren't there and needed to

17  be installed?

18  A.      What about it?  Is that a question?

19  Q.      Yeah.  Would that delay Universal?

20  A.      Not necessarily.

21  Q.      Why not?

22  A.      Well, it depends on how they're erecting the

23  panels.  If they are erecting the panels with a crane

24  outside, they do have to get up on the decks, but if

1    there's no stairs, they usually use ladders.

2    Q.      But how do you get these -- when I'm talking

3    about the concrete stairs, I'm talking about prefab

4    stairs, multiple stories that are brought in intact as

5    concrete.  If the panels, if Universal puts the panels

6    up, how are you going to get the stairs?

7    A.      I'm sorry.  I misunderstood.

8    Q.      I didn't make it clear.

9    A.      I thought you were talking ingress, egress.

10   Q.      No.  I'm talking not stairs for the purpose of

11   installing panels or working, but a structural item

12   that's inside the steel.

13   A.      Once, again, I'm answering on a very general

14   basis because I'm not familiar with the detail, but

15   what could happen possibly is leave the roof out by the

16   stair and drop them in from outside.

17   Q.      So then you couldn't put the roof in in that

18   area?

19   A.      You couldn't put the roof in, but you could put

20   the panels up and put the stairs in later possibly.  I

21   don't know.  I'd have to look at the detail.

22   Q.      You didn't investigate whether or not that

23   occurred or what the ramifications?

24   A.      I read that that probably occurred that way,

```
 1    the stairs were popped in from top.
 2    Q.      Is that what happened, they were popped in from
 3    the top?
 4    A.      I think so.
 5    Q.      Did you find out what kind of delay that caused
 6    the roof installation?
 7    A.      It probably wouldn't -- again, I'm talking very
 8    general terms.  It probably wouldn't have caused much
 9    of a delay, if any, because the bulk of the work is on
10    the interior of the building, not the stairs so even if
11    the roof was left off and there was some delay in the
12    stairway, there's very, very little finish work in the
13    stairway.  The finish work is in the bulk of the --
14    Q.      You mean just leave the roof off right in the
15    area of the stairway?
16    A.      Yes.
17    Q.      But doesn't it have steel beams as rafters that
18    go all the way across the entire span?
19    A.      I don't know.  I didn't do that analysis.
20    Q.      If it did, would not that cause more than just
21    the area around the stairway to have to be left off?
22    A.      Not necessarily.  You can maybe modify the roof
23    and put that last piece of roof in later.  I don't
24    know.  Again, we're talking hypotheticals.
```

```
1    Q.       But they actually were late.

2    A.       Yeah, but I didn't do the analysis on this

3    project to see what the impact would be.  My gut

4    feeling is that it wouldn't have an impact because the

5    critical path would not go through the stairway.  It's

6    going to go through the interior building.

7    Q.       If you did have to leave the portion of the

8    roof off, would they have to install a temporary

9    weather protection at least in that area?

10   A.       It depends on whether they are going to do any

11   work underneath it.  They could hold off until the

12   roof, the permanent roof was on and then do the finish

13   work after that because if it's not in the critical

14   path, they probably had plenty of time to do the

15   stairway work.

16   Q.       All right.  But don't you have to weatherproof

17   the area of the stairway from the rest of the building

18   that you're doing finish work in?

19   A.       It depends on the detail of the project.  They

20   might have been able to put a stud wall up and put

21   drywall on it to protect it.  I don't know.  You'd have

22   to look at the plans.

23   Q.       Was that part of the plans?

24   A.       I have no idea.
```

1    Q.       Are you aware of any design changes that

2    occurred after the beginning of the project?

3    A.       I'm aware that there was some design changes on

4    the brick on the panels.

5    Q.       And what were those design changes?

6    A.       I don't have any specifics on it.  I know that

7    there was an issue with brick and design and the impact

8    of some of the panels.

9    Q.       How did that affect the baseline schedule?

10   A.       I'm not sure I understand your question.  How

11   did it affect the baseline?  When the baseline is put

12   together those problems don't exist.

13   Q.       Right.  So once they made those changes to the

14   design, would that have an effect on the ability to

15   complete the schedule as per the baseline?

16   A.       Not necessarily.  It depends on how many, where

17   the design change is, how many panels were affected,

18   and whether they were able to work around the problem

19   in the field.

20   Q.       I understand in a hypothetical situation it may

21   not affect it.  You could have changes to the design

22   that don't affect it, but in this case how is it

23   affected?

24   A.       I didn't do an analysis of the design impact.

1   It's part of entitlement.

2   Q.      Well, couldn't that delay when the building was

3   ready for Universal?

4   A.      Only if the design, the design changes you're

5   talking about which I didn't analysis, but design

6   change impacted Universal's ability to do panel work on

7   the critical path, it might, but if it didn't --

8   Q.      You didn't analyze that?

9   A.      I did not analyze that.

10  Q.      So it could have affected Universal's ability

11  to perform all the critical path items on the timeline,

12  you just don't know?

13  A.      Well, from the limited information that I have,

14  the design changes on that brick was a small percentage

15  of the overall panels and even if they did, the design

16  change impacted those panels, the other larger part of

17  the panels which weren't produced in a timely manner

18  took months and months to produce, I believe that the

19  critical path would go through those panels, not the

20  design change panel.

21  Q.      So you did analyze it?

22  A.      Only on a very superficial basis.  I didn't get

23  into the panel by panel detail, but understanding the

24  issue I don't believe that was a critical path driving

1   factor.

2   Q.      But it could have been?

3   A.      I don't know.  I didn't do that analysis.

4   Q.      That's what I'm saying.

5   A.      Not in that detail.

6   Q.      That's what strikes me as odd, that you

7   identified an issue that in some instances could be a

8   critical path issue, but you didn't investigate as to

9   whether or not it was?

10  A.      Well, based upon the information that I had, my

11  understanding is that and I'm going from memory here

12  the amount of panels being impacted was somewhere

13  around 10 percent so if that's the case, then 90

14  percent of the panels weren't and when you look at my

15  analysis showing that the magnitude of the delay on the

16  overall panels, I don't believe that that would be a

17  controlling delay of the project.

18  Q.      Are you aware that some panels need to be

19  installed in a particular order to allow for the

20  remainder of the panels to be installed or to allow for

21  other panels to be installed?

22  A.      I'm not aware of any specific order.  I

23  understood that the design allows you to install the

24  panels randomly on the building.

1  Q.      Well, what if you found out that wasn't the

2  case, that they couldn't be installed randomly, for

3  example, they had to be installed from the bottom to

4  the top?

5  A.      That's on phase two.  That was a design issue.

6  Not design issue, that was a prerequisite in phase two,

7  but not in phase one.

8  Q.      So you're sure that the panels could be

9  installed randomly?

10  A.      That'S my understanding.  They are supported

11  by the structural steel.  They are not stacked like in

12  phase two.

13  Q.      And if you were to find out that that wasn't

14  the case, would that change your --

15  A.      Well, I don't have to find out.  It is the

16  case.  I've discussed that numerous times with Pike.

17  Q.      So any panel could be installed at any location

18  at any time?

19  A.      Within reason.  There could be a situation

20  where one might affect the other, but generally

21  speaking, my understanding is they are supported off

22  the steel so they can be put in any order that

23  Universal wants to because it's not a prerequisite like

24  phase two.

1    Q.      Asked a little bit about this before, but what

2    happens if you find that there's an error in the size

3    of the structure and you determine that you modify that

4    and you go and you move to another part of that same

5    building and start randomly applying panels and then it

6    turns out that because of that error in size the other

7    panels that you've installed no longer are in the

8    proper place either, no longer fit.  Is that a concern

9    before you go around and start installing panels in

10   other locations?

11   A.      Again, it's a question as hypothetical to me

12   because I didn't analyze that, in that detail that kind

13   of a situation.  I don't know whether that is

14   applicable to this project.

15   Q.      But wouldn't that be considered a concurrent

16   delay?

17   A.      Not necessarily because you could have an issue

18   as you described where you go to put the panel on and

19   it affects other panels, but if the panels were

20   available for the wing or for the building as planned

21   and you isolate the problem, then while you're fixing

22   that problem in the field you could be erecting all the

23   other panels if you had them.

24   Q.      But don't you first have to determine that that

1    issue isn't going to affect the placement of the rest

2    of the panels?

3    A.      Could be some analysis to be done to see what

4    the impact is on the other panels, sure.

5    Q.      And how long would that take?

6    A.      I have no idea.

7    Q.      Wouldn't that be concurrent delay?

8    A.      No, not as the true definition of a concurrent

9    delay.

10   Q.      What's the definition of a concurrent delay?

11   A.      Concurrent delay is when two delays equally

12   delay the project completion and if you take one of

13   them out, the other one is still delaying the project

14   and as I used the example numerous times in the

15   deposition that you have a field situation that you

16   have to, you can't erect a panel or you have to modify

17   a panel, if you're dealing with that problem and it

18   takes an hour or it takes a day or it takes two days,

19   but you have 20 days of panel installation in the

20   building, I'm saying that you would move off of that

21   panel and move to another panel and the critical path,

22   the longer path would go to the installation of the

23   panels not affected then from that one issue.

24   Q.      So there should be no delay at all when you

```
 1    discover an error in design or an error in the
 2    structure?
 3    A.      Well, not -- you'd have to analyze that if,
 4    give you a hypothetical.  If the delay took you two
 5    months to fix and the panels were only going to take 20
 6    days, then that might delay the project.
 7    Q.      Yeah, I guess it would.
 8    A.      But if the fix is only going to take an hour or
 9    a day and you've got a lot of other work to be done on
10    the critical path, it wouldn't delay it.
11    Q.      What if it takes two days?
12    A.      Again, it's not going to be a critical path
13    item because you've got the panel installation, the
14    panels that are not impacted by the change or by the
15    issue take a lot longer.  That's what makes it critical
16    versus the fix being a non-critical.
17    Q.      How many days makes it critical?
18    A.      It depends on the schedule.  It depends on
19    where the delay is occurring.
20    Q.      What about in this schedule, how many days
21    would it have needed to delay them until it became
22    critical?
23    A.      Well, again, as I said, I didn't do a detailed
24    analysis, but we weren't -- I spoke with Pike about
```

1    issues that occurred during the installation and sure,

2    as with any panel installation you're going to have

3    some issues where things might not fit, metal or

4    whatever.  It's not unusual in the construction

5    business.  They did not indicate to me based upon their

6    understanding of what occurred on this project that

7    there was issues like that that affected big parts of

8    the building or took very long to fix.  The fix was

9    done pretty quickly.

10   Q.     So all the information that you have that leads

11   you to determine that it was not a critical path, none

12   of these things caused critical path delays come from

13   Pike?

14   A.     My understanding of the project record and

15   discussion with Pike, yes.

16   Q.     But you did not conduct any independent

17   investigation such as speaking with other

18   subcontractors or anyone else that was involved other

19   than Pike with these fixes or modifications?

20   A.     Correct.

21   Q.     Okay.  So if Pike was incorrect about the

22   amount of time that it took or the problems that arose,

23   then that would affect your opinions?

24   A.     Not necessarily.  I'd have to take that

information and put it into my analysis and determine
whether that would have become a critical path item or
not a critical path item.  It does not necessarily
impact my analysis.

Q.      But you only know that based on what you were
told by Pike?

A.      My understanding of the project, correct.

Q.      So if they had a misunderstanding about what
occurred, then that would affect your analysis and your
opinion?

A.      You know, I don't believe so because if the
facts of the project were different, then it might have
a bigger impact and what I mean by that is if you look
at both of my graphics in enclosure two and three, when
you look at the time it took to produce the panels
without the brick, just production of the panels, that
is such in my opinion a driving critical path force to
the project completion that if you have on site because
the panels came so slow, if you have these issues going
on that you have to fix things in the field, when I
compare the fix, the normal fix time which could again
be an hour, it could be a day, it could be two days,
whatever it is, compared to the amount of time the
panels took to produce that in my opinion is more, more

1  critical path.

2  Q.      Now, you're looking at the time that the

3  panels, the last panel was produced for building A,

4  correct?

5  A.      I'm looking at all, if you look in enclosure

6  number five, if you look at that spreadsheet we gave

7  you, we show you the production of the panels per, not

8  only per building and wing, but per elevation so you

9  can see the expansion of it.  You can see on that chart

10  that they started production very, very early.

11  Q.      What does that matter, what does the elevation

12  matter if you have to move to a different elevation

13  anyway because of an error on elevation?  So if I

14  produce all the panels for the south side of the north

15  wing and I have them all there ready to install, but I

16  can't install any of them because of an error there,

17  what does it matter if those are all done on time, but

18  now you want me to move over to another side when they

19  shouldn't have been produced yet?

20  A.      Well, your statement assumes that these errors

21  are stopping the erection of the panels.  That's --

22  Q.      I'm assuming that's correct because that's my

23  understanding so when I ask you these questions, I

24  sometimes ask them based on what my understanding of

1   the situation there was.

2   A.        Well, I don't understand it that way.  My

3   understanding is there could have been an issue in the

4   field that occurred, but you have to keep in mind going

5   back to your statement of you have all these panels,

6   again, Universal's plan was always to have all the

7   panels done before they start erection and there's a

8   reason for that.

9   Q.        All the panels for the entire building?

10  A.        Well, in B, yes.  In A, for the building or the

11  wing that they are working on, but they -- well, that's

12  not true either.  If you look at produced panel for

13  building A, they are all produced by October 26th and

14  they don't start erection until November 2nd so I stand

15  corrected.  All the panels are produced before we

16  actually start erection.  Now, that's important

17  because --

18  Q.        All the panels for all three wings of building

19  A or to be produced before we start erection on

20  anything on building A?

21  A.        Correct, and that's important in this

22  particular, in any building where you have multiple

23  kinds of panels as you mentioned, they are not all the

24  same, so if you're going to produce panels by type and

1    most panel contractors do that, you got to have enough

2    of those types so you can do an elevation and if you've

3    got six or seven different types, you've got to have

4    all those types done so there's, it was intentional to

5    schedule like that because that's what makes the most

6    sense.

7    Q.      Were all the -- were the three wings identical

8    in the elevations, meaning I guess each of those three

9    wings had three sides that were visible?

10   A.      I have to look at the plans.  I don't recall

11   the specifics.

12   Q.      Okay.  But you say there were six different

13   types of panels that you needed to complete in one

14   elevation?

15   A.      Whatever, yeah.

16   Q.      Whatever it was.  When was the first time when

17   one of the necessary panels was not available?

18            MS. BOREK:  Objection.  I think we've

19   asked and answered the question a lot at this point.

20   A.      You'd have to go to the matrix that we provided

21   you in enclosure number five of my report and you'd

22   have to look at all the different panel types, look at

23   when the panel was produced, but, again, that doesn't

24   give you the whole story because all we have is the

```
 1    production of panels.  We don't know exactly when the

 2    stone was put on, so it could have taken a little bit

 3    longer.

 4    Q.      Who installed the stone?

 5    A.      Universal.

 6    Q.      Who acquired the stone?

 7    A.      I don't know the specifics of the procurement

 8    of it.

 9    Q.      Do you know where the stone was to be applied?

10    Was it on site or at Universal's facility?

11    A.      My understanding is it was supposed to be put

12    on at the plant.  That was the plan.

13    Q.      Was there any issue that you're aware of with

14    the installation of the stone?

15    A.      Yeah.

16    Q.      What was it?

17    A.      Well, there was an issue with it and because of

18    the issue they ended up putting some stone on in the

19    field.

20    Q.      What was the issue?

21    A.      There was some issue on dimensions, design,

22    something like that.

23    Q.      Someone had the dimensions or the designs

24    incorrect?
```

```
1    A.      I don't know the specifics of it.  I know there
2    was an issue regarding that and it's pretty clear in
3    the record that it occurred, but I didn't analyze the
4    specifics of it.
5    Q.      Okay.  How many panels were affected by that?
6    A.      I didn't do an analysis.  My understanding is
7    talking with the project -- an understanding of the
8    project somewhere around 10 percent.
9                  MS. BOREK:  Just off the record.
10                 (Discussion off the record.)
11   A.      I'm sorry.  We're talking about the brick, the
12   thing that the, the issue that the delay came on.
13   Q.      Okay.  I asked, I'm sorry, you said you were
14   going through your schedule and you said that you saw
15   the panels and when they were assembled, but you didn't
16   even know whether or not that included the installation
17   of the stone.  At that point did you mean installation
18   of the stone or installation of the brick?
19   A.      I'd have to look back at -- my understanding is
20   that the panel is a precast panel.  It's got stone,
21   it's goes brick, and the process is supposed to be
22   complete in the factory, the facility and then brought
23   to the site.
24   Q.      Okay.  Now, were all of the panels to include
```

1    both stone and brick or some to include just stone and

2    some to include stone and brick?

3    A.      I don't know.  I didn't get into that kind of

4    detail.

5    Q.      Okay.  But you're not aware of any delay caused

6    by Universal in their production as a result of the

7    application of just stone?

8    A.      I have not analysed the production in that kind

9    of detail.  I've analysed the production as it shows in

10   enclosure five, the actual producing of the precast

11   panel.  That's the only information I have.

12   Q.      Okay.  But you don't have any reason to believe

13   that the inclusion of stone on those panels extended

14   the delays that you're showing in your report?

