# EXHIBIT VV

# In The Matter Of:

*The Pike Company, Inc. vs.*
*Universal Concrete PRoducts, Inc.*

---

*Richard Merkhofer*
*January 07, 2020*

---

*Media Court Reporting*
*216 West Front Street*
*Media, PA  19063*
*610.566.0805  fax 610.566.0318*
*www.mediacourtreporting.com*

Original File 294413.c01_RICHARD MERKHOFER.TXT

Min-U-Script® with Word Index

1

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF NEW YORK
 2

 3

 4   THE PIKE COMPANY, INC.,        :   NO. 6:17 cv-06365-
                                    :            EAW
 5                  Plaintiff       :
                                    :
 6              vs.                 :
                                    :
 7   UNIVERSAL CONCRETE PRODUCTS,   :
     INC.,                          :
 8                                  :
                Defendant           :
 9

10   MARIST COLLEGE,                :
                                    :
11                  Plaintiff       :
                                    :
12              vs.                 :
                                    :
13   UNIVERSAL CONCRETE PRODUCTS,   :
     INC.,                          :
14                                  :
                Defendant           :
15   - - - - - - - - - - - - - - - - - -

16

17              DEPOSITION OF RICHARD MERKHOFER

18                        Taken at Universal Concrete
          Products, 400 Old Reading Pike, Pottstown,
19   Pennsylvania, on Tuesday, January 7th, 2020, commencing
         at 10:00 a.m. by Marcy J. Janowski, Registered
20            Professional Reporter and Notary Public.

21                          *   *   *

22

23

24
```

**Media Court Reporting**
**610.566.0805  fax 610.566.0318**

2

```
 1   APPEARANCES:

 2
                     PHILLIPS LYTLE, LLP
 3                   BY:  ERIN C. BOREK, ESQ.
                     One Canalside
 4                   125 Main Street
                     Buffalo, NY 14203-2887
 5                   -- For the Plaintiff

 6


 7
                     McNELLY LAW GROUP
 8                   BY:  ROBERT J. McNELLY, ESQ.
                         DAVID B. ERMINE, ESQ.
 9                   1033 Westlake Drive
                     Suite 300
10                   Berwyn, PA 19312
                     -- For the Defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1  project when they first spoke with you?
 2  A.      Specifically, no, I don't remember.
 3  Q.      Were you immediately engaged?
 4  A.      As soon as they contacted me I was, yes.
 5  Q.      And did you issue an engagement letter or
 6  anything like that when you are engaged?
 7  A.      Usually, I do.  I'd have to check if I did it
 8  on this one, but probably.
 9  Q.      And it was with Pike?
10  A.      Correct.
11  Q.      So do you recall what the first thing you did
12  on the project was?
13  A.      Probably asked for documents, do a cursory
14  review, and then meet with the client.
15  Q.      Okay.  And do you recall what you learned
16  during that cursory review?
17  A.      Well, what I learned in the cursory review and
18  what I learned in the analysis is in my report.
19  Q.      Well, but I'm talking about phase two now
20  because assuming that your recollection is correct that
21  you were first contacted about phase two, do you recall
22  what you learned about phase two during that first
23  cursory review?
24  A.      Well, I learned some of the problems.  I was
```

```
 1    the or what things did you have to change to make it an
 2    expert report?
 3    A.      The two basic things that are different between
 4    the mediation report and the expert report is when I
 5    did the mediation report I did not have panel
 6    production logs.  They were not available.  All I used,
 7    could use was the payment requisitions to determine the
 8    percentage of panel production and that was included in
 9    the report.  It was very minimal amount of information.
10    That was number one, and number two, the damages were
11    taken out of the report.
12    Q.      Okay.  Why were they taken out of the report?
13    A.      Why were the damages taken out?
14    Q.      Yeah.
15    A.      Because as part of the mediation and it's
16    pretty common, my job is to present to the mediator as
17    much information as possible to help them understand
18    the case and mediate it.  The damages were provided by
19    Pike to me and all I did was put the damages in the
20    report.  I did not verify them.  I wasn't involved in
21    them.  They were just basically there so the mediator
22    could see it.  Because -- when it became an expert
23    report, I'm not testifying on any damage calculations.
24    It was agreed that we would take them out of the
```

1    report.

2    Q.      Okay.  One second.  I'm going to ask this be

3    marked as P-1.

4                   (Exhibit No. P-1, delay analysis, was

5    marked for identification.)

6    BY MR. McNELLY:

7    Q.      This is your amended report or what we're

8    calling your expert report?

9    A.      Thank you.

10   Q.      This is a report I downloaded from the link

11   that Erin sent to me earlier this week and I printed it

12   from there.  I assume it's complete and includes also

13   attached to this all of the exhibits which were

14   actually separate files so if you see anything in there

15   that is missing or as we talk about it, just let me

16   know.

17   A.      Okay.

18   Q.      I believe it's a true and correct copy of the

19   report that we were recently provided.

20   A.      If you pulled it off the link, it would be

21   correct.

22   Q.      All right.  Now, in your report you identify a

23   Pike baseline schedule.

24   A.      Yes.