15   A.      I did not have the information to analyze that,

16   correct.

17   Q.      But you are aware of delays that relate to the

18   installation of brick?

19   A.      There was some issues on the project.

20   Q.      And are you suggesting that those issues were

21   caused by Universal?

22   A.      I don't know what they are caused by.  I didn't

23   do entitlement.  We keep going back to the same thing.

24   Q.      Yeah, same reason, that was not a material to

1    you because it didn't matter who caused it?

2    A.      My analysis does not address entitlement,

3    correct.

4    Q.      Okay.  If you had been doing entitlement

5    investigation, would that have mattered to you?

6    A.      If I do an entitlement investigation, I look at

7    more things and determine responsibility.

8    Q.      Okay.  Just out of curiosity, why didn't you do

9    entitlement review here because you have, you did the

10   delay review and then we have a lawsuit and Pike is

11   attributing all of the entitlement loss to Universal

12   based on your analysis of that delay in a vacuum, that

13   is a delay without consideration of any entitlement,

14   weren't you concerned that you did a review of delay

15   without regard to entitlement and then your client did

16   their own review of entitlement and attributed it all

17   to one?

18   A.      Again, if you look at the history of this

19   litigation, my reports were done as, for mediation

20   purposes only.  When that failed and time went on, the

21   client asked me to make it an expert report, but make

22   it a delay expert report.  That question would be

23   better served to Pike or counsel on, they determine

24   that -- when you go into litigation, they determine who

128

1   handles what pieces of the litigation.  They determine

2   whatever reason and I don't know what that is that

3   Merkhofer, WHI is going to do the delay side so it's

4   their call, not mine.

5   Q.      Okay.  And other than this issue with the brick

6   that we talked about, are you aware of any other design

7   changes that occurred during the construction process?

8   A.      I did not get into the analysis of the design

9   changes, no.

10  Q.      Do you know whether or not there were any

11  design changes that affected Universal's ability to

12  install panels?

13  A.      I do not know.

14  Q.      What about change directives, is that --

15  A.      Not -- could be.

16  Q.      All right.  Were there any of those?

17  A.      I didn't analyse them.

18  Q.      Did you analyze any discrepancy between the

19  final designs and the documents?

20  A.      No.

21  Q.      But when you look at the time frame that you

22  attribute to Universal on your schedules, where do you

23  get that?

24  A.      Which time --

129

| | |
|---|---|
| 1 | Q.        For example, the plan that Universal was to |
| 2 | have according to that document all the panels prepared |
| 3 | for the entire building prior to the installation of |
| 4 | the first panel, where did you get that information? |
| 5 | A.        From UCP schedule dated 6/10/15. |
| 6 | Q.        Okay.  And do you know that was, for what |
| 7 | reason that was prepared? |
| 8 | A.        It was prepared by Universal for Pike's purpose |
| 9 | in scheduling the project.  Pike used that schedule to |
| 10 | prepare their baseline schedule. |
| 11 | Q.        Okay.  Was that submitted as part of the bid? |
| 12 | A.        I don't know. |
| 13 | Q.        You don't know when that was submitted? |
| 14 | A.        I don't know anything about the submission.  My |
| 15 | understanding was Pike indicated to me that that was a |
| 16 | schedule prepared by Universal on 6/10/15 that provided |
| 17 | Pike with the information that they needed which would |
| 18 | be the submittals, procurement by the producing and the |
| 19 | installation of the panels. |
| 20 | Q.        Do you know whether or not Universal ever |
| 21 | prepared any other schedules that were different from |
| 22 | that one? |
| 23 | A.        I believe they did. |
| 24 | Q.        When, before or after that one was prepared? |

```
 1   A.        After.
 2   Q.        And do you know why they modified those
 3   schedules?
 4   A.        Probably an update.
 5   Q.        What if it was because of design changes that
 6   could not have been anticipated or known at the time
 7   they prepared this first schedule?
 8   A.        Okay.
 9   Q.        So then why didn't you use the more current
10   schedule to place the requirements of Universal on this
11   rather than the earlier?
12   A.        Because in a delay analysis the key, one of the
13   key elements of a delay analysis is a baseline
14   schedule, and my analysis methodology uses a comparison
15   of the baseline to the as-built so Universal could have
16   produced a hundred schedules after that.  It doesn't
17   matter.  It's an updated schedule based upon how they
18   perceive their work and it was fine to be used during
19   construction, but it doesn't affect my analysis.
20   Q.        Well, I may be misunderstanding that, too, but
21   if Pike provides Universal with a design and says we
22   need the panels designed in this certain way and
23   Universal says, okay, we can produce them in this
24   amount of time or in this sequence or whatever and they
```

```
 1    give that to Pike, and then Pike says later we've
 2    modified the design and Universal says, oh, now that
 3    you've modified the design, we have to modify our
 4    schedule because whatever reason, these panels take
 5    longer to produce, these panels have additional stone,
 6    these panels have brick that has to be modified on
 7    site, something like that, and they submit a new
 8    schedule, why are you attributing the delay to them
 9    based on an earlier schedule that is modified as a
10    result of design changes?
11    A.       Because I use the schedule that's the contract
12    schedule that UCP was contractually obligated to Pike
13    and Pike included in the baseline.  The schedules that
14    you're talking about that you've described are the
15    result of an alleged design change which is an
16    entitlement issue which may or may not be factual.
17    You're, being the attorney for UCP, you're saying it
18    was a design change and it was Pike's responsibility
19    and not UCP.  That's why this litigation is going on
20    right now.  We don't necessarily agree with that.  My
21    analysis doesn't address whether we agree or disagree
22    with that position.  My analysis addresses that before
23    any of the problems occurred, this is what UCP
24    obligated, was obligated to Pike to do and my analysis
```

1   shows based upon their performance they spent this

2   amount more time to do their job.

3   Q.      So you didn't determine whether or not the

4   obligation changed as a result of design changes by

5   Pike?

6   A.      Correct.

7   Q.      All right.  So essentially, your report is

8   based on if everything that Pike says is true and

9   correct as to the design changes and everything that

10  Universal says with regard to these design changes, I'm

11  sorry, everything that Pike says is correct, true and

12  correct, and everything that Universal says is

13  incorrect, then this is the appropriate schedule?

14  A.      I disagree with that.  That's not what my

15  analysis says.  My analysis basically says that

16  Universal agreed contractually to build this project a

17  certain way, to procure the panels and to install the

18  panels.  They didn't.  They took a lot longer to do it

19  and I've quantified that delay so factually without

20  looking at any opinions no one can dispute that UCP did

21  not do their job and took longer to do it.  What the

22  question is which you keep going back to is why that

23  happened, and I didn't analyze that.

24  Q.      Okay.  That's fine.  I understand it.

```
 1    A.        Okay.

 2    Q.        Do you know whether or not Pike provided

 3    Universal Concrete with any field dimensions?

 4    A.        I'm not aware.  I didn't -- I don't know.

 5    Q.        You didn't look into that?

 6    A.        I did not.

 7    Q.        For the same reason we just --

 8    A.        Exactly.

 9    Q.        Do you know whether or not field dimensions

10    were required pursuant to the work order?

11    A.        I did not look at that.

12    Q.        Do you know whether or not any discrepancies in

13    bid documents led to any delays?

14    A.        Do not know.

15    Q.        Did you look at that?

16    A.        No.

17    Q.        For the same reasons we've discussed?

18    A.        Correct.

19    Q.        If you were made aware of any, would that have

20    affected your opinion?

21    A.        Depends on the issues, depends on when they

22    occurred, depends on the project, don't know until you

23    do the analysis.

24    Q.        I'll ask you another hypothetical question just
```

1    for the sake of it.  Let's say we have these original

2    time lines that were based on the initial contract and

3    Pike said to you, oh, yeah, we did modify the design,

4    would that have changed your analysis?

5    A.      It could change an analysis hypothetically if

6    you looked at those issues and you determine that the

7    contractor or the, I guess you're saying contractor

8    impacted the subcontractor.  Sure, it could happen in a

9    hypothetical thing if all the facts line up, but I

10   can't opine either way because it's a hypothetical and

11   you'd have to look at the facts of that case and I may

12   not relate whatsoever to this case.

13   Q.      So given the extent of your analysis, that is

14   the analysis of delays, in fact, just delays in time

15   based on the baseline schedule with the actual

16   implementation or installation, production, the extent

17   of your review that did not include entitlements, if

18   somebody else did a review that did include

19   entitlements and explained how each one of those delays

20   from other subcontractors or somebody else impacted

21   Universal's ability to produce panels and/or to install

22   panels, that is if somebody else did a review with

23   regard to the entitlements, you wouldn't be able to

24   dispute that at all, would you?

```
 1   A.      I wouldn't be able to dispute what?
 2   Q.      What the conclusions were of the individual who
 3   prepared the entitlement review.
 4   A.      What would I be disputing?  You'd either have
 5   to agree to disagree with their analysis.   If
 6   Somebody --
 7   Q.      But you haven't done any of that analysis, so
 8   if somebody else did the analysis and came to
 9   conclusions, you'd only be able to base any dispute of
10   that on what they're saying, not on your own
11   investigation, correct?
12   A.      I don't get that question.  Could you, I'm not
13   understanding your question.
14   Q.      If somebody else were to --
15   A.      Do this analysis?
16   Q.      Do this analysis, but also investigated all of
17   the things that you did not investigate that I asked
18   you about today.
19   A.      Correct.  Got that.
20   Q.      Would you be able to dispute whether or not any
21   of those facts that were the result of that
22   individual's investigation were true or not?
23   A.      What would I be disputing, the facts or the
24   delay?  Are you saying --
```

1   Q.     The entitlement portion.

2   A.     Well, I don't know.  I'd have to look at what

3   the analysis showed and just like any trier of fact in

4   the case, whether it's a judge or jury or whatever

5   would have to look at the, weigh the evidence on both

6   sides, but it wouldn't do, it wouldn't change my

7   analysis at all.

8   Q.     Of the total delay between the plan or the

9   as-planned versus as-built?

10   A.     Exactly.  This information never changes

11   regardless of what the entitlement is.  It just --

12   Q.     For the purposes of your report, all you really

13   needed was the as-planned schedules and then the

14   as-built results, right?  You didn't really have to do

15   much more of an analysis than that?

16   A.     To analyze the delay, to compare the two, make

17   sure the information is accurate, and remember, the

18   analysis goes a step further and I think shows clearly

19   that UCP took an enormous amount of time to produce

20   panels which impacted their ability to enclose the

21   building which delayed the job.

22   Q.     And you have no idea why they took an enormous

23   amount of time to --

24   A.     I did not analyze that.

```
 1                    MR. McNELLY:  Okay.  Can we take a break
 2     for about five minutes.  I may be finished.
 3                    (Deposition briefly recessed.)
 4     BY MR. McNELLY:
 5     Q.     I'm going to try to do a couple clarification
 6     questions very quickly.  I think that we probably
 7     already covered them and if I piece it together through
 8     the record we'd probably be able to establish the same
 9     thing, but I just want to make sure that we're clear on
10     a couple.
11                    With regard to Universal's production of
12     the panels, you examined when the panels were produced,
13     right?
14     A.     Correct.
15     Q.     And you determined they were produced later
16     than they were required to be produced by the schedule
17     that you were using?
18     A.     Correct.
19     Q.     But you did not investigate in any way any of
20     the causes of those delays?
21     A.     Correct.
22     Q.     Okay.  With regard to the time when Universal
23     began installing the panels which was 44 days after the
24     original date, you determined that they installed the
```

138

```
 1   last panels at a time considerably later than it was
 2   initially planned; is that correct?
 3   A        Correct.
 4   Q.       And you did not investigate any of the causes
 5   of those delays?
 6   A.       Correct.
 7              MR. McNELLY:  Okay.  I think that's it.
 8   I think that concludes the deposition.  Thank you very
 9   much.
10              THE REPORTER:  Do you both want copies?
11              MS. BOREK:  Well, are you providing this
12   one?  I mean, I would like a copy, but --
13              MR. McNELLY:  Yeah.  Did you provide the
14   others?
15              MS. BOREK:  Yes.  So the way it's been
16   working, if you notice the deposition, you provide it.
17   If we notice the deposition, we provide it.  That's how
18   it's done.
19              MR. McNELLY:  Oh, yeah.  That's fine.
20   Sure, keep it the same way we've been doing it.
21              MS. BOREK:  All right.
22              (Deposition concluded at 1:11 p.m.)
23
24
```

1

2

3                          _____, 2020

4

5

6                I hereby certify that the evidence

7    and proceedings are contained fully and accurately in

8    the notes taken by me of the testimony of the within

9    witness who was duly sworn by me, and that this is a

10   correct transcript of the same.

11

12

13                          _____
                            Marcy J. Janowski, RPR
14                          Registered Professional Reporter
                            Notary Public
15

16

17

18

19   The foregoing certification does not apply to any

20   reproduction of the same by any means unless under the

21   direct control and/or supervision of the certifying

22   reporter.

23

24

Case 6:17-cv-06365-EAW-MJP  Document 65-5  Filed 03/16/20  Page 141 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

**0**

**07 (1)**
16:17

**1**

**1:11 (1)**
138:22
**10 (4)**
73:22;74:3;114:13;
125:8
**100 (2)**
47:5;48:7
**11 (1)**
15:21
**12/16 (1)**
55:4
**155 (2)**
55:24;106:16
**15th (1)**
55:18
**16 (3)**
53:16;71:6;88:20
**16th (15)**
53:21;54:3;55:1,2,10,
22;56:16;57:15;67:20;
89:19;92:3;106:7,9,11,
23
**1975 (1)**
5:21
**19th (4)**
55:23;70:5;107:1,13
**1st (3)**
107:3,4,5

**2**

**20 (4)**
5:22,22;117:19;118:5
**2006 (1)**
16:17
**2009 (1)**
15:21
**2015 (5)**
34:3;35:24;36:8,19;
106:5
**21 (1)**
6:1
**22nd (1)**
67:22
**24 (1)**
46:17
**26 (4)**
46:17;47:18;58:8;
74:11
**26th (2)**
70:3;122:13
**27 (2)**
34:1;35:23
**27th (1)**
35:19

**29 (1)**
46:17
**2nd (7)**
53:21;55:17;71:10;
88:11;106:5;107:2;
122:14

**3**

**30th (1)**
71:11
**38 (1)**
74:11

**4**

**40 (3)**
52:3;85:3;102:5
**44 (11)**
5:20;50:22;53:3,24;
91:11,17,21,23;92:7,8;
137:23
**44-calendar (1)**
91:20
**44-day (1)**
53:17
**44th (1)**
50:24
**45th (1)**
52:5

**5**

**50 (2)**
61:18;88:12

**6**

**6/10/15 (2)**
129:5,16

**7**

**70 (1)**
90:4
**75 (5)**
55:18;106:13,19,20,
23

**8**

**80 (4)**
57:5,8;74:10;106:22

**9**

**90 (2)**
74:3;114:13
**98 (1)**
70:6
**9th (1)**
70:3

**A**

**ability (13)**
40:1;46:8;57:15;
58:1;84:17;93:21;94:8;
112:14;113:6,10;
128:11;134:21;136:20
**able (25)**
8:12;18:16;22:1;
41:20;46:12;47:16;
52:5;59:21;66:24;
75:17;78:2,10;84:6,9;
90:9;94:6,7;97:8;
111:20;112:18;134:23;
135:1,9,20;137:8
**Absolutely (6)**
27:5;29:5;52:19,19;
70:24;92:8
**acceleration (2)**
73:23;74:2
**accept (3)**
65:9;72:15;92:5
**accepted (1)**
37:15
**accordance (1)**
40:2
**according (2)**
82:12;129:2
**account (2)**
92:2;101:13
**accurate (2)**
26:14;136:17
**acquired (1)**
124:6
**across (1)**
110:18
**acting (1)**
5:2
**action (1)**
84:15
**activities (9)**
38:4;86:8,22,24;87:1,
10;92:11,11,14
**actual (4)**
34:7;91:7;126:10;
134:15
**actually (17)**
6:7;17:7;19:16;
33:14;37:20;40:21;
53:21;54:14,14;94:24;
98:12;99:11;104:10;
106:6;107:10;111:1;
122:16
**additional (5)**
48:15;57:8;93:2;
97:5;131:5
**address (2)**
127:2;131:21
**addresses (1)**
131:22
**adversarial (1)**
16:20

**adversary (4)**
14:2;17:9;18:9,24
**advise (2)**
85:11,15
**advisory (1)**
15:19
**affect (15)**
39:24;57:15;86:5,7;
103:19;104:4;112:9,11,
21,22;115:20;117:1;
119:23;120:9;130:19
**affected (12)**
23:19;59:24;60:4;
94:2;112:17,23;113:10;
117:23;119:7;125:5;
128:11;133:20
**affects (2)**
65:19;116:19
**afterwards (1)**
43:2
**again (22)**
9:4;10:13;12:1;
20:13;65:22;67:4;
77:21;78:8;88:11;89:7;
95:1;105:16;109:13;
110:7,24;116:11;
118:12,23;120:21;
122:6;123:23;127:18
**against (6)**
26:18,21;50:15;
52:17;57:12;84:15
**age (1)**
13:17
**ago (6)**
15:21;19:10;31:7;
79:6,8,10
**agree (7)**
41:5,5;47:14;101:20;
131:20,21;135:5
**agreed (2)**
32:24;132:16
**ahead (3)**
88:15,17;90:7
**air (1)**
61:24
**Albany (4)**
18:1,1,5,11
**allegation (2)**
77:20,22
**alleged (1)**
131:15
**allocated (3)**
41:23;42:20;47:18
**allocating (2)**
40:11,22
**allow (10)**
39:23;46:4;48:8;
49:20;50:5;76:12;
87:22;90:22;114:19,20
**allows (1)**
114:23
**almost (1)**
68:2