```
 1    ability of other subcontractors to complete their work
 2    in accordance with the rest of the schedule?
 3    A.      Well, best way for me to answer that, the
 4    schedule doesn't cause delays, contractors cause
 5    delays.  The schedule is just a, you might say a budget
 6    or a tool to plan the work and if a contractor doesn't
 7    do their work in a timely manner, it's the contractor
 8    that delays the project and the schedule would reflect
 9    that or could reflect that.
10    Q.      But how do you know that the schedule is
11    allocating sufficient time for each of the contractors
12    to do their work?
13    A.      That, the contractor that produces the schedule
14    has to do that analysis when you put your baseline
15    together to, so it reflects the proper duration of each
16    subcontractor.
17    Q.      Well, that's what I've been trying to get at
18    with all these questions, that Pike did prepare this
19    schedule and you didn't review it before you used it as
20    your base in your report and you don't know whether or
21    not Pike actually did that investigation to determine
22    whether or not they were allocating sufficient time for
23    all the subcontractors, correct?
24    A.      My understanding talking with Gloria that on
```

1    this project and on I would say all their projects it's

2    the protocol for the general contractor, in this case

3    Pike, when they produce the schedule, they provide that

4    schedule to the subcontractors so they can review it

5    and we can all agree, they can agree that it reflects

6    their intent to build the project.

7    Q.       But you don't know whether they did that or not

8    on this project?

9    A.       I believe they did.

10   Q.       And what makes you believe that they did?

11   A.       They told me they did, specifically with

12   Universal.

13   Q.       Well, see, I'm not talking about just Universal

14   because we were talking about the comprehensive idea

15   behind the entire schedule.

16   A.       Uh-hum.

17   Q.       What I'm focusing in on is the other

18   subcontractors that are on the site.

19   A.       Uh-hum.

20   Q.       And whether or not they may not have been able

21   to complete the work that they needed to complete even

22   through their own fault or because they weren't

23   allocated enough time, and I guess all I'm asking you

24   is you didn't investigate whether or not any of that

1   A.       There weren't any because the point in time

2   when I do, where I calculate when the building is

3   complete is when the fifth floor precast is in place.

4   Where I got that point in time is the same point in

5   time where the baseline schedule shows Universal

6   starting and as I said before, you don't need to have

7   the structure 100 percent complete, but it's got to be

8   substantially complete enough to allow the precast

9   contractor to start and continue, and when I did that

10  analysis and looked at the as-built, the delays that

11  delayed Universal were already done.  There were no

12  other delays.

13  Q.       So you're saying there were no -- after

14  Universal started on building A and hung the first

15  precast panel, there were no additional delays that

16  caused them an inability to hang panels?

17  A.       Not that I'm aware of.

18  Q.       If you were made aware of delays by other

19  subcontractors, like steel, like other concrete, like

20  the roofing erection, things like that, would that

21  change your analysis?

22  A.       It would not change my analysis of the amount

23  of delay that Universal caused.  It would just be a

24  potential concurrent delay.