**along (3)**
15:3;39:18;65:15
**always (3)**
52:22;84:1;122:6
**amend (2)**
29:23;30:2
**amended (2)**
29:19;33:7
**amount (13)**
32:9;47:15;48:22;
51:21;90:15;94:2;
114:12;119:22;120:23;
130:24;132:2;136:19,
23
**analogy (1)**
49:8
**analyse (1)**
128:17
**analysed (2)**
126:8,9
**analyses (3)**
24:15,18;25:3
**analysis (105)**
5:23;6:21,23;9:17,22,
24;14:1,3;15:4;18:7;
20:10;21:18;23:6,8,10;
25:11,19,21,23;26:8;
28:14;33:4;37:17,18;
40:14;42:4,22;44:9,13,
19;48:10,21,22;49:12;
50:18,20;57:3;60:22;
64:18;65:22,24;66:17;
67:5;75:6,22;76:15,18;
79:3;82:12;84:5;86:13,
19;92:16;93:24;95:2,
16;96:7,23;97:2;100:4;
102:15,17;104:4,5,9,18;
107:16;110:19;111:2;
112:24;113:5;114:3,15;
117:3;118:24;120:1,4,
9;125:6;127:2,12;
128:8;130:12,13,14,19;
131:21,22,24;132:15,
15;133:23;134:4,5,13,
14;135:5,7,8,15,16;
136:3,7,15,18
**analyze (20)**
23:5;52:13;75:23;
76:17;77:17;79:22;
80:13;99:24;103:11;
113:8,9,21;116:12;
118:3;125:3;126:15;
128:18;132:23;136:16,
24
**analyzing (1)**
95:2
**and/or (5)**
25:9;74:18;75:18;
108:5;134:21
**answered (4)**
80:11,12;96:13;
123:19
**antagonize (1)**

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 142 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

96:15
**anticipated (1)**
130:6
**anywheres (1)**
72:18
**appear (1)**
57:1
**appears (1)**
89:4
**applicable (1)**
116:14
**application (1)**
126:7
**applied (1)**
124:9
**applying (1)**
116:5
**approached (1)**
86:18
**appropriate (3)**
36:22;94:23;132:13
**approval (1)**
102:23
**architect (25)**
11:13,14,16;12:15,16,
18;18:17,18,21;24:21,
22;25:14,16;37:14;
74:18;75:4,13;76:11;
77:6,10,16;81:8,10,20;
85:3
**architects (1)**
27:13
**architecture (2)**
10:22;16:10
**area (10)**
17:21;59:7;65:10;
70:21;91:22;109:18;
110:15,21;111:9,17
**arose (1)**
119:22
**around (7)**
72:11;94:6;110:21;
112:18;114:13;116:9;
125:8
**art (1)**
95:24
**A's (1)**
88:1
**as-built (18)**
45:10;48:10;49:16;
50:2;55:21;67:8,18;
72:17;90:2,3;91:7,9;
92:22;104:6,11;130:15;
136:9,14
**aside (1)**
64:16
**as-needed (1)**
39:4
**as-plan (1)**
104:6
**as-planned (4)**
91:8;104:12;136:9,13
**assembled (1)**

125:15
**assembly (1)**
92:15
**assist (3)**
36:15,18;37:22
**assisted (1)**
103:24
**associated (1)**
43:14
**assume (7)**
19:18,20;33:12;
36:14;60:6,7;107:24
**assumes (1)**
121:20
**assuming (2)**
21:20;121:22
**assumption (1)**
49:7
**attached (2)**
33:13;53:8
**attempt (1)**
65:6
**attended (1)**
82:2
**attention (4)**
19:4;74:17;93:4;
98:13
**attorney (2)**
4:13;131:17
**attorneys (7)**
8:15;26:21,24;27:11;
31:3,9;81:20
**attributable (1)**
82:19
**attribute (8)**
9:6;10:23;12:9;49:2,
5;64:7;73:22;128:22
**attributed (5)**
10:13;11:8;57:8;
102:13;127:16
**attributes (1)**
94:22
**attributing (2)**
127:11;131:8
**attribution (1)**
74:3
**August (3)**
34:1;35:19,23
**available (33)**
32:6;39:1;52:23;59:6,
7,15,16;61:12;64:23;
66:10;67:2,6,9,12,17;
69:21,23;70:14,17,23;
71:10,22;73:18;90:22;
91:4,10,12,14,14,15;
92:23;116:20;123:17
**aware (44)**
19:7,18,21;30:17;
31:5,12;47:2;48:17,18;
51:2,7,8,10;58:18;
59:19;60:1,2,3,5;75:2,3,
10;77:6,8;84:11,14;
85:22;98:8;99:17;

100:1,5,6;101:3;104:2;
112:1,3;114:18,22;
124:13;126:5,17;128:6;
133:4,19
**away (1)**
62:2

**B**

**back (23)**
12:4,24;15:21;19:4,
22;22:13,18;30:11;
34:7;36:8;53:8;54:24;
59:18;67:4;68:14;83:1;
85:19;86:4;100:2;
122:5;125:19;126:23;
132:22
**back-charged (1)**
85:6
**base (3)**
37:10;40:20;135:9
**based (25)**
42:17;53:23;57:10;
58:19;59:2;72:11,12;
87:20;90:14;92:5;
102:17;104:5,9,10;
114:10;119:5;120:5;
121:24;127:12;130:17;
131:9;132:1,8;134:2,15
**baseline (38)**
16:14;17:6,7,16;
33:23;34:12,13,14,17,
21;35:6,10,18;37:16,20;
40:14;42:10,13,17,21;
43:4;46:14;48:5;50:5,
16;52:20;53:19;55:16;
86:23;112:9,11,11,15;
129:10;130:13,15;
131:13;134:15
**basic (4)**
5:17;32:3;38:8;78:7
**basically (9)**
5:16;6:21;16:14;
18:13;32:21;38:9;
87:21;88:9;132:15
**basis (10)**
15:3;37:19;39:4;
52:8;91:7,8,9;104:17;
109:14;113:22
**beams (1)**
110:17
**became (3)**
31:12;32:22;118:21
**become (3)**
19:7;90:22;120:2
**began (3)**
47:3;80:15;137:23
**begin (5)**
23:10;46:5;55:9;
91:1;106:4
**beginning (6)**
23:11,15;90:16;
98:15;102:23;112:2

**behind (3)**
23:3;41:15;70:7
**belief (1)**
71:5
**best (1)**
40:3
**better (2)**
36:16;127:23
**bid (2)**
129:11;133:13
**big (2)**
39:2;119:7
**bigger (1)**
120:13
**Bill (1)**
20:20
**billings (2)**
22:12,13
**bit (7)**
42:10;53:1;57:13;
61:16;97:4;116:1;124:2
**BOREK (13)**
8:14,21;13:6,11,14;
23:23;53:10;69:12;
123:18;125:9;138:11,
15,21
**both (26)**
7:1;11:12;20:1;24:5,
10,18,22;25:1,7,9,12;
65:23;82:2,5,6,7,8,10,
11,17;83:1;102:2;
120:14;126:1;136:5;
138:10
**bottom (1)**
115:3
**break (4)**
45:13;74:7,13;137:1
**brick (13)**
73:2;112:4,7;113:14;
120:16;125:11,18,21;
126:1,2,18;128:5;131:6
**brief (1)**
5:11
**briefly (2)**
74:15;137:3
**bring (2)**
62:22;67:4;71:3;73:3
**bringing (1)**
81:9
**Brockport (2)**
17:11,11
**broken (2)**
43:20,21
**brought (2)**
109:4;125:22
**budget (1)**
40:5
**Buffalo (1)**
14:6
**build (4)**
39:9;41:6;73:2;
132:16
**building (114)**

8:8;9:4;43:13;46:11,
22;48:2,14;49:11;
50:17,22;53:23,23,24;
54:5,5,8,12,13,16,16,18,
19,20,22;55:7;56:8,18;
57:6,7,15;59:4,15;
60:19;61:3,13;62:21;
63:20,22;64:11,15;
65:16,19;66:4,7;67:10,
13;68:7,16;69:3;70:4,
17;71:21;72:3,5,10,16;
73:6,14,15,16,17,19,20,
21,23;74:8,8,11,11,18;
78:15,16;84:10;86:15;
87:15;88:1,10,21;91:6,
13,14;92:22,23;94:9;
97:14,17;99:21;101:20,
22;106:3,11,13,17;
107:11;108:9;110:10;
111:6,17;113:2;114:24;
116:5,20;117:20;119:8;
121:3,8;122:9,10,13,18,
20,22;129:3;136:21
**buildings (6)**
8:2;54:11;74:4;82:3;
86:4;99:19
**built (3)**
28:8;82:7;92:6
**bulk (2)**
110:9,13
**business (1)**
119:5
**busy (1)**
38:24

**C**

**calculate (1)**
48:2
**calculated (1)**
43:5
**calculating (1)**
100:13
**calculation (4)**
45:8;53:22;80:2;
106:24
**calculations (1)**
32:23
**calendar (11)**
53:24;55:18;57:5,8;
74:10;91:11;106:16,19,
20,22,23
**call (5)**
34:12;87:15;98:12;
99:18;128:4
**called (4)**
35:16;39:4;78:12;
89:14
**calling (2)**
7:8;33:8
**came (4)**
81:7;120:19;125:12;
135:8

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 143 of 154

The Pike Company, Inc. vs.                                    Richard Merkhofer
Universal Concrete PRoducts, Inc.                            January 07, 2020

**can (41)**
    8:17,19;17:8;18:3;
    35:5;41:4,5,5;46:22,22,
    23;47:6;49:2,5;59:4;
    61:9;63:20,20;64:14;
    65:10;66:5;67:4;68:15;
    71:10;72:24;86:3;
    96:18;97:15;98:15;
    102:8;104:8,8,9;
    110:22;115:22;121:9,9;
    123:2;130:23;132:20;
    137:1
**care (1)**
    56:23
**careful (1)**
    82:10
**case (31)**
    7:4,16;8:15;10:5;
    18:9,15;19:20;32:18;
    36:23;41:2;42:19;
    44:12;57:4;83:6,13;
    85:16,17,18;88:23;
    94:1;95:23;100:12;
    105:19;112:22;114:13;
    115:2,14,16;134:11,12;
    136:4
**cases (2)**
    51:21;82:11
**cause (5)**
    40:4,4;53:1;103:12;
    110:20
**caused (55)**
    8:4,7,8;9:17;11:14;
    18:15;23:4;24:7;25:10;
    37:7;45:5;48:16,23;
    53:3,4;56:11;57:19;
    59:20;64:5;76:19,21;
    78:16,18;82:13,15,15;
    83:2,6,7,9,17,17;84:13,
    16;85:3,5;86:16;92:20;
    93:2;95:3,8;98:19;
    101:7;102:3,11;105:6,
    10,13;110:5,8;119:12;
    126:5,21,22;127:1
**causes (2)**
    137:20;138:4
**causing (2)**
    42:16;80:8
**Center (1)**
    15:9
**certain (11)**
    22:9;47:15;51:21;
    66:19;76:4;78:3;85:4;
    87:4;97:16;130:22;
    132:17
**certainly (1)**
    67:16
**cetera (1)**
    28:10
**chance (1)**
    17:20
**change (17)**
    32:1;48:21,22;71:23;

75:14;103:15;112:17;
    113:6,16,20;115:14;
    118:14;128:14;131:15,
    18;134:5;136:6
**changed (3)**
    57:13;132:4;134:4
**changes (28)**
    16:16;26:4,6,10;27:8;
    28:23;29:7,12;35:3;
    37:2;49:20;60:4;112:1,
    3,5,13,21;113:4,14;
    128:7,9,11;130:5;
    131:10;132:4,9,10;
    136:10
**characters (1)**
    82:4
**charge (7)**
    52:17;86:16;101:6,
    14;102:1,9;103:14
**charged (4)**
    94:3,17;95:1;107:7
**charges (1)**
    83:1
**charging (3)**
    50:15;57:11;98:6
**chart (1)**
    121:9
**check (3)**
    21:7;52:10;106:10
**checkup (1)**
    38:9
**claims (6)**
    5:18,19,23;16:18;
    79:13,16
**clarification (1)**
    137:5
**clarifications (1)**
    75:18
**clarified (1)**
    82:18
**clarify (3)**
    45:7;57:21;89:8
**clear (5)**
    67:16;75:21;109:8;
    125:2;137:9
**clearly (2)**
    52:20;136:18
**client (23)**
    6:7,9,10;9:24;20:9;
    21:14;22:24;25:20,24;
    26:2,5,7,9,15;28:6,8,12,
    14,16,18;101:1;127:15,
    21
**clients (1)**
    38:21
**client's (1)**
    69:22
**close (3)**
    20:1;72:18;82:9
**closely (1)**
    44:10
**College (2)**
    12:20;13:4

**column (2)**
    89:15,20
**Combination (4)**
    9:9;11:11;18:17;
    74:11
**coming (1)**
    77:22
**comment (1)**
    28:18
**commented (2)**
    28:21;29:9
**comments (6)**
    16:15;26:12;28:22,
    24;29:10,13
**common (3)**
    25:7;32:16;95:24
**communication (1)**
    5:5
**compare (5)**
    53:17;54:21;66:1;
    120:21;136:16
**compared (2)**
    37:20;120:23
**compares (1)**
    37:19
**comparing (1)**
    104:5
**comparison (2)**
    93:9;130:14
**complain (1)**
    80:19
**complaining (1)**
    77:9
**complaints (3)**
    75:3;77:6;81:6
**complete (26)**
    33:12;39:24;40:1;
    41:21,21;47:4,5,6;48:3,
    7,8;50:4;55:18;80:19;
    88:4,12,21,24;89:3,19,
    20;90:1,4;112:15;
    123:13;125:22
**completed (8)**
    20:2;23:14;25:19;
    55:23;88:8;90:9;92:4;
    106:3
**completing (2)**
    20:2;26:22
**completion (3)**
    58:2;117:12;120:18
**complicated (1)**
    16:11
**complied (1)**
    92:13
**component (1)**
    44:5
**comprehensive (6)**
    14:15;38:10,16;39:5,
    21;41:14
**concern (1)**
    116:8
**concerned (3)**
    56:3;83:8;127:14

**concluded (1)**
    138:22
**concludes (1)**
    138:8
**conclusion (2)**
    65:6;73:7
**conclusions (3)**
    53:4;135:2,9
**Concrete (22)**
    4:14;45:13;46:5;
    47:10;48:19;49:9,23;
    50:4,13;51:3,9;64:6;
    85:16,20;105:10;106:4;
    108:6,9,16;109:3,5;
    133:3
**concurrent (9)**
    48:24;105:15,20,23;
    116:15;117:7,8,10,11
**condition (1)**
    65:18
**conduct (2)**
    105:6;119:16
**conducted (1)**
    103:3
**confused (1)**
    82:2
**confusing (1)**
    72:24
**confusion (1)**
    10:15
**conjunction (1)**
    99:5
**connected (3)**
    6:7;89:6,9
**connection (1)**
    65:20
**connections (1)**
    95:21
**consequence (1)**
    100:14
**considerable (1)**
    100:2
**considerably (1)**
    138:1
**consideration (3)**
    79:18,21;127:13
**considered (1)**
    116:15
**Consigli (1)**
    42:24
**construction (12)**
    5:23;19:9,12;49:11;
    50:9;71:7;95:19;96:1;
    107:9;119:4;128:7;
    130:19
**consultant (1)**
    15:7
**consulting (1)**
    5:19
**contact (2)**
    19:17;20:15
**contacted (8)**
    19:10,13;20:12,22;

21:4,21;31:9,18
**contemplated (1)**
    86:23
**context (1)**
    95:14
**continue (6)**
    16:16;47:20;48:9;
    49:5;65:15;70:10
**contract (7)**
    43:21;83:1;101:11;
    102:16,17;131:11;
    134:2
**contractor (40)**
    7:2,3,9;8:2,5;9:5,7;
    14:18;15:6;17:17;23:4;
    24:7,24;37:22;38:2,12;
    40:6,7,13;41:2;48:9;
    49:3;71:3;80:14;82:13;
    83:3;86:11,21;88:17;
    94:17;101:5,7,19,21;
    102:2;104:7;105:11;
    108:6;134:7,7
**contractors (17)**
    17:21;19:1;24:11;
    36:15;38:20;40:4,11;
    42:20;47:22;49:19,22;
    83:7;87:4;97:15;102:7;
    105:13;123:1
**contracts (2)**
    102:8,13
**contractually (1)**
    131:12;132:16
**contributed (1)**
    80:17
**control (1)**
    57:24
**controlling (2)**
    69:18;114:17
**conversations (1)**
    52:7
**copies (1)**
    138:10
**copy (3)**
    5:20;33:18;138:12
**Cornell (1)**
    11:19
**corporate (2)**
    5:14;30:18
**corrected (3)**
    39:12,18;122:15
**correctly (3)**
    4:17;38:5;39:15
**cost (3)**
    73:23;74:2;102:1
**costs (2)**
    42:24;83:2
**counsel (4)**
    4:1;6:11;29:24;
    127:23
**count (1)**
    71:16
**county (1)**
    18:11