```
 1   Q.      Well, but if Universal can't hang a panel, how
 2   can you attribute -- if they can't hang a panel because
 3   another contractor has made an error in the fabrication
 4   or the erection of steel or of the slab or anything
 5   else of the roof, how can you continue to attribute
 6   that delay to Universal?
 7   A.      You're making an incorrect assumption in your
 8   analogy that there are delays in the structure.  You
 9   used concrete, you used roof, you used steel that would
10   stop Universal from installing the panels.  When
11   Universal starts the panel construction on building A,
12   the point in time where I started that analysis, there
13   wasn't anything in the structure that would delay
14   Universal.
15   Q.      And how did you investigate that?
16   A.      I looked at the as-built schedule and discussed
17   it with Pike.
18   Q.      Did you discuss it with any of the other
19   contractors to determine whether or not they had, in
20   fact or needed to make any changes to allow for the
21   panels to be hung?
22   A.      What other contractors are you referring to?
23   Q.      Performance Concrete or the steel fabricator or
24   erector.
```

1   A.      Okay.  Maybe you misunderstood my answer.  If

2   you look at the as-built schedule, the point in time

3   where Universal starts their panels, the steel and the

4   concrete and the precast is complete enough per the

5   baseline schedule to allow Universal to without any

6   impact erect their panels.  There was no other delays

7   in the structure that would have stopped Universal.

8   Q.      All right.  Move on from that now.  Prior to

9   the start of construction or start of Universal hanging

10  the first panel, what delays did you identify with

11  regard to the steel erection, steel erection?

12  A.      I didn't get into any detail on specifically

13  whether it was concrete, steel, fabrication, erection.

14  I didn't have to.  It didn't matter because we're not

15  charging that against Universal.  Pike and his

16  subcontractors per the baseline schedule had to provide

17  a building for Universal to hang their panels on and

18  they didn't.  They provided it late.  My analysis shows

19  that so I didn't have to get into any detail because it

20  doesn't matter to the analysis.

21  Q.      So how late did they provide it?

22  A.      On building A I think it was 44 days.

23  Q.      And at what point did they notify Universal

24  that it was going to be ready on the 44th day?

1    the ability to keep the project moving forward, not

2    impact the project completion date and those would be

3    the production and the panel installation.  Those other

4    issues that I determined that I mentioned there would

5    be fixing a panel in the field or whatever, they are

6    not on the critical path.  They are done during the

7    panel production and its installation.

8    Q.     Okay.  But if Universal is planning 26 days to

9    install these panels and they can't install a panel in

10    sequence on one day because of a problem with the steel

11    or a problem with something else, what are they

12    supposed to do about that?

13    A.     Move to another panel.

14    Q.     Out of sequence?

15    A.     Out of what sequence?

16    Q.     Out of the sequence that they've designed for

17    the panel installation.

18    A.     I'm not aware of any specific sequence that

19    Universal would have to use to install the panels based

20    upon their schedule.

21    Q.     You're not?

22    A.     No.

23    Q.     They didn't have a plan for which panel they

24    were going to start with?

1  A.      They might have had a plan for internally on a

2  sequence of panel installation, but based upon the

3  schedule that they've produced and Pike put together,

4  the panels can go on the building in any sequence that

5  Universal plans and wants to do and if the panels are

6  available, if you have a problem with one panel in one

7  area, if all the panels are available, you just move

8  over and do another panel while doing a two-hour fix or

9  one-day fix, whatever it takes.  It's not impacting the

10  critical path.

11  Q.      Okay.  So with that understanding, you're

12  expecting that every single panel was on site?  Where

13  were they going to store all the panels?

14  A.      Never said that.  Every single panel or most

15  panels for the building would be available.

16  Q.      Well, if they are available here on the site,

17  I'm just going to talk through an occurrence and I'll

18  ask you first -- I'll go back to that.

19           Are you aware of any situations where

20  there was an error in the steel that caused Universal

21  not to be able to hang a particular panel?

22  A.      I probably read something like that, sure.

23  Q.      Okay.  And do you remember how many panels were

24  affected, how many different errors like that are you

 1   you have some guys hanging on the steel and they are

 2   trying to get it fit and it doesn't fit right away.

 3   how long do you think those guys spend trying to figure

 4   out why it isn't fitting?

 5   A.      They might have figured it out before they put

 6   the panel in place.

 7   Q.      Good point.  So did you investigate to find out

 8   whether or not that happened?

 9   A.      No.

10   Q.      So they take some time to determine whether or

11   not it's going to fit.

12   A.      Uh-hum.

13   Q.      And they probably look, is there a problem with

14   our panel that it's not fitting on the hangers or it's

15   not wide enough or long enough or high enough or it's

16   too long or too wide or too high, right?  You would

17   expect that would take some time and then they come to

18   a determination as to what they think it is.  What do

19   you think those guys that are hanging up there do once

20   they think they have a determination?

21   A.      They put the panel in place on the building and

22   modify it there or they bring it down and put it to the

23   side and go to the next panel so when they are fixing

24   the problem, you're erecting the other panels.

1   Q.     Okay.  How much time should they spend making

2   that determination?

3   A.     I have no idea.

4   Q.     Well, if it gets into the days and it's

5   determined that the error that caused that delay was

6   the steel fabricator or the erector or a concrete

7   pourer, why would you still attribute that delay to

8   Universal?

9   A.     Because you're and I understand what you're

10  doing, you're trying to imply that this problem, this

11  panel going on the building is holding up the

12  production and delaying the project.  What it is doing

13  is it's momentarily stopping Universal from installing

14  this panel, so they have to make a determination, can

15  they land the panel and modify it on the building or if

16  they can't, they take the panel down, put it aside, and

17  go to the next panel.  What, let me finish, what we're

18  missing in your analysis is they couldn't go and grab

19  the next panel and the next panel and keep the

20  production going which is where the critical path is

21  because they didn't produce the panels fast enough.

22  Q.     So which day was it that they didn't have a

23  panel available to install when they met one of these

24  days by one of the other subcontractors?