Case 6:17-cv-06365-EAW-MJP    Document 65-5    Filed 03/16/20    Page 144 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

**Couple (3)**
19:10;137:5,10
**course (3)**
69:10;88:10;91:14
**Courthouse (2)**
18:1,11
**cover (1)**
35:15
**covered (3)**
38:7,8;137:7
**CPM (5)**
5:19,21;14:14;15:6;
16:14
**crane (9)**
51:20,21;60:16;61:1,
1;72:2,4,11;108:23
**cranes (2)**
51:24;60:11
**create (1)**
34:18
**created (1)**
25:8
**creating (2)**
10:21;25:24
**criteria (1)**
38:17
**critical (30)**
57:22,23,24;58:6;
59:10;63:8;64:20;68:3,
4;76:2;108:11;111:5,
13;113:7,11,19,24;
114:8;117:21;118:10,
12,15,17,22;119:11,12;
120:2,3,17;121:1
**curiosity (1)**
127:8
**current (5)**
5:12,16;6:7,8;130:9
**cursory (5)**
21:13,16,17,23;22:23
**cut (1)**
65:20
**CV (5)**
4:24;5:10;6:1;13:8,10

## D

**damage (1)**
32:23
**damages (22)**
5:24;32:10,13,18,19;
35:4;80:2,2;98:10,11,
18,19;99:11,15;100:8,
10,11,13,22;101:1,2,15
**Dan (1)**
20:21
**data (1)**
35:17
**date (15)**
34:1;35:19,20;47:16,
22;58:2;88:5,20;90:12,
17;95:12;107:1,1,2;
137:24

**dated (1)**
129:5
**day (21)**
50:24;52:5,16;54:2;
57:3;58:10;60:7,9;
64:22;67:15;68:12;
70:20,23;71:22;78:11;
91:2,11;107:3;117:18;
118:9;120:22
**days (44)**
46:17,17,17;47:18;
50:22;52:4,17;53:3,24;
55:19,24;56:1;57:5,9,
12;58:8;64:4,24;74:10;
76:5;78:21;85:3;91:17,
22,23;92:7,8;94:2;95:8;
106:13,16,18,19,20,22,
23;117:18,19;118:6,11,
17,20;120:22;137:23
**deal (2)**
8:19;94:5
**dealing (3)**
44:12;87:24;117:17
**dealt (1)**
28:12
**DeCarlo (1)**
20:22
**December (19)**
53:16,21;54:3;55:1,2,
10,22;56:16;57:15;
67:20;68:5;71:6;88:20;
89:19;92:3;106:7,9,11,
23
**decision (1)**
61:9
**decks (1)**
108:24
**deduct (1)**
57:11
**defend (1)**
79:22
**definitely (1)**
27:1
**definition (2)**
117:8,10
**delay (107)**
5:23;9:16,22,24;
12:14,14;14:1,3;15:4;
18:7;25:10;33:4;37:17;
42:16;44:13,19;45:24;
47:19;48:23,24;49:6,
13;52:3,24;53:3,17;
54:7,8,24;55:2,4,5;
56:11;57:1,2;63:8;64:5,
7;66:19,21;68:3,4;74:6,
7,12,12;76:19;80:1,9,
17;82:15;83:2,9;85:24;
86:6,16;90:8,14;91:11,
20,22;92:20;93:3,3;
94:16,22,24;101:7;
102:3,14;105:15,20,23;
106:22;108:19;110:5,9,
11;113:2;114:15,17;

116:16;117:7,9,10,11,
12,24;118:4,6,10,19,21;
125:12;126:5;127:10,
12,13,14,22;128:3;
130:12,13;131:8;
132:19;135:24;136:8,
16
**delayed (19)**
8:9;9:4,5;10:10,20;
12:8;42:6;43:11;46:3;
47:12,15;48:11;56:17;
66:15;67:11;86:12;
94:8;95:9;136:21
**delaying (2)**
64:12;117:13
**delays (117)**
6:22,23;7:1,2,19,20,
23;8:1,3,24;9:17;10:1,8,
9,9,14;11:8,10,11,13;
12:2,3,9;18:16;23:4,5,
19;24:7;25:8;37:7;
39:19;40:4,5,8;42:4;
43:14;44:5,11,19;45:1,
4,5,8,9,11,12,15,22;
46:2,7;47:9,10,21;
48:10,12,15,18;49:8;
50:6,10;57:14,22,23,24,
24;74:19;75:3,15;76:1,
1,1,2;77:2;80:13,16;
82:13;19;83:5,10,16,17;
84:13,16;85:2,4,19,23;
86:5,7,12,20;91:23;
94:3;95:3;97:16;98:19;
99:12,14;100:14;
102:12;103:10,12;
104:1,2;105:6,10,13;
117:11;119:12;126:14,
17;133:13;134:14,14,
19;137:20;138:5
**delivered (1)**
108:9
**delivering (1)**
108:5
**delivery (1)**
72:15
**depend (1)**
65:18
**depends (10)**
61:10;108:22;111:10,
19;112:16;118:18,18;
133:21,21,22
**deposed (3)**
4:22;5:2;7:16
**deposition (9)**
4:5,18;74:15;117:15;
137:3;138:8,16,17,22
**described (3)**
63:7;116:18;131:14
**description (1)**
5:11
**design (41)**
10:17;63:11;68:15;
74:18,18;75:5,18;

80:21;112:1,3,5,7,14,
17,21,24;113:4,4,5,14,
15,20;114:23;115:5,6;
118:1;124:21;128:6,8,
11;130:5,21;131:2,3,10,
15,18;132:4,9,10;134:3
**design-built (1)**
11:4
**designed (2)**
58:16;130:22
**designer (2)**
11:2,3
**designs (2)**
124:23;128:19
**detail (12)**
50:12,19;78:19;90:2;
109:14,21;111:19;
113:23;114:5;116:12;
126:4,9
**detailed (1)**
118:23
**determination (15)**
10:7;24:6;29:22;
37:10;43:9,12;62:18,
20;63:14;64:2,14;77:2,
3;95:5;101:14
**determinations (2)**
34:18;42:15
**determine (35)**
8:23;12:2;32:7;36:20,
24;37:6,10;40:21;
42:19;44:19;45:1,4;
49:19;52:10;61:17;
62:10;63:2,5,6,19;74:6;
82:19;83:16;102:9;
105:18;116:3,24;
119:11;120:1;127:7,23,
24;128:1;132:3;134:6
**determined (13)**
18:14;25:9;58:4;
63:10;64:5;76:4;84:6,
17;88:3;102:11;105:22;
137:15,24
**determining (2)**
42:23;104:1
**deviate (2)**
55:12;72:19
**deviation (1)**
72:22
**difference (2)**
52:15;68:13
**different (22)**
24:15;30:9;32:3;
39:3;56:15;59:24;
66:13;70:21,22;72:7,9;
77:20;78:4;84:24;87:1;
97:4;120:12;121:12;
123:3,12,22;129:21
**differentiate (2)**
89:10,16
**differently (1)**
37:21
**difficult (2)**

39:1,17
**dimension (2)**
69:1;73:5
**dimensional (1)**
56:22
**dimensions (4)**
124:21,23;133:3,9
**direct (2)**
19:4;81:22
**directed (1)**
97:4
**directing (1)**
93:4
**directives (1)**
128:14
**director (1)**
5:16
**disagree (4)**
61:21;131:21;132:14;
135:5
**discover (1)**
118:1
**discovery (1)**
30:18
**discrepancies (1)**
133:12
**discrepancy (1)**
128:18
**discuss (2)**
49:18;52:8
**discussed (4)**
26:13;49:16;115:16;
133:17
**discussing (1)**
69:8
**Discussion (5)**
53:11;77:19;104:21;
119:15;125:10
**discussions (3)**
26:7;27:7;85:9
**dispute (5)**
14:20;83:3;132:20;
134:24;135:1,9,20
**disputes (1)**
15:3
**disputing (2)**
135:4,23
**document (2)**
28:7;129:2
**documents (5)**
20:10;21:13;28:6;
128:19;133:13
**done (21)**
22:23;39:5;48:11;
57:18;58:6;60:22;
67:21;83:23;96:24;
101:4,12;107:4;117:3;
118:9;119:9;121:17;
122:7;123:4;127:19;
135:7;138:18
**down (6)**
45:13;62:22;64:16;
65:16;74:7;82:1

Case 6:17-cv-06365-EAW-MJP  Document 65-5  Filed 03/16/20  Page 145 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

**downloaded (1)**
  33:10
**draft (6)**
  26:11,20,22;28:13,13,
  16
**drawings (1)**
  95:22
**driving (2)**
  113:24;120:17
**drop (2)**
  63:15;109:16
**dropped (1)**
  22:18
**dry-in (5)**
  99:18,20;101:2,4,5
**drying (1)**
  99:23
**drywall (2)**
  68:8;111:21
**due (2)**
  8:2;100:9
**duly (1)**
  4:7
**duration (3)**
  40:15;55:22,24
**during (12)**
  21:16,22;45:15;58:6;
  68:5;103:11;104:7;
  105:9,12;119:1;128:7;
  130:18

**E**

**earlier (5)**
  27:15;33:11;44:16;
  130:11;131:9
**early (2)**
  102:5;121:10
**east (10)**
  54:10,17;72:10;
  89:15,24;90:1,11,17;
  91:1;92:1
**Eastman (1)**
  15:22
**effect (1)**
  112:14
**effective (1)**
  97:21
**efforts (1)**
  102:2
**egress (1)**
  109:9
**eight (1)**
  13:15
**either (15)**
  19:8;23:18;24:2;
  43:10;75:13;76:11;
  78:9,20;85:3;89:11;
  91:6;116:8;122:12;
  134:10;135:4
**elaborate (1)**
  14:15
**elapsed (1)**

  90:15
**elements (2)**
  38:8;130:13
**elevation (7)**
  72:4;121:8,11,12,13;
  123:2,14
**elevations (1)**
  123:8
**else (15)**
  6:15;49:5;58:11;
  61:1;66:22;72:21;
  77:15;87:17;102:12;
  119:18;134:18,20,22;
  135:8,14
**employ (1)**
  28:4
**employed (1)**
  61:2
**employees (1)**
  99:17
**employment (1)**
  5:12
**enclose (3)**
  68:6,7;136:20
**enclosed (1)**
  70:9
**enclosure (11)**
  34:8;54:15;55:14;
  69:24;73:17;89:12;
  104:14;120:14;121:5;
  123:21;126:10
**enclosures (1)**
  74:10
**end (2)**
  89:10,11
**ended (1)**
  124:18
**ends (2)**
  38:6;39:15
**engaged (8)**
  21:3,6;22:6,7,10,15;
  37:21;44:18
**engagement (6)**
  6:14;21:5;44:17,18,
  23;45:4
**enormous (2)**
  136:19,22
**enough (14)**
  41:23;47:6;48:8;
  50:4;62:15,15,15;
  64:21;72:9,14;73:9;
  88:15,17;123:1
**entire (8)**
  41:15;70:4;88:20;
  89:3;102:1;110:18;
  122:9;129:3
**entitlement (21)**
  75:22;77:3;78:9;
  95:2;98:5;102:20;
  103:13;113:1;126:23;
  127:2,4,6,9,11,13,15,16;
  131:16;135:3;136:1,11
**entitlements (3)**

  134:17,19,23
**equally (1)**
  117:11
**erect (8)**
  50:6;63:22;67:10,13;
  90:22;106:13,16;
  117:16
**erecting (5)**
  61:14;62:24;108:22,
  23;116:22
**erection (22)**
  43:10,22;45:21;
  48:20;49:4;50:11,11,
  13;52:23;67:7,14,15;
  68:5;69:22;93:13;
  106:5;107:9;121:21;
  122:7,14,16,19
**erector (4)**
  49:24;63:11,19;64:6
**Erin (1)**
  33:11
**error (13)**
  49:3;59:20;61:4;
  63:11;64:5;69:17;
  72:20;116:2,6;118:1,1;
  121:13,16
**errors (8)**
  56:23;59:24;68:18,
  22;69:15;84:8;100:9;
  121:20
**essentially (1)**
  132:7
**establish (1)**
  137:8
**et (1)**
  28:10
**evaluate (1)**
  76:17
**even (12)**
  41:21;57:3;66:18;
  67:22;69:14;70:7;
  97:23;99:1;102:4;
  110:10;113:15;125:16
**everybody (1)**
  102:8
**everyone (2)**
  61:1;102:12
**evidence (1)**
  136:5
**exact (1)**
  90:15
**exactly (7)**
  19:23;69:15;82:1;
  88:13;124:1;133:8;
  136:10
**EXAMINATION (1)**
  4:9
**examined (2)**
  4:8;137:12
**example (4)**
  83:6;115:3;117:14;
  129:1
**examples (1)**

  75:24
**except (2)**
  4:2;47:11
**executive (1)**
  5:16
**Exhibit (3)**
  33:4;35:5;53:6
**exhibits (2)**
  33:13;53:9
**exist (2)**
  38:15;112:12
**expand (1)**
  15:6
**expanded (1)**
  14:14
**expansion (1)**
  121:9
**expect (1)**
  62:17
**expecting (1)**
  59:12
**expensive (1)**
  51:24
**experience (2)**
  13:9,10
**expert (22)**
  5:2;30:5,9,14,18,22;
  31:1,3,3,12,19,20;32:2,
  4,22;33:8;96:3;98:24;
  101:17;102:4;127:21,
  22
**expertise (2)**
  39:2;95:18
**explained (1)**
  134:19
**extended (1)**
  126:13
**extensions (3)**
  10:2,3;12:5
**extent (4)**
  7:23;47:12;134:13,16
**extra (1)**
  42:23

**F**

**fabricated (1)**
  67:6
**fabrication (7)**
  43:10,22;44:4,6;47:2;
  49:3;50:13
**fabricator (2)**
  49:23;64:6
**facility (3)**
  51:7;124:10;125:22
**fact (9)**
  24:7;34:11,17;37:11;
  42:5;49:20;76:10;
  134:14;136:3
**factor (1)**
  114:1
**factory (1)**
  125:22

**facts (8)**
  82:2,10;86:3;120:12;
  134:9,11;135:21,23
**factual (2)**
  26:14;131:16
**factually (1)**
  132:19
**failed (3)**
  9:1;31:17;127:20
**failing (1)**
  105:19
**failure (4)**
  42:17;101:4;105:5,8
**familiar (4)**
  44:3;99:22;108:5;
  109:14
**far (3)**
  28:12;88:15,17
**fast (2)**
  64:21;73:9
**fault (5)**
  18:14,15;41:22;
  63:11;101:23
**faulty (1)**
  100:3
**feasible (2)**
  36:22;37:11
**feeling (1)**
  111:4
**feet (1)**
  65:8
**few (3)**
  31:7;68:23;100:17
**field (13)**
  56:22,23;58:5;72:22;
  73:4;112:19;116:22;
  117:15;120:20;122:4;
  124:19;133:3,9
**fifth (1)**
  48:3
**figure (3)**
  62:3;65:11;76:17
**figured (1)**
  62:5
**file (1)**
  98:1
**files (1)**
  33:14
**final (4)**
  26:6,11,22;128:19
**finalized (2)**
  26:6;28:15
**finalizing (2)**
  28:17;29:3
**find (8)**
  42:5;47:24;62:7;
  69:17;110:5;115:13,15;
  116:2
**findings (3)**
  7:18;12:6;85:15
**fine (3)**
  130:18;132:24;
  138:19

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 146 of 154

The Pike Company, Inc. vs.                                          Richard Merkhofer
Universal Concrete PRoducts, Inc.                                  January 07, 2020

**finish (12)**
  64:17;67:23;68:2,9;
  69:13;70:10;94:12;
  107:10;110:12,13;
  111:12,18
**finished (2)**
  47:17;137:2
**finishes (1)**
  68:9
**firm (2)**
  26:17;29:2
**first (50)**
  6:12;7:22;19:7,17,18,
  19,21;20:6,15;21:1,11,
  21,22;22:10,17,22;
  23:13;28:15;35:1;
  38:19;44:4,17;46:4;
  48:14;50:10;53:2,5;
  54:7,8,24;55:2;56:10;
  59:18;60:15;61:17;
  73:13;75:2;78:23;
  83:14,15;85:21;86:9;
  89:2;91:22;98:14;
  101:12;116:24;123:16;
  129:4;130:7
**fit (7)**
  61:4;62:2,2,11;63:10;
  116:8;119:3
**fitting (2)**
  62:4,14
**five (6)**
  54:15;89:13;121:6;
  123:21;126:10;137:2
**Five-minute (1)**
  74:13
**fix (11)**
  59:8,9;61:14;118:5,8,
  16;119:8,8;120:20,21,
  21
**fixes (1)**
  119:19
**fixing (3)**
  58:5;62:23;116:21
**flaws (1)**
  80:21
**floats (1)**
  38:6
**floor (1)**
  48:3
**floors (1)**
  87:23
**focus (1)**
  7:1
**focuses (1)**
  57:3
**focusing (5)**
  12:3;41:17;42:10;
  47:8;86:11
**followed (1)**
  93:1
**follows (1)**
  4:8
**footprint (1)**