```
 1   A.       I don't know.

 2   Q.       How many times did they not have a panel ready

 3   to install?

 4   A.       I don't know.

 5   Q.       Now, I'm going to question because this is

 6   hypothetical, question your conclusion, if they attempt

 7   to install a panel and it can't be installed because

 8   the structure is say, inches or feet too short to

 9   accept it, that is that panel is hanging over from the

10   area that's to be installed, how can they go and start

11   hanging another panel until they figure out whether or

12   not the problem is the panel is too wide or that the

13   structure is too short because if the panel is the

14   correct size and the structure is too short that means

15   that that would continue along the rest of the

16   building, up or down, side to side, correct?

17   A.       You just gave me a hypothetical.  It would

18   depend on the condition.  You're making it something

19   that it affects the whole building.  It could be a

20   simple connection.  It could be a simple cut the panel.

21   You'd have to look at each individual issue, but, but,

22   one of the things that, again, in your analysis you're

23   overlooking is if you look at both of my graphics, my

24   analysis and you look at the production of the panels,
```

```
 1    the production of the panels, if you compare it to what
 2    Universal planned, they took months and months and
 3    months longer to produce the panels and no matter how
 4    many little issues you have going on the building, you
 5    can resolve those issues, but you can't keep the
 6    project on schedule because you have no panels to put
 7    on the building.  You're taking too long to produce
 8    them.
 9    Q.      But the reason I'm asking you when it was that
10    there was a panel that was not available is because
11    these are not all the same panels, correct?
12    A.      Correct.
13    Q.      There's all sorts of different panels?
14    A.      Correct.
15    Q.      You don't know which panels were delayed, do
16    you?
17    A.      I did not do that specific analysis, no.
18    Q.      Okay.  Which means that even if there were a
19    delay in hanging or in producing a certain type of
20    panel, when we get to the point that we're talking
21    about here where there was a delay and you're saying
22    they should move on to something else --
23    A.      To another panel.
24    Q.      To another panel, you are not able to identify
```

1  a single instance where they didn't have a panel
2  available to hang.
3  A.    I don't have to look at a specific instance.
4  What I can look at is, again, I bring you back to my
5  analysis.  They were supposed to have all their panels
6  available, substantially all in place, fabricated,
7  ready to go when they started erection.  If you look at
8  the as-built schedule, they have taken months and
9  months longer and they did not have panels available to
10  erect on the building when they needed them so it
11  delayed the project.
12  Q.    When did they not have panels available to
13  erect on the building?
14  A.    All through the erection, all through the
15  production and erection.  Specifically by day I can't
16  tell you, but it certainly is very clear that if you
17  planned on having them all available before you started
18  and when you look at the as-built, when they started --
19  if you look at the south wing panels starting on
20  December 16th, if you look at the production of the
21  south wing panels, the pours aren't done until March
22  22nd and that doesn't even include the stone so how
23  could you finish installing the south wing if when you
24  start and you were supposed to have them all there