  89:12
**force (1)**
  120:17
**forced (1)**
  72:19
**forget (1)**
  34:1
**form (2)**
  4:3;73:2
**formats (1)**
  38:7
**forth (1)**
  86:4
**forward (3)**
  58:1;86:21;91:12
**found (2)**
  52:16;115:1
**foundation (1)**
  36:11
**foundations (1)**
  46:6
**four (2)**
  90:6;98:13
**frame (2)**
  75:11;128:21
**full (1)**
  81:17
**functions (1)**
  5:18
**further (1)**
  136:18

**G**

**gave (7)**
  15:19;29:22;31:8;
  54:15;65:17;75:24;
  121:6
**general (9)**
  6:23;9:7,24;24:24;
  41:2;95:18;97:11;
  109:13;110:8
**generally (4)**
  51:10;60:12;97:21;
  115:20
**Geneseo (3)**
  12:20,20;13:4
**G-E-N-E-S-E-O (1)**
  13:4
**gets (3)**
  12:24;39:5;64:4
**given (5)**
  47:16;70:23;71:8,22;
  134:13
**Global (1)**
  13:18
**Gloria (2)**
  36:5;40:24
**goes (4)**
  93:12,14;125:21;
  136:18
**Good (8)**
  4:11,12;17:20;38:9,

  13;62:7;96:19;99:22
**grab (2)**
  63:15;64:18
**grade (5)**
  85:21,21,24;86:7,19
**grammatical (1)**
  27:10
**graphic (4)**
  53:18;55:14,15,19
**graphics (2)**
  65:23;120:14
**group (2)**
  5:21;36:6
**groups (2)**
  38:21,23
**guess (4)**
  41:23;118:7;123:8;
  134:7
**gut (1)**
  111:3
**guys (3)**
  62:1,3,19

**H**

**hand (2)**
  12:17;53:6
**handed (1)**
  57:14
**handles (1)**
  128:1
**hang (9)**
  48:16;49:1,2;50:17;
  59:21;67:2;78:23;
  88:22;93:21
**hangers (1)**
  62:14
**hanging (10)**
  50:9;52:18;61:24;
  62:1,19;65:9,11;66:19;
  88:7;93:10
**happen (7)**
  38:18;39:6,8;73:6;
  88:13;109:15;134:8
**happened (11)**
  22:3,5;28:9;31:11;
  61:6,7;62:8;81:13;
  104:10;110:2;132:23
**happens (2)**
  60:24;116:2
**hats (1)**
  16:19
**head (2)**
  5:5,7
**hear (4)**
  20:18;77:16,18;108:8
**help (5)**
  14:18;16:15;32:17;
  36:5;103:11
**high (2)**
  62:15,16
**hire (1)**
  38:20

  **hired (10)**
  10:16;13:1,21;14:10;
  16:6;17:3;28:2;82:19;
  83:16,22
**history (1)**
  127:18
**Hohns (1)**
  5:13
**hold (1)**
  111:11
**holding (1)**
  64:11
**home (1)**
  96:18
**Hornell (2)**
  16:22,22
**Hospital (1)**
  14:6
**hour (3)**
  117:18;118:8;120:22
**hundred (3)**
  61:19,22;130:16
**hung (6)**
  48:14;49:21;61:3;
  78:23;88:4;89:23
**hypothetical (11)**
  65:6,17;101:9,17,18;
  112:20;116:11;118:4;
  133:24;134:9,10
**hypothetically (1)**
  134:5
**hypotheticals (2)**
  102:6;110:24

**I**

**ice (2)**
  97:5,13
**idea (11)**
  41:14;47:8;51:1;
  52:6;63:4;64:3;71:17;
  92:10;111:24;117:6;
  136:22
**identical (1)**
  123:7
**identification (1)**
  33:5
**identified (7)**
  6:6,12;35:14;46:7;
  85:2,4;114:7
**identifies (1)**
  44:13
**identify (7)**
  33:22;44:5,10;45:24;
  50:10;66:24;86:11
**imagine (1)**
  52:6
**immediately (3)**
  21:3;63:13;88:22
**impact (12)**
  45:14;50:6;58:2;
  76:16;98:5;111:3,4;
  112:7,24;117:4;120:4,

  13
**impacted (11)**
  45:8;46:8;90:8;
  93:21;113:6,16;114:12;
  118:14;134:8,20;
  136:20
**impacting (1)**
  59:9
**impacts (1)**
  25:16
**implementation (1)**
  134:16
**imply (1)**
  64:10
**important (3)**
  37:9;122:16,21
**impression (1)**
  88:19
**improved (1)**
  37:1
**inability (1)**
  48:16
**inadvertently (1)**
  35:4
**inches (1)**
  65:8
**include (11)**
  11:1,2;67:22;80:2;
  86:20;101:2;125:24;
  126:1,2;134:17,18
**included (11)**
  23:21;32:8;34:4,16;
  98:19,21;99:1,2;
  104:13;125:16;131:13
**includes (2)**
  33:12;46:5
**including (1)**
  10:21
**inclusion (1)**
  126:13
**Incorporated (1)**
  5:14
**incorrect (7)**
  13:12;49:7;77:11;
  106:2;119:21;124:24;
  132:13
**independent (1)**
  119:16
**indicate (1)**
  119:5
**indicated (4)**
  23:2,3;72:6;129:15
**individual (3)**
  65:21;101:24;135:2
**individual's (1)**
  135:22
**industry (2)**
  5:18;96:1
**infiltration (3)**
  97:9,20,24
**information (17)**
  8:12;32:9,17;39:11;
  52:14;103:10,17;

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 147 of 154

The Pike Company, Inc. vs.                                    Richard Merkhofer
Universal Concrete PRoducts, Inc.                            January 07, 2020

113:13;114:10;119:10;
120:1;126:11,15;129:4,
17;136:10,17
**informed (1)**
    31:13
**Inglis (1)**
    5:13
**ingress (1)**
    109:9
**initial (11)**
    15:6;22:2;29:18,21;
    30:13;31:24;45:24;
    90:8,14;101:7;134:2
**initially (6)**
    8:9;9:4;30:10;45:7,
    13;138:2
**input (1)**
    15:19
**inside (1)**
    109:12
**inspection (1)**
    104:23
**inspections (4)**
    105:2,6,19,19
**install (32)**
    46:12;47:18;54:9;
    56:7,16;57:16;58:9,9,
    19;60:8,13,14;64:23;
    65:3,7;68:10,12,16;
    70:20,23;71:10;73:3;
    78:3;107:14;108:15;
    111:8;114:23;121:15,
    16;128:12;132:17;
    134:21
**installation (41)**
    55:6,7,22;56:2,4,11;
    58:3,7,17;59:2;74:13,
    20;76:23;78:10;79:1;
    80:18,20;86:14;90:17;
    91:5;92:15,19;105:9,12,
    21;108:3,6;110:6;
    117:19,22;118:13;
    119:1,2;124:14;125:16,
    17,18;126:18;129:3,19;
    134:16
**installed (23)**
    53:2,5;63:13;65:7,10;
    71:8,22;93:11;95:6,12;
    96:6;98:7;108:17;
    114:19,20,21;115:2,3,9,
    17;116:7;124:4;137:24
**installing (20)**
    46:21;47:3,7;49:10;
    53:13,15;55:9;64:13;
    67:23;69:2,7;78:8;
    87:12,14;91:1,24;
    108:1;109:11;116:9;
    137:23
**instance (5)**
    56:24;67:1,3;83:21;
    102:1
**instances (7)**
    20:19;68:23;82:17;

84:22;85:2;86:3;114:7
**instead (2)**
    19:1;81:4
**insufficient (1)**
    42:21
**intact (1)**
    109:4
**intended (3)**
    52:22;75:12;97:19
**intent (1)**
    41:6
**intentional (1)**
    123:4
**interesting (2)**
    16:2,8
**interior (4)**
    68:9;87:23;110:10;
    111:6
**internally (1)**
    59:1
**into (35)**
    5:23;14:14,24;30:4;
    39:10;42:8,9;43:20,21;
    46:22;50:12,19;64:4;
    75:6,22;76:3;78:8,19;
    79:18,21;87:15;92:2,
    23;93:19;95:16;96:23;
    97:2;101:13;102:20;
    113:23;120:1;126:3;
    127:24;128:8;133:5
**introduced (1)**
    4:16
**introduction (1)**
    98:14
**investigate (17)**
    25:6;41:24;42:3;
    47:21;49:15;62:7;76:7;
    77:13;94:23;98:4;
    107:24;108:3;109:22;
    114:8;135:17;137:19;
    138:4
**investigated (1)**
    135:16
**investigating (1)**
    22:5
**investigation (8)**
    22:3;40:21;42:12;
    119:17;127:5,6;135:11,
    22
**involved (16)**
    5:1;6:2;10:5;15:2;
    19:11,24;20:11;27:1,
    18;32:20;42:23;85:8;
    97:1;98:11;100:13;
    119:18
**isolate (1)**
    116:21
**issue (31)**
    21:5;65:21;68:24;
    69:1;73:4;86:19;93:23;
    94:10;101:10;105:15;
    108:11;112:7;113:24;
    114:7,8;115:5,6;

116:17;117:1,23;
118:15;122:3;124:13,
17,18,20,21;125:2,12;
128:5;131:16
**issues (23)**
    18:20;57:17,18;58:4;
    66:4,5;69:4;75:5;82:8;
    85:13;93:5,8,20;
    101:13;108:1;119:1,3,
    7;120:19;126:19,20;
    133:21;134:6
**item (5)**
    108:12;109:11;
    118:13;120:2,3
**items (1)**
    113:11
**Ithica (1)**
    11:19

### J

**January (1)**
    55:18
**Jersey (1)**
    5:15
**job (16)**
    16:11;22:1;32:16;
    38:15;39:24;44:14;
    69:18;75:24;76:18;
    92:5;99:23;103:3;
    104:7;132:2,21;136:21
**judge (1)**
    136:4
**July (1)**
    70:3
**jumped (1)**
    19:24
**jury (1)**
    136:4

### K

**keep (11)**
    58:1;64:19;66:5;
    68:7;72:11,23;86:10;
    122:4;126:23;132:22;
    138:20
**Ketchen (1)**
    20:20
**key (5)**
    54:16;94:8,9;130:12,
    13
**kind (21)**
    14:24;15:1;16:2,18;
    17:15;38:9;39:13;52:9,
    13;76:18;78:5;81:7;
    86:17;92:16;96:7;
    104:2;105:24;110:5;
    116:12;126:3,8
**kinds (1)**
    122:23
**knew (1)**
    52:4

**known (1)**
    130:6
**knows (1)**
    8:19

### L

**labeled (1)**
    98:14
**labor (1)**
    86:8
**ladders (1)**
    109:1
**land (1)**
    64:15
**landed (1)**
    60:18
**large (1)**
    101:3
**larger (1)**
    113:16
**last (10)**
    81:1;90:5;95:5,11;
    98:15;100:16,17;
    110:23;121:3;138:1
**late (11)**
    10:20;50:18,21;76:5;
    78:21;79:4,14,21;83:7;
    108:9;111:1
**later (11)**
    8:19;31:6;63:10;
    68:2;80:19;92:7;
    109:20;110:23;131:1;
    137:15;138:1
**Laurel (2)**
    5:15,17
**law (2)**
    26:17;29:2
**lawsuit (1)**
    127:10
**lawyers (1)**
    29:3
**lays (1)**
    89:13
**leads (1)**
    119:10
**learn (1)**
    20:6
**learned (7)**
    20:11;21:15,17,18,22,
    24;102:5
**leased (1)**
    51:21
**least (1)**
    111:9
**leave (3)**
    109:15;110:14;111:7
**led (1)**
    133:13
**left (2)**
    110:11,21
**letter (1)**
    21:5

**level (1)**
    93:22
**lift (1)**
    63:23
**limited (2)**
    93:1;113:13
**line (5)**
    70:2;87:2;89:15;
    98:22;134:9
**lines (3)**
    29:17;87:3;134:2
**link (2)**
    33:10,20
**list (5)**
    13:13;18:2,2;19:2;
    96:18
**listings (1)**
    6:2
**litigating (1)**
    82:24
**litigation (10)**
    6:14;10:5;15:1;30:4;
    31:19;94:21;127:19,24;
    128:1;131:19
**little (11)**
    14:3;42:9;53:1;
    54:15;57:13;61:16;
    66:4;97:3;110:12;
    116:1;124:2
**lived (1)**
    81:12
**Living (1)**
    15:9
**load (1)**
    60:16
**loaded (1)**
    51:15;60:21
**location (3)**
    51:3;78:4;115:17
**locations (1)**
    116:10
**logically (2)**
    38:5;39:14
**logs (1)**
    32:6
**long (13)**
    46:11,11,15;60:20,
    23;62:3,15,16;63:4;
    66:7;79:6;117:5;119:8
**longer (15)**
    53:1;54:9,11;57:5;
    66:3;67:9;88:16;116:7,
    8;117:22;118:15;124:3;
    131:5;132:18,21
**look (79)**
    7:1;8:1;12:1;18:2;
    19:2,22;20:9;22:11,13;
    23:16;27:20;37:24;
    38:2;44:9;45:12,17;
    50:2;52:19;53:18;
    54:15;55:14,15,21,21;
    56:24;62:13;65:21,23,
    24;67:3,4,7,18,19,20;

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 148 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

69:24;70:1,5;72:17;
73:16;74:9,9;78:22;
79:2;88:9;89:7,12;
90:20;91:23;92:3,21;
95:22;101:10,11,11;
102:7,12;105:11;
109:21;111:22;114:14;
120:13,15;121:5,6;
122:12;123:10,22,22;
125:19;127:6,18;
128:21;133:5,11,15;
134:11;136:2,5
**look-ahead (2)**
    103:22;104:6
**looked (6)**
    9:23;45:9;48:10;
    49:16;80:15;134:6
**looking (9)**
    13:6,8;22:7;38:17;
    74:23;105:14;121:2,5;
    132:20
**loss (2)**
    5:24;127:11
**lot (9)**
    15:1;39:3;77:20;
    84:20;101:12;118:9,15;
    123:19;132:18
**Lowe's (2)**
    16:22;17:11
**Lytle (3)**
    6:11;29:24;31:18

## M

**magnitude (4)**
    23:5;69:1,7;114:15
**major (2)**
    16:9;35:3
**makes (6)**
    39:16;41:10;54:18;
    118:15,17;123:5
**making (7)**
    28:23;37:9;38:4;
    49:7;64:1;65:18;83:8
**manner (2)**
    40:7;113:17
**manufacture (3)**
    51:2;52:22;75:20
**manufactured (3)**
    51:6,11;75:19
**manufacturing (3)**
    51:7,9,13
**many (19)**
    59:23,24;60:5,8,11;
    65:2;66:4;69:4,15;
    71:14;78:21;95:8;
    102:7;106:18;112:16,
    17;118:17,20;125:5
**March (5)**
    67:21;68:6;107:3,4,4
**Marist (4)**
    6:13,15;19:5,8
**marked (2)**

33:3,5
**material (1)**
    126:24
**matriculated (1)**
    25:22
**matrix (1)**
    123:20
**matter (16)**
    12:7;14:21;26:15;
    50:14,20;66:3;76:15;
    86:13,15;100:19;
    102:18;121:11,12,17;
    127:1;130:17
**mattered (1)**
    127:5
**matters (4)**
    5:1;47:11;86:13,16
**may (25)**
    5:1;6:6;10:19;13:12;
    29:1,14;41:20;55:23;
    57:16,19;61:5;74:19;
    86:6;88:5;96:13;97:3;
    105:17;106:2;107:13;
    112:20;130:20;131:16,
    16;134:11;137:2
**maybe (3)**
    17:19;50:1;110:22
**McNELLY (16)**
    4:10,13;8:18,22;13:8,
    12;24:1,4;33:6;74:16;
    104:22;137:1,4;138:7,
    13,19
**mean (14)**
    10:17;56:1;57:23;
    69:23;70:13,13;82:5;
    89:8;95:23;97:13;
    110:14;120:13;125:17;
    138:12
**meaning (3)**
    72:8;87:1;123:8
**means (3)**
    65:14;66:18;70:18
**meant (5)**
    10:16,23;22:12;
    57:21;89:19
**measurement (1)**
    57:18
**mediate (1)**
    32:18
**mediation (32)**
    7:12,12;14:24;25:22,
    24;26:11,24;27:1,2,4,
    15;30:3,15;31:2,16,17,
    17,24;32:4,5,15;79:6,8;
    80:4,6;81:11,14,17;
    98:23;99:2,6;127:19
**mediations (1)**
    18:8
**mediator (2)**
    32:16,21
**meet (5)**
    20:8;21:14;28:8;
    38:16;42:17