```
 1   before you started, you still don't have them all
 2   produced almost three months later.  You can't finish
 3   the south wing.  It's going to delay the critical path.
 4   Q.      And when did it delay the critical path?
 5   A.      During the erection of that, from December
 6   through March they could not enclose the south wing.
 7   If you can't enclose the building, you can't keep the
 8   drywall and you can't put the roof on and you can't
 9   finish interior finishes.
10   Q.      But if they can't install the panels --
11   A.      They can't --
12   Q.      In one particular day if you can't install the
13   panels, what difference does it make if you have all
14   the rest of them sitting back here at the storage yard?
15   A.      Because in this particular design Universal can
16   install the panels anywhere on the building.  They are
17   supported by the structure.
18   Q.      And what if there's errors in the structure?
19   A.      What if there's not?
20   Q.      But you know that there were.
21   A.      You have portrayed a situation where there are
22   errors all over the place.  My understanding reading
23   the record, there were a few instances that there could
24   have been a steel issue, there could have been a
```

1    some modification might need to be made here or there.

2    Q.      Were you aware of any other -- first, are you

3    aware of any complaints from Universal of delays in

4    receiving responses to questions from the architect or

5    from Pike regarding design issues?

6    A.      No, I did not get into the analysis of the

7    record.

8    Q.      Did you ever talk to anybody about that?

9    A.      No.

10   Q.      Well, if you were made aware that Universal was

11   unable to produce panels in the time frame that they

12   intended to produce those because they could not get

13   specifications from either Pike or from the architect,

14   would that change your opinions as to the production

15   delays?

16   A.      No.

17   Q.      Okay.  So if Universal were not able to get

18   design specifications and/or clarifications regarding

19   what, the way a panel was to be manufactured, how would

20   they manufacture the panel?

21   A.      Well, let me clear something up.  You're

22   getting into the analysis of entitlement, who shot who.

23   It wasn't my role in the project.  I did not analyze

24   any of the examples you just gave.  My job here was to

1   quantify delays, Pike delays and Universal delays on

2   the project, critical path delays.  Who's responsible

3   for them I did not get into.  It wasn't part of my --

4   Q.      So you determined that Universal was a certain

5   number of days late in producing panels?

6   A.      Correct.

7   Q.      But you did not investigate why those panels

8   were not produced?

9   A.      I did not.

10   Q.      And, therefore, could be the fact that the

11   architect either was unable to or refused to provide

12   required specifications in order to allow for the

13   panels to be produced?

14   A.      I don't know that.

15   Q.      And that didn't matter to your analysis?

16   A.      It did not impact my scope because I was not

17   retained to figure out and analyze and evaluate that

18   kind of thing.  My job was to produce an analysis to

19   quantify the delay that Universal caused to the

20   project.

21   Q.      That the panels not being ready caused to the

22   project?

23   A.      The production and installation of the panels.

24   Q.      So with regard to the ultimate, with regard to

1  to the east wing and then going to the north wing as it

2  was scheduled, when you take into account the start of

3  the panels on December 16th and you look at how the

4  steel was completed, the steel would have been in place

5  to accept the panels based upon the way the job was

6  built.

7  Q.    But also 44 days later than --

8  A.    Absolutely.  Everything moves 44 days, correct.

9  Correct.

10 Q.    Do you know, we were talking about the idea of

11 stacking of activities or parallel activities.  Do you

12 know whether or not all the other subcontractors or

13 Pike complied with the schedule with regard to the

14 activities that were supposed to be going on at the

15 same time as Universal's assembly or installation?

16 A.    I didn't do any kind of specific analysis like

17 that, no.

18 Q.    Is there anything that could have been

19 occurring parallel to Universal's installation that

20 could have caused them any delay?

21 A.    I didn't see anything.  I saw that if you look

22 at the as-built schedule as soon as the building was

23 available, as they planned they got into the building

24 and they started their MEP work and some of their

1  limited stud work, but they followed the schedule so I

2  didn't see anything that would have caused additional

3  delay.

4  Q.      Okay.  Now, directing your attention to the

5  roofing, were there any issues with the roof trusses

6  and with the non-bearing sheathing?

7  A.      There could have been.  I remember reading

8  something about there was some issues on the roof.

9  Q.      Okay.  And when in sequence in comparison to

10  Universal's hanging of panels was, were those roof

11  trusses to be installed?

12  A.      The roof, the roof goes on.  The trusses are

13  part of the steel erection.  The roofing system, if

14  you're asking about that, goes on after the panels.

15  Q.      After the panel?

16  A.      After the panels.

17  Q.      And when were the -- let me ask you, what were

18  the problems with the roof trusses?

19  A.      I didn't get into that.

20  Q.      Well, what if the issues with the, with those

21  roof trusses impacted Universal's ability to hang the

22  top level panels?

23  A.      Then there might have been an issue.  I don't

24  know.  I didn't analysis that.

1    Q.      Asked a little bit about this before, but what

2    happens if you find that there's an error in the size

3    of the structure and you determine that you modify that

4    and you go and you move to another part of that same

5    building and start randomly applying panels and then it

6    turns out that because of that error in size the other

7    panels that you've installed no longer are in the

8    proper place either, no longer fit.  Is that a concern

9    before you go around and start installing panels in

10   other locations?

11   A.      Again, it's a question as hypothetical to me

12   because I didn't analyze that, in that detail that kind

13   of a situation.  I don't know whether that is

14   applicable to this project.

15   Q.      But wouldn't that be considered a concurrent

16   delay?

17   A.      Not necessarily because you could have an issue

18   as you described where you go to put the panel on and

19   it affects other panels, but if the panels were

20   available for the wing or for the building as planned

21   and you isolate the problem, then while you're fixing

22   that problem in the field you could be erecting all the

23   other panels if you had them.

24   Q.      But don't you first have to determine that that