**meeting (3)**
    22:22;103:2,11
**meetings (5)**
    52:8,11;103:3,15,16
**memory (2)**
    18:3;114:11
**mentioned (12)**
    27:14;36:13;38:17;
    45:22;58:4;73:4;74:20;
    87:24;103:11;104:18;
    105:17;122:23
**mentioning (1)**
    42:8
**MEP (2)**
    87:16;92:24
**Mercy (1)**
    14:6
**MERKHOFER (4)**
    4:7,19,20;128:3
**met (3)**
    9:23;22:1;64:23
**metal (1)**
    119:3
**methodology (4)**
    46:10;57:10;104:5;
    130:14
**methods (1)**
    70:18
**might (22)**
    19:23;38:23,24,24;
    39:10;40:5;56:22;57:1,
    4;59:1;62:5;75:1;77:20;
    80:17;93:23;96:2;
    111:20;113:7;115:20;
    118:6;119:3;120:12
**mind (4)**
    18:23;19:3;72:23;
    122:4
**mine (2)**
    37:12;128:4
**minimal (1)**
    32:9
**minor (1)**
    14:23
**minute (1)**
    104:20
**minutes (4)**
    31:7;103:2,11;137:2
**missing (2)**
    33:15;64:18
**misunderstand (1)**
    44:16
**misunderstanding (2)**
    120:8;130:20
**misunderstood (4)**
    50:1;88:18;91:18;
    109:7
**mitigate (2)**
    97:16,19
**mitigated (1)**
    97:9
**mix (1)**
    82:10

**modification (1)**
    75:1
**modifications (2)**
    94:7;119:19
**modified (10)**
    29:18;63:12,21;
    74:21;98:23;130:2;
    131:2,3,6,9
**modify (10)**
    61:10;62:22;64:15;
    100:7;10;110:22;116:3;
    117:16;131:3;134:3
**modifying (1)**
    56:21
**momentarily (1)**
    64:13
**months (9)**
    66:2,2,3;67:8,9;68:2;
    113:18,18;118:5
**more (13)**
    14:15;24:3;39:17;
    61:16;81:16;88:12;
    110:20;120:24,24;
    127:7;130:9;132:2;
    136:15
**morning (3)**
    4:11,12;60:14
**most (8)**
    11:9,11;15:20;51:20;
    59:14;83:23;123:1,5
**Mostly (1)**
    11:9
**Mount (2)**
    5:14,17
**Move (14)**
    50:8;51:3;58:13;
    59:7;66:22;70:21;
    72:11;86:3;88:14;
    116:4;117:20,21;
    121:12,18
**moved (3)**
    5:23;90:7;91:21
**moves (1)**
    92:8
**moving (3)**
    31:18;58:1;86:21
**much (15)**
    12:13;32:17;38:24;
    51:8;54:9;61:18;63:1,5;
    64:1;74:14;84:1;97:1;
    110:8;136:15;138:9
**multiple (5)**
    19:1;87:2,3;109:4;
    122:22

## N

**naive (1)**
    88:5
**name (4)**
    4:13,15,17;13:3
**necessarily (10)**
    11:3;39:2;94:4;

108:20;110:22;112:16;
116:17;119:24;120:3;
131:20
**necessary (3)**
    96:5;107:14;123:17
**necessity (1)**
    5:4
**need (10)**
    31:19,19;48:6;71:4,
    21;74:14;75:1;96:21;
    71:14;130:22
**needed (17)**
    16:9;30:4;31:10;
    37:2;41:21;43:13;
    49:20;57:17;67:10;
    70:10,20;71:23;108:16;
    118:21;123:13;129:17;
    136:13
**needs (4)**
    51:14,20;63:21;73:1
**negotiate (2)**
    10:1;12:4
**New (16)**
    5:15;6:10,13;9:11;
    11:19;12:20;13:19;
    14:6;15:23;16:22;
    17:12;18:1;51:4,18;
    98:13;131:7
**next (12)**
    15:9,22;16:22;17:11;
    62:23;63:16,24;64:17,
    19,19;89:22;95:8
**non-bearing (1)**
    93:6
**non-critical (1)**
    118:16
**none (2)**
    47:11;119:11
**normal (2)**
    20:8;120:21
**normally (2)**
    35:5;108:11
**north (7)**
    54:10;55:23;89:14;
    90:14;91:22;92:1;
    121:14
**note (3)**
    106:2,3,12
**notice (2)**
    138:16,17
**notify (2)**
    30:21;50:23
**November (9)**
    53:21;55:17;71:10,
    11;88:11;106:5;107:1,
    2;122:14
**number (17)**
    5:1;32:10,10;36:13;
    53:6,18;54:15;55:15;
    60:2,3;69:24;73:17;
    76:5;89:13;94:2;121:6;
    123:21
**numbers (1)**

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 149 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

106:21
**numerous (3)**
18:4;115:16;117:14

# O

**Objection (3)**
23:23;69:12;123:18
**objections (1)**
4:2
**obligated (3)**
131:12,24,24
**obligation (1)**
132:4
**observe (1)**
81:18
**occur (2)**
54:7;55:1
**occurred (28)**
10:1;11:10;12:2;
27:17;42:1;44:14,20;
45:15;54:8;55:2;57:4;
72:21;74:19;94:19,20;
105:12;107:8;109:23,
24;112:2;119:1,6;
120:9;122:4;125:3;
128:7;131:23;133:22
**occurrence (2)**
59:17;73:13
**occurring (6)**
23:21;27:21;45:11;
87:8;92:19;118:19
**occurs (1)**
51:2
**October (2)**
70:5;122:13
**odd (1)**
114:6
**off (16)**
33:20;53:10,11;
60:17;63:23;104:19,21;
110:11,14,21;111:8,11;
115:21;117:20;125:9,
10
**office (2)**
5:15,17
**offices (1)**
5:14
**official (1)**
35:6
**old (1)**
13:13
**older (2)**
12:24,24
**Once (7)**
56:15;62:19;80:18;
87:13;90:19;109:13;
112:13
**one (88)**
5:18;6:12,12,17,18;
8:9;13:19;14:23;15:9,
12,22;16:1,6,22;17:1,
11,14;19:8,24;20:1,1,

13;21:8;22:8,8,15,18;
23:11,13,15,18,22;24:5,
10,12,14;25:3;27:19,24;
28:5;30:6;32:10;33:2;
39:22;43:22,22;44:2,
23;54:20;57:19;58:10;
59:6,6;60:4,6,12;61:5;
63:16;64:23,24;65:22;
68:12;69:9;70:20;
74:12,12;78:9,18;83:12,
14;85:24;86:1,3;88:7;
115:7,20;117:12,13,23;
123:13,17;127:17;
129:22,24;130:12;
132:20;134:19;138:12
**one-day (1)**
59:9
**ones (2)**
38:23;87:7
**one's (1)**
101:23
**only (21)**
8:16;15:17;22:4,6;
30:16;35:23;47:18;
52:16,24;56:3;73:22;
85:5;113:4,22;118:5,8;
120:5;121:8;126:11;
127:20;135:9
**open (2)**
38:6;39:15
**operator (1)**
61:1
**opine (3)**
79:23;101:18;134:10
**opinion (5)**
99:10;120:10,17,24;
133:20
**opinions (3)**
75:14;119:23;132:20
**opposed (1)**
30:10
**option (1)**
63:21
**order (6)**
76:12;103:16;114:19,
22;115:22;133:10
**original (4)**
78:11;85:19;134:1;
137:24
**originally (5)**
90:16;91:2,17;96:5;
102:3
**Orlando (1)**
5:15
**others (5)**
8:8,10;18:23;81:18;
138:14
**out (30)**
6:10;18:23;32:11,12,
13,24;52:16;57:17;
58:14,15,16;62:4,5,7;
65:11;76:17;88:15,17;
89:13;91:21;98:22;

101:22;109:15;110:5;
115:1,13,15;116:6;
117:13;127:8
**outside (4)**
35:9;85:15;108:24;
109:16
**over (7)**
59:8;65:9;68:22;
83:1;85:3;102:5;121:18
**overall (4)**
77:19;80:15;113:15;
114:16
**overhang (2)**
97:5,12
**overlap (1)**
20:4
**overlooking (1)**
65:23
**oversaw (1)**
15:19
**overseeing (1)**
10:18
**own (5)**
41:22;72:12;100:9;
127:16;135:10
**owner (12)**
10:2;11:9;12:4,8;
18:10,12,13,17;19:1;
37:14;102:23;103:4
**owner-caused (1)**
12:3

# P

**P-1 (2)**
33:3,4
**packages (1)**
43:22
**page (7)**
6:12;9:11;12:23;
13:11,15;35:15;98:13
**pages (2)**
6:2;13:12
**paid (1)**
42:24
**panel (113)**
23:3;32:5,8;48:15;
49:1,2,11;50:10;51:3,9;
53:2,5;55:6,22;56:10;
57:2,19;58:3,5,7,9,13,
17,23;59:2,6,8,12,14,
21;60:13,16,17;61:4,10,
12,13,17,24;62:6,14,21,
23;63:2,9,12,15,16,20,
24;64:11,14,15,16,17,
19,19,23;65:2,7,9,12,
13,20;66:10,20,23,24;
67:1;69:16;70:5,20;
71:2,20;72:3;73:2,6,7,
13;74:12,12,20;75:19,
20;80:14,15;83:3;
86:14;93:15;95:5;
113:6,20,23,23;115:17;

116:18;117:16,17,19,
21,21;118:13;119:2;
121:3;122:12;123:1,22,
23;125:20,20;126:11;
129:4
**paneling (1)**
95:11
**panels (202)**
46:13,19,21;47:3,7,
18;48:16;49:10,21;
50:3,6,17;52:18,23;
53:1,13,15,20,22;54:9;
55:7,9,17,18,24;56:7,
16,21;57:5,6,16,18;
58:9,19;59:4,5,7,13,15,
23;60:3,8;61:12,14,18;
62:24;64:21;65:24;
66:1,3,6,11,13,15;67:5,
9,12,19,21;68:10,13,16;
69:2,16,18,19;70:2,6,
11,22,22;71:7,9,14;
72:1,6,6,7,9,13,14,23;
73:8,10,11,12,15,18;
74:21;75:11;76:5,7,13,
21,23;78:3,4,7,8,11,24,
24;87:12,14;88:4,7,11,
16,22;89:23;90:23;
91:1,4,13,21,24;92:3,5;
93:10,14,16,22;94:13,
14;105:21;106:5,13,16;
107:9,10;108:2,15,23,
23;109:5,5,11,20;112:4,
8,17;113:15,16,17,19;
114:12,14,16,18,20,21,
24;115:8;116:5,7,9,19,
19,23;117:2,4,23;118:5,
14;120:15,16,19,24;
121:3,7,14,21;122:5,7,
9,15,18,23,24;123:13,
17;124:1;125:5,15,24;
126:13;128:12;129:2,
19;130:22;131:4,5,6;
132:17,18;134:21,22;
136:20;137:12,12,23;
138:1
**paragraph (2)**
98:14,14
**parallel (5)**
87:3,3,10;92:11,19
**Park (1)**
15:9
**part (27)**
22:2;26:8;27:15;
30:18;31:4;32:15;36:7;
37:5,12;43:15;45:23,
24;72:10;76:3;77:21;
79:22;86:19;93:13;
103:9,14;104:15,16;
111:23;113:1,16;116:4;
129:11
**partially (2)**
4:15;23:17
**particular (11)**

56:24;57:2,3;59:21;
61:12;68:12,15;70:20;
88:5;114:19;122:22
**parties (1)**
4:2
**parts (2)**
24:3;119:7
**party (1)**
77:1
**past (1)**
105:17
**path (28)**
57:22,23,24;58:6;
59:10;63:8;64:20;68:3,
4;76:2;108:11;111:5,
14;113:7,11,19,24;
114:8;117:21,22;
118:10,12;119:11,12;
120:2,3,17;121:1
**payment (2)**
32:7;43:5
**payments (1)**
83:1
**people (5)**
28:8;39:1;81:10,24;
104:7
**per (9)**
50:4,16;69:22;71:11;
102:16;112:15;121:7,8,
8
**perceive (1)**
130:18
**percent (11)**
47:5;48:7;70:6;
73:23;74:3,4;88:12;
94:14;114:13,14;125:8
**percentage (3)**
32:8;74:7;113:14
**perform (5)**
5:17;20:10;102:16,
19;113:11
**Performance (2)**
49:23;132:1
**performed (3)**
9:24;99:18;100:9
**period (1)**
16:17
**permanent (1)**
111:12
**permit (2)**
97:4;106:4
**permitted (1)**
101:18
**person (1)**
15:19
**phase (63)**
6:19,20;7:8,19;8:9,
23;19:8,8,15,19,19,24;
24;20:1,2,6,13,15;
21:19,21,22;22:5,6,7,7,
8,10,15,15,17,18;23:10,
11,13,13,14,15,21,22;
24:5,6,10,10,12,12;

Case 6:17-cv-06365-EAW-MJP    Document 65-5    Filed 03/16/20    Page 150 of 154

The Pike Company, Inc. vs.                                      Richard Merkhofer
Universal Concrete PRoducts, Inc.                              January 07, 2020

25:18;26:10;27:18,24;
28:5;30:6;44:18,23;
78:5,17,18;82:18;
83:14;115:5,6,7,12,24
**phases (3)**
20:4;23:19;86:1
**phasing (1)**
89:5
**Philip (1)**
20:21
**Phillips (3)**
6:11;29:24;31:18
**pick (3)**
60:17,18;72:2
**pictures (1)**
74:24
**piece (3)**
90:5;110:23;137:7
**pieces (2)**
89:16;128:1
**Pike (128)**
6:10;8:24;9:6,8,15,
20:10:1,10,14,16,17,17,
20,23;11:3,10,23;12:3,
14;13:22;14:11;16:7;
17:4,18,24;18:24;
19:10;20:17,18;21:9;
22:24;25:1,9;26:15,21;
28:2,12;29:3,24;32:19;
33:23;34:23;35:7;36:2,
3,3,13,14,20;37:13,19;
40:18,21;41:3;42:5;
46:3,22;49:17;50:15;
52:7,21;53:4;56:19;
59:3;69:8,10;70:1,9;
73:24;75:5,13;76:1;
81:10,24;82:7,21,22,24;
83:8,18,21,21,22,24;
84:6,11,14,20,23;85:5,
7,11,15;87:14;89:13;
92:13;98:6,16,17;
99:17;102:22;103:3,4,
4;107:7;115:16;118:24;
119:13,15,19,21;120:6;
127:10,23;129:9,15,17;
130:21;131:1,1,12,13,
24;132:5,8,11;133:2;
134:3
**Pike's (9)**
34:13,14;46:7;52:21;
53:19;94:8;98:18;
129:8;131:18
**place (14)**
43:13;46:6;48:3;
61:10;62:6,21;67:6;
68:22;87:21;88:15;
90:20;92:4;116:8;
130:10
**placed (1)**
94:15
**placement (1)**
117:1
**plan (21)**

14:18;40:6;54:16;
58:23;59:1;60:7,13;
70:16;71:23;72:20;
89:1,24;90:7;91:4,24;
96:20;102:22;122:6;
124:12;129:11;136:8
**planned (11)**
53:20;66:2;67:17;
72:16;90:16;91:2;
92:23;96:21,24;116:20;
138:2
**planning (2)**
36:7;58:8
**plans (6)**
38:2;54:1;59:5;
111:22,23;123:10
**plant (2)**
51:14;124:12
**players (1)**
82:4
**Please (1)**
69:12
**plenty (1)**
111:14
**pm (1)**
138:22
**point (21)**
19:12;22:4;23:8;
26:14;38:3;46:8;48:1,4,
4;49:12;50:2,23;62:7;
66:20;69:14;70:19;
78:24;91:12;106:4;
123:19;125:17
**popped (2)**
110:1,2
**portion (7)**
39:22;94:16;100:2;
101:3,6;111:7;136:1
**portrayed (1)**
68:21
**position (3)**
5:16;38:15;131:22
**possible (4)**
8:20;32:17;97:17;
99:21
**possibly (4)**
24:19;46:24;109:15,
20
**potential (1)**
48:24
**Poughkeepsie (4)**
6:13;10:12;51:4,17
**pounds (2)**
61:19,22
**pour (1)**
73:2
**pourer (1)**
64:7
**pours (1)**
67:21
**precast (22)**
7:2,3,9,20;8:2,4;9:5;
24:7,11;44:12;46:6;