```
 1    issue isn't going to affect the placement of the rest
 2    of the panels?
 3    A.      Could be some analysis to be done to see what
 4    the impact is on the other panels, sure.
 5    Q.      And how long would that take?
 6    A.      I have no idea.
 7    Q.      Wouldn't that be concurrent delay?
 8    A.      No, not as the true definition of a concurrent
 9    delay.
10    Q.      What's the definition of a concurrent delay?
11    A.      Concurrent delay is when two delays equally
12    delay the project completion and if you take one of
13    them out, the other one is still delaying the project
14    and as I used the example numerous times in the
15    deposition that you have a field situation that you
16    have to, you can't erect a panel or you have to modify
17    a panel, if you're dealing with that problem and it
18    takes an hour or it takes a day or it takes two days,
19    but you have 20 days of panel installation in the
20    building, I'm saying that you would move off of that
21    panel and move to another panel and the critical path,
22    the longer path would go to the installation of the
23    panels not affected then from that one issue.
24    Q.      So there should be no delay at all when you
```

1    discover an error in design or an error in the

2    structure?

3    A.      Well, not -- you'd have to analyze that if,

4    give you a hypothetical.  If the delay took you two

5    months to fix and the panels were only going to take 20

6    days, then that might delay the project.

7    Q.      Yeah, I guess it would.

8    A.      But if the fix is only going to take an hour or

9    a day and you've got a lot of other work to be done on

10   the critical path, it wouldn't delay it.

11   Q.      What if it takes two days?

12   A.      Again, it's not going to be a critical path

13   item because you've got the panel installation, the

14   panels that are not impacted by the change or by the

15   issue take a lot longer.  That's what makes it critical

16   versus the fix being a non-critical.

17   Q.      How many days makes it critical?

18   A.      It depends on the schedule.  It depends on

19   where the delay is occurring.

20   Q.      What about in this schedule, how many days

21   would it have needed to delay them until it became

22   critical?

23   A.      Well, again, as I said, I didn't do a detailed

24   analysis, but we weren't -- I spoke with Pike about

1   issues that occurred during the installation and sure,

2   as with any panel installation you're going to have

3   some issues where things might not fit, metal or

4   whatever.  It's not unusual in the construction

5   business.  They did not indicate to me based upon their

6   understanding of what occurred on this project that

7   there was issues like that that affected big parts of

8   the building or took very long to fix.  The fix was

9   done pretty quickly.

10  Q.      So all the information that you have that leads

11  you to determine that it was not a critical path, none

12  of these things caused critical path delays come from

13  Pike?

14  A.      My understanding of the project record and

15  discussion with Pike, yes.

16  Q.      But you did not conduct any independent

17  investigation such as speaking with other

18  subcontractors or anyone else that was involved other

19  than Pike with these fixes or modifications?

20  A.      Correct.

21  Q.      Okay.  So if Pike was incorrect about the

22  amount of time that it took or the problems that arose,

23  then that would affect your opinions?

24  A.      Not necessarily.  I'd have to take that

_April 13_ , 2020

      I hereby certify that the evidence
and proceedings are contained fully and accurately in
the notes taken by me of the testimony of the within
witness who was duly sworn by me, and that this is a
correct transcript of the same.


Marcy J. Janowski, RPR
Registered Professional Reporter
Notary Public


The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.