48:3,8,15;50:4;82:8,11,
12;87:21;90:3;125:20;
126:10
**preceding (1)**
45:9
**precluded (1)**
80:13
**prefab (1)**
109:3
**preparation (2)**
36:19;99:6
**prepare (5)**
7:7;28:13;31:2;
40:18;129:10
**prepared (15)**
15:6;17:7,16;25:21;
30:13;31:16;36:1;
129:2,7,8,16,21,24;
130:7;135:3
**prepares (1)**
36:4
**preparing (5)**
26:10;36:7,16;37:22;
101:1
**prerequisite (2)**
115:6,23
**present (1)**
32:16
**pretty (3)**
32:16;119:9;125:2
**prevented (1)**
86:20
**previously (1)**
34:24
**printed (1)**
33:11
**prior (13)**
6:3;23:11,15;25:24;
26:10,21;28:17;29:3;
36:12;44:14;50:8;
102:23;129:3
**Probably (27)**
12:11;21:8,13;24:19;
27:8,10;28:19;29:8;
35:2,17;36:5,14;57:1;
59:22;62:13;77:19;
79:15;80:5,10;100:17;
109:24;110:7,8;111:14;
130:4;137:6,8
**problem (22)**
57:19;58:10,11;59:6;
61:11,11,15;62:13,24;
63:2;64:10;65:12;71:2;
94:5,6,7,15;96:10;
112:18;116:21,22;
117:17
**problems (15)**
21:24;22:24;23:1;
39:10,13,16;56:21;78:5,
7,16,17;93:18;112:12;
119:22;131:23
**procedure (2)**
20:8;72:1

**process (10)**
19:13;28:4;31:4;51:9,
10;73:1,1,1;105:10;
125:21;128:7
**procure (2)**
57:6;132:17
**procurement (2)**
124:7;129:18
**produce (19)**
41:3;64:21;66:3,7;
70:15;72:8;73:9;75:11,
12;76:18;113:18;
120:15,24;121:14;
122:24;130:23;131:5;
134:21;136:19
**produced (25)**
26:23;29:17,18,21;
37:13;59:3;68:2;69:16;
70:2,6;76:8,13;78:24;
113:17;121:3,19;
122:12,13,15,19;
123:23;130:16;137:12,
15,16
**producer (1)**
82:13
**produces (1)**
40:13
**producing (7)**
66:19;70:3;72:23;
76:5;78:7;126:10;
129:18
**production (26)**
32:6,8;35:3;55:7;
56:1,2;58:3,7;64:12,20;
65:24;66:1;67:15,20;
75:14;76:23;79:4;
120:16;121:7,10;124:1;
126:6,8,9;134:16;
137:11
**productivity (1)**
5:24
**Products (2)**
4:14;106:4
**professional (1)**
38:14
**progress (2)**
20:2;52:7
**project (100)**
6:13,16,22;7:20;8:4;
9:12,15,17,19;10:10,12;
11:4,7,14,17,20,22;
12:1,2,8,21;13:2,3,17;
14:4,19;16:3,13;18:6;
19:5,8,11,14,18;20:7,
10;21:1,12;22:2,3;23:2;
25:3,10,17;28:7,9,9;
35:7;38:1,3;39:1,3,9;
40:8;41:1,6,8;42:6,13;
44:20;45:5,10,11;58:1,
2;64:12;66:6;67:11;
75:23;76:2,22;80:21,
16;82:14,15;84:13,23;
85:13;86:8;97:12;

111:3;19;112:2;114:17;
116:14;117:12,13;
118:6;119:6,14;120:7,
12,18;125:7,8;126:19;
129:9;132:16;133:22
**projection (1)**
104:7
**projects (14)**
6:2;11:11;15:1,18;
17:22,23;18:4;25:7,9,
12;36:24;41:1;82:10;
100:18
**pronounce (1)**
4:17
**proper (2)**
40:15;116:8
**protect (1)**
111:21
**protection (4)**
97:6;98:7;102:22;
111:9
**protocol (1)**
41:2
**provide (16)**
8:12,17;25:20,23;
26:20;28:16;29:2;
35:12;41:3;46:3;50:16,
21;76:11;138:13,16,17
**provided (16)**
9:16;16:15;28:14;
32:18;33:19;34:24;
35:1,9;37:13,14;50:18;
98:16,17;123:20;
129:16;133:2
**provides (1)**
130:21
**providing (1)**
138:11
**pulled (1)**
33:20
**purpose (5)**
14:17;61:2;70:7;
109:10;129:8
**purposes (5)**
8:16;30:15;89:17;
127:20;136:12
**pursuant (1)**
133:10
**put (53)**
32:19;34:7;35:4,5;
38:3;40:14;42:7;43:13;
24;44:1;55:3;57:5,6;
59:3;60:18;61:10;62:5,
21,22;63:20,22;64:16;
66:6;68:8;69:16;70:17;
72:3,5,9,15;73:2,14,18;
78:4;88:15;90:10;
91:13;94:8,12;106:24;
109:17,19,19,20;
110:23;111:20,20;
112:11;115:22;116:18;
120:1;124:2,11
**puts (2)**

Case 6:17-cv-06365-EAW-MJP    Document 65-5    Filed 03/16/20    Page 151 of 154

The Pike Company, Inc. vs.                                                    Richard Merkhofer
Universal Concrete PRoducts, Inc.                                            January 07, 2020

89:13;109:5
**putting (1)**
   124:18

## Q

**quantified (1)**
   132:19
**quantifies (1)**
   95:2
**quantify (3)**
   76:1,19;80:1
**quick (1)**
   106:10
**quickly (2)**
   119:9;137:6
**quite (1)**
   78:1

## R

**rafters (1)**
   110:17
**ramifications (1)**
   109:23
**randomly (4)**
   114:24;115:2,9;116:5
**rather (2)**
   5:5;130:11
**react (1)**
   102:6
**read (6)**
   59:22;61:5;95:20;
   98:15;108:8;109:24
**reading (3)**
   4:4;68:22;93:7
**ready (27)**
   50:24;53:24,24;54:6;
   60:14;65:2;67:7;71:8,
   21;76:21;78:4,15,17,18;
   79:1;88:4;90:11,14,18;
   91:1,2,3,6;106:6;108:2;
   113:3;121:15
**real (1)**
   106:10
**really (4)**
   54:17;85:22;136:12,
   14
**real-time (1)**
   15:2
**reason (12)**
   13:17;66:9;86:10;
   103:19;115:19;122:8;
   126:12,24;128:2;129:7;
   131:4;133:7
**reasonably (1)**
   47:6
**reasons (4)**
   39:3;79:20,21;133:17
**recall (64)**
   9:3,11;11:8,15,16,20;
   12:6,12,13,18,21;13:1,
   16;14:2,8,12,20;15:12,

14,16;16:1;17:1,5,14,
21,23;18:5,14,18,20;
19:12;20:16,22,24;
21:11,15,21;25:15,15;
26:23;27:9,20,23;28:20,
21,23;29:1,6,8,10;35:8;
44:1;46:16;74:22,23;
78:20,21;79:17;80:22;
81:2,22;86:1;108:10;
123:10
**received (3)**
   36:20;77:10,10
**receiving (1)**
   75:4
**recently (1)**
   33:19
**recessed (2)**
   74:15;137:3
**recollection (3)**
   21:20;22:17,20
**recommend (1)**
   26:9
**recommended (1)**
   29:6
**record (18)**
   8:14;9:23;19:22;
   20:9;23:16;53:10,11;
   56:20;68:23;74:23;
   75:7;104:20,21;119:14;
   125:3,9,10;137:8
**redirect (1)**
   74:17
**redo (1)**
   100:2
**referred (2)**
   54:13;104:17
**referring (4)**
   6:14;47:10;49:22;
   83:21
**refers (1)**
   6:17
**reflect (2)**
   40:8,9
**reflects (2)**
   40:15;41:5
**refresh (1)**
   18:3
**refused (1)**
   76:11
**regard (27)**
   6:15,23;7:7,18;10:8,
   12;42:13;43:8;44:4,15,
   23;45:22;47:1;50:11;
   76:24,24;79:14;84:12;
   85:23;92:13;95:11;
   105:18;127:15;132:10;
   134:23;137:11,22
**regarding (5)**
   75:5,18;81:5;98:5;
   125:2
**regardless (1)**
   136:11
**regular (1)**

52:8
**relate (2)**
   126:17;134:12
**related (5)**
   11:13;45:18,19;
   85:19;100:6
**relates (1)**
   95:24
**relating (2)**
   39:22;85:13
**remainder (2)**
   47:19;114:20
**remaining (1)**
   90:21
**remedial (1)**
   97:23
**remember (23)**
   7:24;8:10;9:9;13:19,
   21,23;14:5;20:16;21:2;
   22:11;24:19;20;26:12;
   59:23;77:22;79:2,11,
   12;80:11,23;82:1;93:7;
   136:17
**remove (2)**
   96:5;101:8
**removed (3)**
   51:6,13;96:22
**renovation (1)**
   16:10
**rented (1)**
   51:21
**rephrase (1)**
   83:12
**report (94)**
   7:7,13;8:1,16;13:7,
   13,15;21:18;25:22,24;
   26:7,10,13,20,20,24;
   27:2,3;28:13,13,15,16,
   17;29:18,18,19,23;
   30:5,10,10,13,14,22;
   31:1,2,3,4,9,10,13,16,
   19,20,24,24;32:2,4,4,5,
   9,11,12,20,23;33:1,7,8,
   10,19,22;34:4,6,16,19;
   35:1,4;90:20;42:7;46:1;
   73:22;78:22;79:3;80:3;
   94:21;98:13,20,21,23,
   23,24;99:2,3,6;104:13,
   14,15,16;123:21;
   126:14;127:21,22;
   132:7;136:12
**REPORTER (1)**
   138:10
**reports (3)**
   30:19;104:24;127:19
**representing (4)**
   26:17,21;29:3;81:21
**request (1)**
   101:1
**required (8)**
   30:19;70:8;76:12;
   100:1;105:3;107:22;
   133:10;137:16

**requirements (1)**
   130:10
**requisitions (1)**
   32:7
**reserved (1)**
   4:3
**resolution (1)**
   5:18
**resolve (2)**
   15:3;66:5
**resolved (1)**
   14:24
**respective (1)**
   4:2
**response (1)**
   77:15
**responses (1)**
   75:4
**responsibility (4)**
   71:6,20;127:7;131:18
**responsible (6)**
   76:2;77:1;83:10;
   94:17,24;99:14
**rest (9)**
   4:17;40:2;47:16;
   65:15;68:14;86:5;90:9;
   111:17;117:1
**result (15)**
   8:24;10:20;27:6;
   28:23;29:12;39:19;
   80:20;84:7;100:8,13;
   126:6;131:10,15;132:4;
   135:21
**resulted (1)**
   99:11
**resulting (2)**
   98:18;99:15
**results (1)**
   136:14
**retained (5)**
   9:18;11:22;15:14;
   36:13;76:17
**retaining (1)**
   16:10
**review (41)**
   15:5,17;21:14,16,17,
   23;22:23;23:11;26:2,4;
   27:18;28:7,9,17;36:10,
   15,20,23;38:1;40:19;
   41:4;43:2;74:1;96:11;
   97:11;98:1,3,10;99:5;
   102:23;103:2,17;
   104:23;127:9,10,14,16;
   134:17,18,22;135:3
**reviewed (3)**
   16:14;17:6;97:3
**revise (5)**
   15:5,17;31:10,20;
   36:16
**revising (2)**
   31:8;37:22
**RFI (1)**
   98:1

**RFIs (1)**
   98:5
**RICHARD (2)**
   4:7,19
**Ridge (1)**
   15:9
**right (52)**
   5:8,10;6:1;7:11;9:10,
   16,21;11:6;13:9,18;
   15:22;22:4;25:18,21;
   27:14;30:7;33:22;34:2,
   4,6;37:7;43:8;50:8;
   52:1;57:9;60:15;62:2,
   16;70:12;71:13,19;
   79:13,23;86:22;87:7;
   96:4,12,19;101:23;
   102:21;103:2,22;
   106:11;110:14;111:16;
   112:13;128:16;131:20;
   132:7;136:14;137:13;
   138:21
**rise (2)**
   29:22;31:8
**RIT (1)**
   13:18
**Rob (2)**
   4:13;13:6
**Rochester (10)**
   6:10;9:10,16;11:7;
   13:19;15:10,23;17:19;
   36:6
**role (1)**
   75:23
**roof (32)**
   49:5,9;68:8;70:9;
   93:5,8,10,12,12,18,21;
   94:9,12,15,18;95:14,16,
   24;97:16;108:1,4;
   109:15,17,19;110:6,11,
   14,22,23;111:8,12,12
**roofer (2)**
   97:4,8
**roofing (4)**
   48:20;93:5,13;97:15
**rough-in (4)**
   46:23;87:16,16,23
**run (2)**
   5:17;39:10

## S

**sake (1)**
   134:1
**same (31)**
   6:21;10:24;17:6,15;
   22:15,16;24:17,22;
   43:4;44:23;48:4;66:11;
   72:8;78:7,17;79:20;
   80:12;82:4;87:5,8;
   90:15;92:15;103:19;
   116:4;122:24;126:23,
   24;133:7,17;137:8;
   138:20

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 152 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

**saw (5)**
4:24;6:1;80:16;
92:21;125:14
**saying (14)**
31:10,11;48:13;
57:16;66:21;71:19;
95:4;104:8;114:4;
117:20;131:17;134:7;
135:10,24
**schedule (104)**
10:21;14:14,15,18;
15:6;16:15;17:7,7,16;
23:3;33:23;34:8,12,13,
14,17,17,22;35:6;36:8,
10,19,23;37:11,12,16,
18,23;38:10,13;39:5,9,
16,21,22;40:2,4,5,8,10,
13,19;41:3,4,15;42:17,
21;43:5,21;46:14;48:5;
49:16;50:2,5,16;52:20,
21,21;53:19;55:13,16;
58:20;59:3;66:6;67:8;
69:22;70:1,8;71:11;
72:12,17;78:11;86:23;
88:9;89:14,24;92:13,
22;93:1;102:16;104:6,
13;112:9,15;118:18,20;
123:5;125:14;129:5,9,
10,16;130:7,10,14,17;
131:4,8,9,11,12;132:13;
134:15;137:16
**scheduled (2)**
43:23;92:2
**schedulers (1)**
14:22
**schedules (13)**
28:7;35:10;36:4,15;
38:21,22;103:22;
128:22;129:21;130:3,
16;131:13;136:13
**scheduling (12)**
5:19,21,22;15:7,19,
20;16:18;36:6;38:21,
23;89:16;129:9
**scope (12)**
9:21;11:24;13:23;
14:12;16:12;17:5;37:5;
76:16;77:21;79:22;
103:9,20
**sealing (1)**
4:4
**second (6)**
8:23;30:12;33:2;
98:13;101:6,12
**section (2)**
13:10;60:7
**self-performed (1)**
83:24
**send (1)**
28:6
**senior (2)**
14:22;15:18
**sense (2)**

38:6;123:6
**sent (1)**
33:11
**sentence (1)**
27:10
**sentences (1)**
98:15
**separate (2)**
24:11;33:14
**separately (1)**
11:5
**sequence (13)**
26:23;27:21;58:10,
14,15,16,18;59:2,4;
71:23;90:21;93:9;
130:24
**served (1)**
127:23
**set (1)**
72:4
**setting (1)**
57:2
**settlement (1)**
8:16
**seven (1)**
123:3
**shaking (2)**
5:5,7
**shape (1)**
72:20
**sheathing (1)**
93:6
**shield (2)**
97:5,13
**short (3)**
65:8,13,14
**shot (1)**
75:22
**show (3)**
53:19;72:2;121:7
**showed (1)**
136:3
**showing (2)**
114:15;126:14
**shows (14)**
48:5;50:18;52:20,21;
53:19;55:19;56:20;
72:1;88:10;90:3;
102:15;126:9;132:1;
136:18
**side (8)**
35:12,12;62:23;
65:16,16;121:14,18;
128:3
**sides (2)**
123:9;136:6
**signing (1)**
4:4
**similar (3)**
82:3,9;90:6
**Simonelli (1)**
36:5
**simple (2)**

65:20,20
**simply (1)**
24:3
**single (3)**
59:12,14;67:1
**site (22)**
22:1,1;41:18;56:8,10;
57:18;59:12,16;63:12;
69:20;71:4,7;72:2;73:3;
74:21;98:7;99:19;
103:6;120:18;124:10;
125:23;131:7
**sitting (1)**
68:14
**situation (8)**
68:21;97:11;100:24;
112:20;115:19;116:13;
117:15;122:1
**situations (1)**
59:19
**six (5)**
12:23;13:11;123:3,12
**size (5)**
54:21;65:14;72:20;
116:2,6
**slab (6)**
49:4;85:20,21,24;
86:7,18
**slow (1)**
120:19
**small (1)**
113:14
**smaller (1)**
14:4
**smiths (1)**
27:11
**somebody (11)**
20:16,18;36:3;38:15;
102:9;134:18,20,22;
135:6,8,14
**someone (3)**
14:22;104:2;124:23
**sometimes (5)**
72:24;82:8;97:22,22;
121:24
**somewhere (2)**
114:12;125:8
**soon (4)**
21:4;63:14;92:22;
99:21
**sorry (10)**
19:16;35:22;83:13;
84:6;90:3;107:2;109:7;
125:11,13;132:11
**sorts (1)**
66:13
**sound (1)**
34:2
**sounds (3)**
4:24;44:3;96:19
**south (30)**
53:15,20;54:8,10,10,
12,17;67:19,21,23;68:3,

6;71:9,13,14,21;72:5,
10;88:24;89:1,2,3,6,10,
14,20;90:5,20;91:24;
121:14
**span (1)**
110:18
**speak (1)**
27:3
**speaking (2)**
115:21;119:17
**specific (14)**
6:24;19:1,14;25:16;
26:12;44:11,11;58:18;
60:2;66:17;67:3;86:12;
92:16;114:22
**specifically (23)**
7:24;8:11;9:9;12:3,
13;17:15;18:22;20:16,
22;21:2;23:12;24:20;
27:22;28:21;29:8,16;
41:11;47:1;50:12;
52:13;67:15;81:2,4
**specifications (4)**
75:13,18;76:12;77:9
**specifics (9)**
42:9;74:22;79:12;
80:13;112:6;123:11;
124:7;125:1,4
**specs (1)**
38:2
**speculate (1)**
39:7
**spend (3)**
62:3;63:13;64:1
**spending (1)**
63:1
**spent (1)**
132:1
**spoke (3)**
21:1;44:16;118:24
**spreadsheet (1)**
121:6
**stacked (2)**
87:10;115:11
**stacking (3)**
86:22,24;92:11
**stadium (2)**
12:20;13:5
**stair (1)**
109:16
**stairs (11)**
108:6,9,16;109:1,3,4,
6,10,20;110:1,10
**stairway (7)**
110:12,13,15,21;
111:5,15,17
**stand (2)**
18:23;122:14
**standpoint (1)**
38:14
**start (47)**
6:3;23:6,7,8;28:4;
45:14;46:9,23,23;47:6,

12,16,22;48:9;50:9,9;
52:5;53:13;54:1,6,6;
55:17;58:24;65:10;
67:24;70:5,7;73:16;
74:12;78:10;83:7;84:7,
9,17;86:14;87:15,18,23;
91:20;92:2;107:2;
116:5,9;122:7,14,16,19
**started (28)**
5:21;19:23;22:21;
27:23;42:13;43:14;
48:14;49:12;53:15,20,
21;54:4;55:4;56:16;
67:7,17,18;68:1;69:22;
71:6;74:20;80:18;
83:14;88:7;91:5;92:24;
105:21;121:10
**starting (6)**
37:19;48:6;55:2;
67:19;80:14;88:11
**starts (4)**
47:14;49:11;50:3;
52:24
**statement (2)**
121:20;122:5
**Station (3)**
9:10,16;11:7
**status (1)**
19:21
**steel (49)**
43:9,10,15,20,20,21;
45:13,18,19,21;46:6;
47:2,9;48:19;49:4,9,23;
50:3,11,11,13;58:10;
59:20;62:1;63:3,11;
64:6;68:24;73:5;85:20;
86:6,10;87:21;88:12,14,
16,17;90:4,7,9,21;92:4,
4;93:13;96:2;109:12;
110:17;115:11,22
**step (1)**
136:18
**still (12)**
16:17;47:4,17,19;
52:17;64:7;68:1;97:24;
101:6;102:1,18;117:13
**stipulated (1)**
4:1
**stone (16)**
67:22;124:2,4,6,9,14,
18;125:17,18,20;126:1,
1,2,7,13;131:5
**stop (1)**
49:10
**stopped (3)**
50:7;69:2,7
**stopping (2)**
64:13;121:21
**storage (1)**
68:14
**store (3)**
53:1;59:13;71:3
**stored (3)**

Case 6:17-cv-06365-EAW-MJP   Document 65-5   Filed 03/16/20   Page 153 of 154

The Pike Company, Inc. vs.                                   Richard Merkhofer
Universal Concrete PRoducts, Inc.                            January 07, 2020

51:14;70:16;71:1
**stories (1)**
  109:4
**story (1)**
  123:24
**strikes (1)**
  114:6
**structural (14)**
  43:8,9,15;47:19;
  85:20;86:6,10,20;
  88:12;90:4,7;96:2;
  109:11;115:11
**structure (36)**
  27:11;43:12;45:23;
  46:3,4;47:1,4,11,17,20;
  48:7;49:8,13;50:7;
  54:20;65:8,13,14;68:17,
  18;87:13,19,20;88:3,21;
  89:18,19;90:10,11,19,
  20;91:10,12,21;116:3;
  118:2
**stud (4)**
  46:24;87:18;93:1;
  111:20
**subcontractor (16)**
  6:24;11:2;12:14;
  18:10;39:23;40:16;
  42:24;44:11,13;46:7;
  56:18;80:16;84:3;
  86:12;87:1;134:8
**subcontractors (39)**
  9:7;10:16,18,19;
  12:10;24:9,17;25:7,10;
  40:1,23;41:4,18;42:5,
  16;48:19;50:16;53:4;
  64:24;77:8,9;80:8,20;
  81:6;83:9,22,24;84:2,
  12,16;85:4,6;92:12;
  99:18;103:5,5;105:9;
  119:18;134:20
**subcontractors' (1)**
  98:18
**subcontractor's (1)**
  84:7
**subject (1)**
  81:7
**submission (1)**
  129:14
**submit (2)**
  7:11;131:7
**submittals (1)**
  129:18
**submitted (10)**
  7:12;30:11,17,19,22;
  31:12;70:1;102:22;
  129:11,13
**submitting (1)**
  31:4
**substantially (2)**
  48:8;67:6
**subtract (1)**
  106:21
**successful (1)**

30:4
**sufficient (3)**
  39:23;40:11,22
**suggesting (2)**
  70:21;126:20
**suing (1)**
  69:10
**superficial (1)**
  113:22
**support (2)**
  81:23,23
**supported (3)**
  68:17;115:10,21
**supposed (13)**
  58:12;67:5,24;69:19,
  21;87:2,8,17;90:12,13;
  92:14;124:11;125:21
**sure (33)**
  4:16;5:13;6:5;12:14;
  22:14;26:13,13;31:10;
  38:4,8,9;39:4;44:9;
  51:5;56:14;59:22;63:4;
  71:20,24;83:9,23;
  85:14;87:6;88:16;91:3;
  112:10;115:8;117:4;
  119:1;134:8;136:17;
  137:9;138:20
**sworn (1)**
  4:8
**system (2)**
  93:13;95:21

## T

**tabulation (1)**
  98:17
**tail (2)**
  95:19,24
**tails (4)**
  95:15,20;96:5,21
**talk (6)**
  33:15;59:17;75:8;
  83:13;85:22;88:10
**talked (5)**
  20:23;44:17;47:9;
  77:19;128:6
**talking (30)**
  19:15,17;20:13,14,
  14;21:19;25:18;30:6;
  40:24;41:13,14;56:2;
  66:20;72:22,23;74:19;
  78:1;92:10;104:19;
  106:6;109:2,3,9,10;
  110:7,24;113:5;125:7,
  11;131:14
**task (3)**
  79:24,24;98:4
**team (1)**
  22:2
**technical (2)**
  38:3;39:16
**Tehan (1)**
  20:21

**temporary (1)**
  111:8
**term (4)**
  83:21;86:10;95:24;
  105:17
**terms (1)**
  110:8
**testified (3)**
  4:8;80:6,24
**testify (3)**
  7:14;27:15;79:6
**testifying (1)**
  32:23
**testimony (4)**
  57:13;81:16,18;82:18
**thanks (1)**
  42:8
**Theater (2)**
  15:22;16:9
**therefore (1)**
  76:10
**third-party (1)**
  104:23
**though (5)**
  57:4;69:14;97:23;
  99:1;102:4
**thought (6)**
  22:24;23:1;34:10;
  61:21;104:9;109:9
**thousand (2)**
  61:19,22
**three (14)**
  53:7;54:11,17,19;
  68:2;70:4;73:17;88:1,6;
  120:14;122:18;123:7,8,
  9
**throughout (1)**
  4:17
**tied (2)**
  38:5;39:14
**tight (2)**
  94:9;97:17
**timeline (1)**
  113:11
**timely (2)**
  40:7;113:17
**times (4)**
  36:14;65:2;115:16;
  117:14
**timing (1)**
  85:13
**title (1)**
  35:15
**today (2)**
  80:8;135:18
**together (12)**
  38:3,5;39:14;40:15;
  43:24;44:1;53:9;55:3;
  59:3;89:14;112:12;
  137:7
**told (6)**
  20:24;30:20;31:5;
  41:11;52:21;120:6

**tons (1)**
  61:18
**took (20)**
  14:14;54:9,11;57:5;
  63:5;66:2;84:15;90:5;
  106:12,16;113:18;
  118:4;119:8,22;120:15,
  24;132:18,21;136:19,22
**tool (1)**
  40:6
**top (5)**
  55:15;93:22;110:1,3;
  115:4
**total (2)**
  90:5;136:8
**train (1)**
  9:15
**transcript (1)**
  4:5
**transported (1)**
  51:17
**trial (1)**
  4:4
**tried (1)**
  99:20
**trier (1)**
  136:3
**Tri-Krete (28)**
  7:5,8;24:14;26:18,21;
  78:6,10,23;79:13,23;
  80:3,6,18;81:21;82:20,
  21;83:1,6,7,17;84:3,6,
  13;85:5,5,16,17;100:19
**Tri-Krete's (2)**
  83:13;84:17
**truck (2)**
  51:15;60:17
**true (6)**
  33:18;117:8;122:12;
  132:8,11;135:22
**trusses (10)**
  93:5,11,12,18,21;
  94:16,18;95:14,17,24
**try (4)**
  39:8;97:16,23;137:5
**trying (8)**
  36:21;37:6;40:17;
  62:2,3;63:14;64:10;
  96:14
**turns (2)**
  101:22;116:6
**twice (2)**
  100:9;101:4
**two (65)**
  5:17;6:19,20;7:8,19;
  9:11;16:19;18:8;19:8,
  24;20:2,4,15;21:19,21,
  22;22:5,6,7,10,15,17;
  23:10,13,14,21;24:6,10,
  11,12,14,15;25:18;
  26:10;32:3,10;35:3;
  43:21;44:18;52:16;
  53:6,19;55:15;69:24;

74:4;78:6,17;82:18;
  83:14;88:8;89:6,11;
  98:15;106:21;115:5,6,
  12,24;117:11,18;118:4,
  11;120:14,22;136:16
**two-hour (1)**
  59:8
**type (3)**
  10:22;39:23;66:19;
  122:24
**types (11)**
  37:23;70:22;72:7,9,
  13;78:17;123:2,3,4,13,
  22
**typical (1)**
  35:11

## U

**UCP (9)**
  70:1;98:19;129:5;
  131:12,17,19,23;
  132:20;136:19
**Uh-hum (19)**
  4:21;8:21;10:4;
  16:24;24:13,16;41:16,
  19;42:11;44:21;45:2;
  47:13;51:12;62:12;
  82:23;83:19;91:16;
  95:7,10
**ultimate (1)**
  76:24
**ultimately (1)**
  77:1
**unable (3)**
  75:11;76:11;80:19
**under (2)**
  88:19;91:3
**underneath (1)**
  111:11
**understood (3)**
  11:1;96:16;114:23
**Unity (1)**
  15:9
**Universal (127)**
  4:14;7:5;24:14;41:12,
  13;43:14;44:12,14;
  45:6;46:4,12,21;47:3,
  14,16,17,20,22;48:5,11,
  14,23;49:1,6,10,11,14;
  50:3,5,7,9,17,23;
  52:4,12,16,20,22;53:5,
  12;54:4,6;55:1,16;
  56:15;57:4,9,12;58:8,
  19;59:5,20;61:2,9;64:8,
  13;66:2;68:15;69:2,7,
  10;70:8,15;72:1,14;
  73:1;74:8;75:3,10,17;
  76:1,4,19;77:5;78:2;
  79:21,23;85:16;86:12,
  14,17;87:11,14;88:7,21;
  89:23;90:8,12,22,24;
  94:3,22;95:3;98:6;

Case 6:17-cv-06365-EAW-MJP Document 65-5 Filed 03/16/20 Page 154 of 154

The Pike Company, Inc. vs.
Universal Concrete PRoducts, Inc.

Richard Merkhofer
January 07, 2020

102:11,14,15,18;
105:10,20;106:4;107:7;
108:15,19;109:5;113:3;
115:23;124:5;126:6,21;
127:11;128:22;129:1,8,
16,20;130:10,15,21,23;
131:2;132:10,12,16;
133:3;137:22
**Universal's (22)**
45:8,9,14,16;46:8;
47:12;60:7;71:5,20;
90:16;92:15,19;93:10,
21;105:12;113:6,10;
122:6;124:10;128:11;
134:21;137:11
**University (1)**
11:19
**unless (2)**
11:3;56:8
**unusual (2)**
74:24;119:4
**up (33)**
30:11;46:6;54:16,18;
60:16,18,21;62:19;
63:9;64:11;65:16;72:1,
2,3,4,6,9;75:21;77:21,
23;81:7,9;82:10;87:14,
22;90:10;94:5;108:24;
109:6,20;111:20;
124:18;134:9
**update (2)**
17:8;130:4
**updated (4)**
13:7,15;14:15;130:17
**updates (3)**
35:11;39:10,17
**updating (2)**
37:15,23
**upon (16)**
53:23;57:10;58:20;
59:2;72:12,12;87:20;
90:14;92:5;102:17;
104:9,10;114:10;119:5;
130:17;132:1
**use (10)**
17:8;32:7;36:22;
39:9;58:19;71:24;
89:15;109:1;130:9;
131:11
**used (16)**
32:6;34:18,19;35:7;
37:15;40:19;43:5;49:9,
9,9;80:3;83:20;104:17;
117:14;129:9;130:18
**uses (2)**
37:19;130:14
**using (5)**
16:16;46:10;60:11;
86:10;137:17
**usually (8)**
20:18;21:7;28:16,22;
43:23;51:20;60:8;109:1

**V**

**vacuum (1)**
127:12
**Vaguely (3)**
12:22;13:20;15:13
**variables (1)**
102:7
**varies (1)**
63:4
**variety (1)**
10:9
**verbal (1)**
5:5
**verify (2)**
32:20;37:17
**versus (6)**
31:24;74:3,8;89:11;
118:16;136:9
**view (2)**
26:14;38:4
**Village (1)**
13:18
**visible (1)**
123:9

**W**

**Wagner (1)**
5:13
**waived (1)**
4:5
**wall (2)**
88:10;111:20
**wants (2)**
59:5;115:23
**water (3)**
97:5,13,24
**way (25)**
7:22;24:5;36:11;
40:3;43:11,23;56:17;
57:22;72:16;75:19;
78:20;80:12;86:18;
88:13;92:5;96:14;
109:24;110:18;122:2;
130:22;132:17;134:10;
137:19;138:15,20
**wearing (1)**
16:18
**weather (6)**
97:6,9,19;98:7;
102:22;111:9
**weatherproof (3)**
101:19,22;111:16
**weatherproofed (1)**
101:21
**weatherproofing (6)**
99:19;101:24;102:2;
107:8,15,21
**week (1)**
33:11
**weeks (1)**

90:6
**weigh (3)**
61:18,23;136:5
**weighed (1)**
61:22
**weren't (15)**
41:22;43:2;48:1;
52:18;69:6;73:10;83:8;
85:8;91:13;94:14;
108:16;113:17;114:14;
118:24;127:14
**west (2)**
54:17;72:10
**What's (3)**
13:3;54:13;117:10
**whatsoever (1)**
134:12
**wherever (1)**
60:18
**WHI (3)**
15:7;98:17;128:3
**whichever (1)**
19:17
**whole (3)**
12:1;65:19;123:24
**Who's (1)**
76:2
**wide (3)**
62:15,16;65:12
**wing (46)**
46:4;53:16,20;54:17,
17;55:23;67:19,21,23;
68:3,6;70:9,9;71:9,13,
15;88:14,14,14,24;89:1,
2,3,6,11,14,15,15,20,22,
24;90:1,11,14,17,20;
91:1,15,22,24;92:1,1;
116:20;121:8,15;
122:11
**wings (12)**
54:14,17,19;70:4;
88:1,6,8;89:6,11;
122:18;123:7,9
**within (7)**
11:11;34:19;80:24;
96:1;100:17;107:3;
115:19
**without (7)**
50:5;95:11;106:24;
120:16;127:13,15;
132:19
**wondering (3)**
23:18;52:3;56:9
**word (4)**
27:11;36:21;70:13;
95:23
**words (1)**
54:1
**work (77)**
5:13;6:20;9:18,22;
11:22,24;13:1,9,10,23;
14:13;15:2,18,20,20;
16:12;17:5,20;23:11,17,

18:27;23;28:5;36:12;
37:24;38:24;40:1,6,7,
12;41:21;42:6;45:9,14,
16;46:9,18,23,24;56:18;
57:17;63:15;70:10;
80:14,15;83:23;84:20;
87:16,18,19,23;89:1;
90:21;92:24;93:1;94:6;
100:2,8;101:2,4,6;
102:24;105:8,11,12;
110:9,12,13;111:11,13,
15,18;112:18;113:6;
118:9;130:18;133:10
**worked (5)**
6:18;14:22;15:7;18:3,
4
**workers (1)**
87:22
**working (8)**
6:11;9:8;17:24;
18:24;24:10;109:11;
122:11;138:16
**wrong (2)**
79:24;107:1
**wrote (1)**
94:21

**Y**

**yard (1)**
68:14
**year (7)**
34:2;35:21,23;79:7,8;
81:1;100:17
**years (6)**
5:20,22,23;15:21;
19:10;102:5
**York (13)**
6:10,13;9:11;11:19;
12:20;13:19;14:6;
15:23;16:23;17:12;
18:1;51:4,18