UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE PIKE COMPANY, INC.,

              Plaintiff,

     v.

UNIVERSAL CONCRETE PRODUCTS,
INC.,

              Defendant.


_____

MARIST COLLEGE,

              Plaintiff-Intervenor,

     v.

UNIVERSAL CONCRETE PRODUCTS,
INC.,

              Defendant.

_____

**DECISION AND ORDER**

6:17-CV-06365 EAW

## <u>INTRODUCTION</u>

This action involves disputes arising out of the construction of dormitory buildings on the campus of Plaintiff-Intervenor Marist College ("Marist") in Poughkeepsie, New York. Plaintiff The Pike Company, Inc. ("Pike"), the general contractor for the construction project, claims in its amended complaint that defendant Universal Concrete Products Corp. ("UCP"), its subcontractor, materially breached the terms of the parties' subcontract and caused the improper encumbrance of the project property with mechanic's

- 1 -

liens.  (Dkt. 7).  Pike seeks damages for breach of contract, unjust enrichment, and violations of the New York Lien Law, and a declaration that the lien filed by UCP was invalid.  (*Id.*).  UCP denies Pike's allegations and asserts counterclaims for breach of contract (both direct claims and as a third-party beneficiary), unjust enrichment/quantum meruit, misappropriation of trade secrets in violation of the Pennsylvania Trade Secrets Act, 12 Pa. Cons. Stat. Ann. § 5301 *et seq*. ("PUTSA"), and tortious interference with prospective business relationships.  (Dkt. 29).

Presently before the Court are competing summary judgment motions filed by the parties.  UCP seeks summary judgment on its first counterclaim "for the balance due of the Subcontract price," it seeks summary judgment dismissing the amended complaint "in its entirety," including dismissing the third, fourth, fifth and sixth causes of action "to the extent that such causes of action seek damages relating to any alleged delay," and it seeks to strike as inadmissible Pike's expert report prepared by Richard Merkhofer.  (Dkt. 65). Pike moves for partial summary judgment seeking dismissal of UCP's fourth and fifth counterclaims.  (Dkt. 68).

For the reasons set forth below, UCP's motion to strike Mr. Merkhofer's expert report is denied, UCP's motion for summary judgment is denied except as to Pike's fifth cause of action seeking to declare UCP's mechanic's lien invalid, and Pike's motion for partial summary judgment in its favor on UCP's fourth and fifth counterclaims is granted.

## BACKGROUND[1]

Pike entered into an agreement with Marist on May 1, 2015, to become the general contractor for a two-building residence hall complex located on the Marist College North Campus in Poughkeepsie, New York. (Dkt. 68-3 at ¶ 6; Dkt. 78 (no response)). The project was designated as the first phase of a two phase dormitory project ("Phase I" and "Phase II," respectively, and collectively the "Project"). (*Id.*). During the Project, the two buildings of Phase I were referred to as "Building A" and "Building B." (Dkt. 68-3 at ¶ 7;

---

[1]      The facts set forth in this Background section are undisputed unless otherwise indicated. Notably, in response to Pike's Statement of Undisputed Facts in support of its motion for partial summary judgment dismissing UCP's fourth and fifth counterclaims (Dkt. 68-3 ("Pike's Statement")), UCP submitted a "counterstatement" of undisputed facts (Dkt. 78) wherein it contested some of the facts set forth in Pike's Statement but failed to respond to a large number of the paragraphs in Pike's Statement. This District's Local Rule 56(a)(2) provides that the "papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried." *See also* Fed. R. Civ. P. 56(e)(2) (when a party fails to properly support an assertion of fact or fails to address another party's assertion of fact, the court may consider the fact undisputed for purposes of the motion). UCP failed to comply with this requirement. As a result, consistent with the Local Rule, and because the unanswered paragraphs in Pike's Statement are supported by the record, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001), the Court deems the facts therein admitted by UCP. *See N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005); *Gubitosi v. Kapica*, 154 F.3d 30, 31 n. 1 (2d Cir. 1998).

In addition to Pike's Statement and UCP's response in connection with Pike's partial summary judgment motion, the Court has also considered UCP's Statement of Undisputed Facts submitted in support of its motion for summary judgment ("UCP's Statement") (Dkt. 65-1) and Pike's response thereto and counterstatement (Dkt. 79), as well as all of the exhibits attached and referenced by the parties' statements and responses. The Court notes that UCP's Statement almost exclusively relies on an affidavit of UCP's President, Donald Faust, Jr. ("Faust") (Dkt. 65-6), as opposed to the deposition testimony elicited during discovery.

Dkt. 78 (no response)).  Phase II involved the construction of two buildings that were referred to as "Building C" and "Building D."  (*Id.*).  The Project Architect for both Phase I and Phase II was Robert A.M. Stern Architects, LLP.  (Dkt. 65-1 at ¶ 16; Dkt. 79 at ¶ 16). The architectural design contemplated using pre-cast concrete wall panels with a natural stone veneer for the exterior walls, so that the new buildings would blend in with existing campus buildings.  (Dkt. 65-1 at ¶ 17; Dkt. 79 at ¶ 17).

Marist originally intended Kirchhoff-Consigli Construction Management ("Consigli') to serve as the construction manager for Phase I and Phase II.  (Dkt. 68-3 at ¶ 14; Dkt. 78 (no response)).  Due to concerns with Consigli's price and schedule, Marist decided to accept general contracting bids for Phase I instead.  (Dkt. 68-3 at ¶ 15; Dkt. 78 (no response)).  While Consigli was negotiating with Marist to be construction manager on the Project, Marist had begun preliminary work with UCP for Phase I's precast concrete wall panels, including the production of shop drawings and mock-ups.  (Dkt. 68-3 at ¶ 16; Dkt. 78 (no response)).  UCP specializes in precast concrete exterior wall cladding, and produces both architectural and structural precast panels.  (Dkt. 68-3 at ¶ 8; Dkt. 78 (no response)).  After deciding to solicit bids from general contractors for Phase I of the Project, Marist issued an invitation to bid specifying that a preconstruction agreement arrangement existed with UCP for the fabrication and installation of architectural precast panels and the balance of the contract between UCP and Marist would be assigned to the successful bidder.  (Dkt. 68-3 at ¶ 17; Dkt. 78 (no response)).  Four general contractors bid the Project to serve as general contractor for Phase I, including Consigli and Pike.  (Dkt. 68-3 at ¶ 18;

Dkt. 78 (no response)).  The bid process resulted in Marist selecting Pike to be the general contractor for Phase I.  (*Id.*).

Pike entered into a Master Subcontract Agreement with UCP on May 29, 2015 ("the MSA").  (Dkt. 68-3 at ¶ 9; Dkt. 78 (no response); *see* Dkt. 69-2 (copy of the MSA)).  The parties also entered into an Exhibit AA, Work Order, which incorporated the terms and conditions of the MSA and provided the specific terms and conditions by which UCP would produce and install precast concrete wall panels with brick and stone veneer for Phase I of the Project.  (Dkt. 68-3 at ¶ 12; Dkt. 78 at ¶ 3; *see* Dkt. 69-3; Dkt. 69-4).

The parties dispute the sufficiency of each other's performance with respect to the Project, as well as the performance of others.  (Dkt. 65-1 at ¶¶ 50-82; Dkt. 79 at ¶¶ 50-82).  It is undisputed that during the construction, Pike sent its employee Thomas Scheg ("Scheg") to observe the UCP facility and report back on the status and quality of the panel production.  (Dkt. 68-3 at ¶ 40; Dkt. 78 at ¶ 18).  Pike did this because it was concerned that UCP was unable to meet the agreed-upon panel production schedule and the then-current temperatures were too cold to properly carry out the process of affixing stone veneer to the pre-cast panels.  (Dkt. 68-3 at ¶ 41; Dkt. 78 (no response)).  Scheg visited the UCP facility for multiple days at a time for six to eight weeks in March and April of 2016.  (Dkt. 68-3 at ¶ 43; Dkt. 78 (no response)).  During his visits, Scheg took digital photographs with his camera and uploaded them to a Pike project folder.  (Dkt. 68-3 at ¶ 44; Dkt. 78 (no response)).  He did not take any videos of the UCP production facility or the panels.  (*Id.*).  UCP representatives permitted Scheg to take his own photographs of the production process, including the stoning process.  (Dkt. 68-3 at ¶ 47; Dkt. 78 (no response)).  UCP's

project manager from January 2016 through December 2017, Gary Reed, escorted Scheg on several of his visits, and did not voice any concern about Scheg's photography.  (Dkt. 68-3 at ¶¶ 27, 47; Dkt. 78 at ¶ 6 (responding to Pike Statement ¶ 27) and no response to Pike Statement ¶ 47)).  In fact, at one point in April 2016, UCP's then-chief operating officer, Joseph O'Brien, offered to take photographs of the production facility and provide them to Pike.  (Dkt. 68-3 at ¶ 48; Dkt. 78 (no response)).[2]

Pike also served as the construction manager for Phase II of the Project involving the construction of Buildings C and D, and solicited bids for the subcontract work necessary.  (Dkt. 68-3 at ¶ 52; Dkt. 78 (no response)).  UCP's bid for Phase II was higher than the bid of Tri-Krete Limited ("Tri-Krete").  (Dkt. 69-15 at 7).[3]  Pike subcontracted

---

[2]    Faust claims in an affidavit submitted in opposition to Pike's motion for partial summary judgment that Scheg was eventually banned from visiting UCP's facility.  (Dkt. 78-1 at ¶ 14).  However, a review of the documentation attached to the affidavit reveals that this action had nothing to do with the taking of photographs, and appears driven at least in part by a personality conflict with Scheg.  (*See* Dkt. 78-2).  In other words, there is no evidence in the record that UCP voiced any concerns about Scheg taking photographs; instead, the record establishes that UCP was fully aware of the photographing by Scheg and voiced no concerns or opposition.  Counsel for UCP conceded this point during oral argument.

[3]    UCP makes the unsupported statement in its memorandum of law in opposition to Pike's partial summary judgment motion that UCP "had the lowest bid for Phase 2."  (Dkt. 78-7 at 17).  However, UCP failed to sufficiently controvert Pike's statement of undisputed fact that "Pike subcontracted with Tri-Krete Limited for the construction of the necessary precast concrete panels because Tri-Krete was the low bidder and represented it could meet the schedule necessary to complete the Project."  (Dkt. 68-3 at ¶ 53).  In support of that statement, Pike relies on the deposition testimony of Justin Butwell (Marist's Director of Physical Plant) and Gloria Ciminelli (senior project manager at Pike).  (*Id*.).  In response to that statement, UCP simply states that Butwell did not testify from personal knowledge.  (Dkt. 78 at ¶ 22).  However, it fails to address Ciminelli's testimony which was plainly based on personal knowledge.  (*See* Dkt. 69-15 at 7-8 (Ciminelli testifying that she saw both bids and that Tri-Krete's was lower when comparing "apples to apples.")).  The

with Tri-Krete for construction of the necessary precast concrete panels for Phase II.  (Dkt. 68-3 at ¶ 53; Dkt. 78 (no response)).  UCP, by separate contract with Marist, assisted Tri-Krete in its production of the panels necessary for Phase II.  (Dkt. 68-3 at ¶ 54; Dkt. 78 (no response)).  Pike's decision to subcontract with Tri-Krete occurred prior to 2017.[4]

In late winter or early spring of 2017, Scheg shared approximately thirty photographs of the UCP facility with Tri-Krete at its offices in Canada.  (Dkt. 68-3 at ¶ 55; Dkt. 78 at ¶ 23).  Pike contends that the reason for this was that it was a "necessary effort to ensure that the facades of the Phase 2 buildings would exactly match the Phase I

---

conclusory statement in the affidavit Faust's affidavit that "[w]e initially had a lower bid than Tri-Krete" (Dkt. 78-1 at ¶ 21) does not sufficiently controvert Ciminelli's testimony, particularly when considering UCP's failure to dispute Pike's statement of undisputed fact in this regard.

[4]   Pike states in its memorandum of law in support of partial summary judgment that Pike's act of sharing the photographs with Tri-Krete in early spring 2017 occurred after Tri-Krete already won the bid for the Phase II precast panels, but there is no record cite for that statement.  (See Dkt. 68-4 at 30).    However, it seems evident from a review of the record that the decision to award Tri-Krete the subcontract occurred prior to the sharing of photographs with Tri-Krete in 2017.  Among other reasons, Butwell testified that the decision had to be before the winter or spring of 2017, although he did not recall the exact date.  (Dkt. 69-8 at 25).  In addition, Faust states in an affidavit submitted in opposition to Pike's partial summary judgment motion that UCP submitted bids for Phase II to Pike on October 26, 2015, and again on March 10, 2016.  (Dkt. 78-1 at ¶ 21).  Also, in an email between Faust and Scheg from April 2017, it is evident that Tri-Krete is already involved in the project.  (Dkt. 69-6).  And, although not expressly relied on in this Decision and Order, the Court notes that it has issued a Decision and Order in connection with litigation between Tri-Krete and Pike recognizing that their relationship was governed by "a Master Subcontract Agreement and a Work Order, dated October 2, 2015, and June 14, 2016. . . ." *Pike Co., Inc. v. Tri-Krete Ltd.*, 349 F. Supp. 3d 265, 268 (W.D.N.Y. 2018).  Finally, at oral argument counsel for Pike stated that a letter of intent was signed between Pike and Tri-Krete with respect to Phase II at least one year before Scheg shared the photos with Tri-Krete and when the photos were shared, Phase II was well underway.  UCP's counsel did not dispute these points.

buildings." (*Id.*).  UCP contends that Scheg had neither the education nor experience to be able to determine what information reflected in the photographs was proprietary. [5]  (*Id.*).  UCP's President (Faust), when learning that the photographs had been shared with Tri-Krete, did not ask Tri-Krete to destroy the photographs.  (Dkt. 68-3 at ¶ 59; Dkt. 78 at ¶ 25).

Also, on April 5, 2017, Tri-Krete, Marist, UCP, and Pike held a "Panel Coordination Meeting" to discuss the panel production and erection for Phase II.  (Dkt. 68-3 at ¶ 60; Dkt. 78 (no response)).  During the meeting, it was decided that Pike would provide "pictures of Phase I and Phase II for UCP to reference." (*Id.*).  After the meeting, Scheg forwarded Pike's photographs to Faust, who responded by thanking Scheg for forwarding the photographs.  (Dkt. 68-3 at ¶ 61; Dkt. 78 at ¶ 26; *see* Dkt. 69-6).  Tri-Krete's vice president was copied on the email, although it does not appear that he received the photographs through that email because of their size.  (Dkt. 69-6; *see* Dkt. 84 at 10).

The MSA provides for mediation through the American Arbitration Association ("AAA") "before recourse to any other form of binding dispute resolution."  (Dkt. 69-2 at § 11.1 (also providing that "[e]ngaging in mediation is a condition precedent to any other form of binding dispute resolution")).  However, UCP initiated litigation of this matter in the Court of Common Pleas of Montgomery County, Pennsylvania, on December 22, 2016 (Dkt. 81-19), and refused to participate in the AAA mediation (Dkt. 81-21).  The parties

---

[5]     This argument by UCP actually seems to undermine its allegations that Scheg intentionally went into the facility to misappropriate UCP's trade secrets.  In other words, if he was not even able to gauge what constituted a trade secret, it is difficult to understand how he could have intentionally misappropriated UCP's proprietary information.

ultimately participated in this District's mediation program after commencement of the present action, but it was unsuccessful.  (Dkt. 81 at ¶ 24; *see also* Dkt. 43).

UCP filed a mechanic's lien on Marist's property on November 7, 2016 (Dkt. 81-11), and several of UCP's subcontractors filed mechanic's liens on Marist's property (Dkt. 81-12; Dkt. 81-13; Dkt. 81-14; Dkt. 81-15; Dkt. 81-16).  One of those subcontractors (Diener Brick Company) filed an action in New York State Supreme Court, Dutchess County, against Pike, Marist, UCP, and Fidelity and Deposit Company of Maryland, seeking to foreclose on its mechanic's lien.  (Dkt. 81-17).  In answering that complaint, UCP asserted a counterclaim seeking to foreclose on its mechanic's lien.  (Dkt. 81-18 at ¶¶ 13-36).

An amended scheduling order in this case required the production of Pike's expert report by June 22, 2018.  (Dkt. 44).  Pike first submitted a report from Mr. Merkhofer on or about June 21, 2018.  (Dkt. 65-1 at ¶ 6; Dkt. 79 at ¶ 6; *see* Dkt. 65-3, Dkt. 81-9).  Thereafter, on December 30, 2019, Pike submitted a supplemental report from Mr. Merkhofer.  (Dkt. 65-1 at ¶ 8; Dkt. 79 at ¶ 8; *see* Dkt. 65-4, Dkt. 81-10).  Mr. Merkhofer's deposition was conducted on January 7, 2020.  (Dkt. 65-1 at ¶ 9; Dkt. 79 at ¶ 9; *see* Dkt. 65-5).  Mr. Merkhofer testified that the June 2018 report was not an "expert" report but rather a "mediation" report, although he acknowledged that he never communicated to anyone that the initial report was not an "expert" report.  (Dkt. 65-5 at 31).  There were two basic differences between Mr. Merkhofer's June 2018 report and December 2019 report:  (1)  he removed the damages calculations from the December 2019 report because the figures were simply included in the June 2018 report for purposes of mediation—he

- 9 -

had not verified the damages, only included the figures as provided by Pike, and was not intending to offer an opinion on damages (Dkt. 65-5 at 32-33); and (2) when he prepared the June 2018 report, he did not have the panel production logs and therefore updated the report with that information once it was provided by UCP (*id*. at 32). These logs had been requested from UCP by Pike's counsel since as early as June 2018, but after initially denying that any such reports existed, UCP produced the reports on August 21, 2019, on the evening of Faust's scheduled deposition. (See Dkt. 81 at ¶¶ 3-9).[6]

## PROCEDURAL HISTORY

On May 4, 2017, Pike commenced this action against UCP in New York State Supreme Court, Monroe County. (Dkt. 1-1). UCP removed the case on June 9, 2017, on the basis of diversity jurisdiction. (Dkt. 1). Pike subsequently filed an amended complaint (Dkt. 7), UCP filed a motion to dismiss that complaint or transfer the action (Dkt. 8), and Marist filed a motion to intervene (Dkt. 18). On January 8, 2018, the Court issued a Decision and Order denying UCP's motion and granting Marist's motion to intervene. (Dkt. 25). Discovery subsequently ensued with sixteen depositions conducted and 220 exhibits introduced (Dkt. 81 at ¶ 43), and the motions for summary judgment were filed on March 16, 2020 (Dkt. 65; Dkt. 68). Oral argument was held before the undersigned on February 2, 2021, at which time the Court reserved decision.

---

[6]     UCP made no effort in its reply papers or at oral argument to refute Pike's counsel's description of the late production of the reports. (*See generally* Dkt. 83).

## DISCUSSION

I.     **UCP's MOTION TO STRIKE MR. MERKHOFER'S REPORT**

UCP's motion to strike is based on two separate theories:  (1) Pike failed to timely submit Mr. Merkhofer's report, because the report submitted by the June 22, 2018, deadline was characterized by Mr. Merkhofer at his deposition as a "mediation report" and it was not until December 30, 2019, that a report was produced that Mr. Merkhofer characterized as an "expert report" (Dkt. 65-15 at 18-19); and (2) Mr. Merkhofer's report is inadmissible under the standard set forth at Federal Rule of Evidence 702 (*id.* at 19-22).  The Court addresses each argument in turn.

### A.     **UCP's Argument that the Report is Untimely**

Under Federal Rule of Civil Procedure 26(a)(2)(D), a party must disclose expert witness reports in accordance with a court's scheduling order, and Rules 26(a)(2)(E) and 26(e)(2) impose a duty to supplement the information as necessary.  A party who fails to comply with Rule 26 is not allowed to present that witness at trial unless the failure "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  "Substantial justification may be demonstrated where there is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request, or if there exists a genuine dispute concerning compliance." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (internal quotations omitted).  "'Harmless[ness]' means an absence of prejudice." *Id*. (alteration in original).  "The party that failed to comply with its discovery

obligations bears the burden of proving that its failure was both substantially justified and harmless." *Coene v. 3M Co.*, 303 F.R.D. 32, 44 (W.D.N.Y. 2014).

When evaluating whether preclusion of an expert witness is appropriate, a court considers the following factors: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commn's, Inc.*, 118 F.3d 955, 961 (2d Cir.1997). The Second Circuit has counseled that district courts should consider "lesser sanctions prior to precluding evidence as a sanction for discovery violations." *Coene*, 303 F.R.D. at 42 (citing *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir.1988)).

Here, there is no dispute that a report from Mr. Merkhofer was produced by the court-ordered deadline. There is also no dispute that the only differences between that report and the report produced in December 2019, was that Mr. Merkhofer removed the damages calculations from the report and he added information based upon documents produced in an untimely fashion by UCP. Furthermore, there is no dispute that the December 2019 report was produced in advance of Mr. Merkhofer's deposition.

Under the circumstances, UCP's argument that the report should be stricken as untimely borders on frivolous. It is irrelevant whether Mr. Merkhofer characterized his report as a "mediation" report or "expert" report—the relevant inquiry is whether the report provided the information required by Rule 26, and UCP has advanced no argument that either report failed to comply with those requirements. In terms of the removal of the

damages information, the Court is not persuaded that this somehow prejudiced UCP in its examination of fact witnesses in this case, who were apparently questioned about issues of damages. Even if there was some prejudice, this certainly would not justify striking the report under the circumstances, as opposed to some less drastic remedy (such as permitting a further deposition or depositions). Furthermore, UCP cannot in good faith argue that its own dilatory discovery tactics should result in the preclusion of Mr. Merkhofer's opinion based upon the untimely produced production logs. Accordingly, the Court denies UCP's motion to strike Mr. Merkhofer's report on the grounds of timeliness.

### B.     The Admissibility of Mr. Merkhofer's Opinion

UCP argues that Mr. Merkhofer's opinion is inadmissible because he "simply compared the 'as planned' vs. 'as built' calendar dates on Pike's 'Baseline Schedule'" and in a conclusory manner attributed the entirety of the delay to UCP. (Dkt. 65-15 at 19-20). UCP complains that Mr. Merkhofer did not perform an "entitlements" analysis by analyzing the nexus between any alleged delays and the damages claimed by Pike, and instead only employed an "As Planned/As Built" analysis "which is little more than a comparison of calendar dates." (*Id*. at 21). UCP equates this to the "Total Cost method" which compares "the as-bid price to the as-incurred cost to perform," and is not favored, citing *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861-62 (Fed. Cir. 1991)[7]. (*Id*. at 21-22). In its reply papers, UCP cites to Mr. Merkhofer's opinion in another case

---

[7]     *Servidone* actually affirmed the trial court's award of damages based upon the total cost method, although it explained that it is a rule of last resort and not favored. 931 F.2d at 861. *Cf. Thalle Const. Co. v. Whiting-Turner Contracting Co.*, 39 F.3d 412, 417 (2d Cir. 1994) (explaining correct application of total cost method under New York law).

where he purportedly "criticized the opposing expert for, among other things, failing to show cause and effect between the alleged damages and delays, failing to use the reliable 'measured mile' analysis, and for simply doing a mathematical calculation." (Dkt. 83 at 6).

Pike responds that Mr. Merkhofer's opinion is based on the reasonable assumption that "UCP's failure to produce a sufficient number of panels prior to commencement of erection (despite having an extra 44 days to do so) was the sole cause of UCP's delays" and "[h]aving a reasonable factual basis upon which to explain the cause of the subject delay, it is well within the realm of Mr. Merkhofer's considerable experience and expertise to render an opinion as to the scheduling consequences of UCP's delay," and that this opinion "requires much more than 'a comparison of calendar dates,' as argued by UCP." (Dkt. 80 at 26-28).

Federal Rule of Evidence 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"As the Second Circuit has noted, district courts should presume expert evidence is reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007). In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court has a "gatekeeping" duty under Rule 702, and must make sure that

proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable.") (quotation and alteration omitted).

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). "Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria." *Id.* (quotation and alteration omitted). However, "[a]s the courts and Advisory Committee have made clear, 'the rejection of expert testimony is the exception rather than the rule.'" *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (quoting Fed. R. Evid. 702, Advisory Committee's Note).

"Disputes as to the strength of an expert's credentials, faults in the use of a methodology, or lack of textual authority for an opinion go to 'the weight, and not the admissibility' of an expert's testimony." *United States v. American Exp. Co.*, No. 10-CV-4496(NGG)(RER), 2014 WL 2879811, at *2 (E.D.N.Y. June 24, 2014). Further, "[a]rguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony." *Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936(KMW), 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2011). "Unless

the information or assumptions that plaintiff's expert [ ] relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *Washington*, 105 F. Supp. 3d at 306 (quoting *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010)) (alteration in original).   "Expert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable. . . .   It is [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [that] are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. at 306-07 (internal quotations and citations omitted) (alteration in original). However, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."  *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008).

Here, the Court easily concludes that Mr. Merkhofer's proposed opinion satisfies the requirements of Rule 702 and *Daubert*.   UCP has cited no case that supports its position that Mr. Merkhofer's opinion should be excluded under the circumstances here, and instead its attacks on Mr. Merkhofer's opinion are fair grounds for cross-examination at trial, but not a basis to declare the opinion inadmissible.   The Court notes that it disagrees with UCP's argument in its reply memorandum that an expert is "required to calculate delay damages."   (Dkt. 83 at 8).   The cases cited by UCP simply do not stand for that broad proposition and do not support the conclusion that Mr. Merkhofer's opinion is inadmissible because he did not quantify delay damages.   In fact, there is support in the caselaw that Pike does not even need expert testimony on critical path analysis to successfully recover

delay damages in a construction project, as offered by Mr. Merkhofer in this case.  *See The Helena Assoc. LLC v. EFCO Corp.*, No. 06 Civ. 0861(PKL), 2008 WL 2117621, at \*4 (S.D.N.Y. May 15, 2008).  Certainly, Pike must prove its claim of damages, but there is nothing in the case law suggesting that it cannot attempt to prove its damages through the testimony of fact witnesses or that it must rely on expert testimony to prove those damages. Accordingly, UCP's motion to strike Mr. Merkhofer's report is denied.

## II.   UCP's Motion for Summary Judgment

UCP makes the following arguments in support of its motion for summary judgment:[8]  (1)  because there is no dispute that UCP performed under the terms of the subcontract by manufacturing and installing "404 wall pre-cast concrete wall panels on Building A" and "206 wall pre-cast concrete wall panels on Building B", it is entitled to the balance due of not less than $1.4 million "subject to any damages which Plaintiff Pike can establish in this action, if any" (Dkt. 65-15 at 22-23); (2) because the case was mediated as part of the District's mediation program, Pike's claims for damages based upon the failure to mediate must be dismissed (*id*. at 28-30); and (3) Pike's claims under the fifth and sixth causes of action based upon the lien filed by UCP in state court in Dutchess County must be litigated in that action, and not in this federal court proceeding (*id*. at 30-31).  Each of UCP's arguments is addressed in turn.  To the extent UCP based its motion

---

[8]     UCP's summary judgment motion is based, in part, on the argument that delay damages must be established by expert testimony and Mr. Merkhofer's report is inadmissible.  (*See* Dkt. 65-15 at 24-28).  As discussed at Point I(B) of this Decision and Order, the Court disagrees with UCP's arguments in this regard, and therefore, it similarly rejects UCP's motion based on that argument.

for summary judgment on any other argument not expressly addressed herein, those arguments are rejected as UCP failed to sufficiently develop the argument in its motion papers.

**A.    UCP's Claim for Amounts Due Under the Subcontract**

UCP contends that it is entitled to this Court's "determination that it has earned the Subcontract balance, subject to damages Pike may prove, if any." (Dkt. 83 at 10).  UCP clarified at oral argument that it was not seeking a declaratory judgment from the Court on this point, but rather partial summary judgment on liability.  In opposition to UCP's motion, Pike has raised material issues of fact concerning UCP's performance under the terms of the parties' contractual agreements, including whether UCP fabricated panels incorrectly, failed to make necessary repairs, and failed to timely perform.  (*See* Dkt. 80 at 17).  UCP has failed to establish its entitlement to partial summary judgment on this claim, and therefore the motion is denied.

**B.    Mediation through the Court's Mediation Program**

Pike has based its claims for damages, in part, on UCP's initiation of a lawsuit in Pennsylvania and its initial refusal to engage in mediation, which Pike alleges breached UCP's contractual obligations.  (*See* Dkt. 7 at ¶¶ 1, 10, 35, 37).  The fact that the parties unsuccessfully mediated their disputes as part of the Court's automatic mediation program *after* the commencement of this litigation, does not resolve Pike's claims of a breach by failing to engage in mediation before the commencement of litigation.  Likewise, based on the record before the Court, UCP has not established its entitlement to summary judgment on this claim based on the doctrine of waiver.  Finally, to the extent UCP claims for the

first time in its reply brief that Pike's claims in this regard are barred under the doctrine of collateral estoppel or because of the general legal principle that a successful party in litigation must bear its own attorneys' fees (*see* Dkt. 83 at 12), not only is it inappropriate to raise these arguments for the first time in a reply brief, *see Jiles v. Rochester Genesee Reg'l Transp. Auth.*, 317 F. Supp. 3d 695, 701 (W.D.N.Y. 2018), but UCP's arguments lack merit.  Indeed, the caselaw relied upon by UCP does not stand for the proposition that a damages claim for breach of contract cannot include damages in the form of attorneys' fees.  Thus, UCP's motion for summary judgment on this claim is denied.

## C.     Pike's Claims Based on the Lien

Pike's fifth cause of action alleges that "UCP inappropriately filed a lien on the Property even though it had not performed under the subcontract" and that Pike is "entitled to a declaration that the lien filed by UCP in Dutchess County, New York is not valid and the lien and bond filed to discharge it should be vacated."  (Dkt. 7 at ¶¶ 46-47).  At oral argument, counsel for Pike conceded that this claim should be litigated in the context of the state court action pending in Dutchess County, and therefore UCP's motion for summary judgment on this claim is granted.

By contrast, the sixth cause of action alleges that UCP violated New York's lien law by failing to pay its subcontractors, who then filed liens on the Property resulting in damages to Pike which was required to bond or negotiate those liens on behalf of Marist.  (*Id*. at ¶¶ 48-50; *see also* Dkt. 80 at 22).  The Court agrees with Pike that its "expenses related to UCP's violation of New York's trust fund lien law is not related to the Dutchess County action" (Dkt. 80 at 22), and therefore this claim may be properly pursued in this

federal court litigation.   To the extent UCP argues for the first time in its reply memorandum about Pike's alleged failure to comply with certain procedural requirements of New York's Lien Law, these arguments are not appropriately presented on reply (and the Court disagrees that Pike's theory of recovery under the New York Lien Law should have come as some sort of surprise to UCP, as it is clearly pleaded as the basis for Pike's claims in the sixth cause of action).

Accordingly, summary judgment is granted in favor of UCP on the fifth cause of action, but denied on the sixth cause of action.

## III.   PIKE'S MOTION FOR SUMMARY JUDGMENT

Pike seeks summary judgment as to UCP's fourth and fifth counterclaims.  The fourth counterclaim asserts a claim under PUTSA based upon Scheg's visits to UCP's facility during the construction process and his taking of "photographs and/or videos." (Dkt. 29 at ¶¶ 188-208).   The fifth counterclaim alleges tortious interference with prospective business relationships based upon the same underlying site visits by Scheg and the sharing of photographs from those visits with UCP's competitor.  (*Id*. at ¶¶ 209-225).

### A.   The MSA's Choice of New York Law

Pike first argues that New York, not Pennsylvania law, applies to the fourth and fifth counterclaims because of language in the MSA.  (Dkt. 68-4 at 15-21).  "A federal district court sitting in diversity jurisdiction must apply the choice-of-law principles of the forum state, in this case New York."  *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 423 (S.D.N.Y. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).  "New York law is clear in cases involving a contract with an express choice-

of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). Pike relies on section 13.3 of the MSA for the proposition that the parties contractually agreed to have New York law apply, and accordingly the fourth and fifth counterclaims are governed by New York law. (Dkt. 68-4 at 16-17). Section 13.3 of the MSA, entitled "Governing Law", states as follows:

> All matters relating to the validity, performance, interpretation or construction of this [MSA] . . . or the breach of this [MSA], shall be governed by the law in effect at the location of the Project.

(Dkt. 69-2 at 26). UCP does not dispute the validity of this provision, or that under the terms of the MSA that New York law is the governing law. However, UCP contends that its fourth and fifth counterclaims do not "relate to the validity, performance, interpretation or construction of the MSA, and thus, are not covered by the MSA choice of law provision." (Dkt. 78-7 at 10).

The Second Circuit has explained that under New York law, "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335 (2d Cir. 2005) (concluding that extra-contractual setoff rights fell outside the scope of the choice-of-law clause that provided the agreement was to "be governed by and construed in accordance with the laws of the State of New York"). "Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the

- 21 -

express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309-10 (2d Cir.1994)).

"As a general rule of thumb, 'provisions applying to disputes "arising out of" or "relating to" a contract are capacious enough to reach related tort claims, while provisions stating that a contract will be "governed by" or "construed in accordance with" the law of a state are not.'" *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 270-71 (S.D.N.Y. 2019) (quotation and citation omitted). The MSA language is broader than simply stating that the agreement is governed by New York law. On other hand, it does not go so far as to state that the entire relationship between parties is governed by New York law, and while it does state that "[a]ll matters relating to the validity, performance, interpretation or construction" of the MSA are governed by New York law, it does not state that all matters arising out of the MSA are governed by New York law.

While the parties did not exhaustively brief the issue, the Court's own survey of district courts' interpretations of similar contractual choice-of-law provisions reveals some inconsistent results. *Compare Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13 CIV. 3956, 2014 WL 837050, at *8 n. 4 (S.D.N.Y. Mar. 3, 2014) (finding that fraud claim did not fall within scope of contractual choice-of-law provision providing "this Agreement and all rights and obligations hereunder, including but not limited to matters of construction, validity and performance, are governed by and construed in accordance with the laws of the State of New York."); *J&R Multifamily Grp., Ltd. v. U.S. Bank Nat'l Ass'n as Tr. for Registered Holders of UBS-Barclays Commercial Mortg. Tr. 2012-C4,*

- 22 -

*Commercial Mortg. Pass-Through Certificates, Series 2012-C4*, No. 19-CV-1878 (PKC), 2019 WL 6619329, at *4 (S.D.N.Y. Dec. 5, 2019) (agreement was not sufficiently broad as to encompass tort claims where it encompassed "matters of construction, validity, and performance" of the agreement), *with Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.*, No. 14-CV-6640-FPG, 2016 WL 2622013, at *8 (W.D.N.Y. May 5, 2016) (concluding that contract choice-of-law provision was sufficiently broad to include tort claims where it provided that "[t]his Agreement and all claims related to it, its execution or the performance of the parties under it, shall be construed and governed in all respects according to the laws of the State of New York"); *see also Capital Z Fin. Servs. Fund II, L.P. v. Health Net, Inc.*, 43 A.D.3d 100, 109-10 (2007) (tort claims fell within scope of choice-of-law provision in agreements which stated that "Delaware Law governs 'all issues' concerning 'enforcement of the rights and duties of the parties.'").

The Court believes that it is a close question as to whether the fourth and fifth counterclaims are governed by New York law based upon the choice-of-law provision in the MSA. There is no question that both of the counterclaims arise from Scheg's visits to UCP's production facility, and those visits plainly related to performance of the MSA. However, UCP's counterclaims are only partially related to Scheg's conduct during those visits—the crux of UCP's allegations relates to the sharing of photographs taken during those visits with Tri-Krete at some point after the visits. While those claims may arise from performance of the MSA, the Court is not convinced that they "relate" to performance of the MSA.

Nonetheless, the Court does not need to resolve this difficult question.  As discussed below, there is no meaningful difference between New York and Pennsylvania law on the key points at issue with the pending motions relevant to these counterclaims.  As a result, the Court does not resolve the issue of whether the MSA's language mandates application of New York law.

### B.     The Fourth Counterclaim—Misappropriation of Trade Secrets

"'In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws.'"  *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (quotation and citations omitted).  "An actual conflict exists where the applicable law from each jurisdiction provides differing rules that have the potential to affect the outcome of the case significantly."  *Hatteras Enters. Inc. v. Forsythe Cosmetic Grp., Ltd.*, No. 2:15-CV-05887(ADS)(ARL), 2018 WL 1935984, at *6 (E.D.N.Y. Apr. 23, 2018) (quoting *Horton v. Greenwich Hosp.*, No. 12-CV-4436, 2014 WL 956468, at *2 n.1 (S.D.N.Y. Mar. 10, 2014)).  "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law."  *Id.* (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank*, SAL, 672 F.3d 155, 157 (2d Cir. 2012)).

Here, Pike contends that there is no actual conflict between New York and Pennsylvania law that would impact the outcome of the fourth counterclaim.  (Dkt. 68-4 at 19-21).  Pike contends that the two main differences between a claim under PUTSA and New York common law trade secret misappropriation, are the continuous use requirement under New York law and the fact that misappropriation under PUTSA merely requires

acquisition of the trade secret, whereas New York law requires use. (Dkt. 68-4 at 19-21). Pike argues that neither of those aspects of a trade secret misappropriation claim are at issue—in other words, there is no dispute that UCP continuously used the alleged trade secrets and there is no dispute that Pike's employee sent photographs to Tri-Krete that UCP contends reflected trade secrets. (*Id.*). Thus, with no conflict that impacts the outcome of the matter, New York law applies to the trade secret misappropriation claim, according to Pike.

In response, UCP contends that Pike's argument that the difference between Pennsylvania and New York law regarding trade secret misappropriation claims are not germane, is incorrect, but then it fails to meaningfully articulate how any difference impacts the outcome here. (Dkt. 78-7 at 10-11). Pike is not disputing that under Pennsylvania law the mere acquisition of a trade secret can constitute misappropriation— its point is that here, there is no dispute that its employee not only took the subject photographs, but it also shared the photographs with Tri-Krete—so if the photographs reflected trade secret information that Pike wrongfully acquired, it would be liable under either Pennsylvania or New York law.

Although Pike makes several arguments in support of its motion for summary judgment as to the fourth counterclaim, the Court views the pivotal issue that resolves this motion to be whether the alleged trade secret information claimed by UCP was, in fact, secret. The law on this issue is the same under both Pennsylvania and New York law. Specifically, under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an

opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (quotation and citation omitted).   In deciding whether that definition is satisfied, the following factors should be considered:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id*. (quoting Restatement of Torts § 757, comment b).   Under Pennsylvania law, a trade secret is defined as follows:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5302.   Thus, under the law of either jurisdiction, there must be proof that steps are taken to keep the information secret.

Based on the undisputed facts, the Court concludes that no reasonable jury could conclude that UCP took steps to maintain the secrecy of the information at issue so that Scheg's disclosure of photographs to Tri-Krete constituted a misappropriation.   In evaluating whether a viable trade secret misappropriation claim has been stated, "[t]he most important consideration is whether the information was kept secret.  This requires that the owner of a trade secret take reasonable measures to protect its secrecy." *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 314 (S.D.N.Y. 1999) (citation omitted)   The Court

acknowledges that it is "generally a question of fact" whether a trade secret is, in fact, secret. *Ashland*, 82 N.Y.2d at 407. However, here, the undisputed facts establish that UCP knew Scheg took photographs during his visits to the facility (Dkt. 68-3 at ¶¶ 44 & 47; Dkt. 78 (no response)); UCP took no steps to restrict Scheg's access or use of those photographs (*see* Dkt. 68-1 at ¶ 5); and in fact a year after his visits Faust thanked Scheg for forwarding photographs that he had taken during his visits (in an email that was copied to Tri-Krete) (Dkt. 69-6).[9] In fact, UCP cites to no language in the MSA or any other document that restricted Scheg's disclosure of the photographs that it knew he was creating during his visits, and UCP's counsel acknowledged during oral argument that there was no fiduciary relationship between the parties nor any contractual restrictions on Pike's disclosure of the information.

UCP argues that while it knew Scheg took the photographs, it did not consent to their disclosure to Tri-Krete. (Dkt. 78-7 at 14.) But this misses the relevant point—because UCP indisputably failed to maintain the secrecy of its alleged trade secrets by permitting Scheg access with no restrictions on his subsequent dissemination of the information, UCP cannot maintain a claim for misappropriation of trade secrets—even if the photographs reflected trade secret information, which the Court does not resolve for purposes of this motion. *See Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017) ("[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property

---

[9]     Despite the submission of two affidavits from Faust in connection with the pending motions, nowhere does he address this email. (*See* Dkt. 65-6; Dkt. 78-1).

right is extinguished." (quotation and citation omitted)).   Under the circumstances, summary judgment is warranted in favor of Pike on the fourth counterclaim.

### C.    The Fifth Counterclaim

UCP's fifth counterclaim alleges tortious interference with prospective contractual relationship.   Specifically, UCP alleges that Pike and Scheg "intentionally used the photographs and/or videos taken of [UCP's] process to interfere with [UCP's] continued work on the Project for Buildings 'C' and 'D'" by providing the photographs to UCP's competitor which "frustrated [UCP's] business relationship with Marist and terminated [UCP's] continued status on the Project, which resulted in substantial economic harm to [UCP] and the loss of work for Buildings 'C' and 'D'. . . ."  (Dkt. 29 at ¶¶ 222-224).

As an initial matter, Pike contends that there is no meaningful difference between New York and Pennsylvania law with respect to a claim for tortious interference with prospective contractual relationship (Dkt. 68-4 at 27), and UCP does not dispute that point (*see* Dkt. 78-7 at 11, 15-17).  Indeed, the law is the same in both jurisdictions with respect to this claim, *see Brotech Corp. v. White Eagle Int'l Techs. Grp., Inc.*, No. CIV.A. 03-232, 2003 WL 22797730, at *8 n. 1 (E.D. Pa. Nov. 18, 2003), and accordingly New York law will be utilized to evaluate UCP's fifth counterclaim.

Under New York law, "[t]he four elements of this cause of action are '(1) a prospective contractual relation or business with a third party; (2) defendants' interference with that relation; (3) [that] defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair or improper means; and (4) injury to the plaintiff.'"  *FaZe Clan Inc. v. Tenney*, 467 F. Supp. 3d 180, 193 (S.D.N.Y. 2020) (quotation and citation omitted).

"Tortious interference with business relations also 'requires an allegation that plaintiff would have entered into an economic relationship but for the defendant's wrongful conduct." *Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 766 (S.D.N.Y. 2020) (quoting *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009)). "To demonstrate 'but for' causation, a plaintiff must show that any breach would not have occurred but for the activities of the defendant." *Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, 412 F. Supp. 3d 338, 351 (S.D.N.Y. 2019).

For the same reasons the Court concluded that summary judgment is warranted in favor of Pike on the misappropriation counterclaim, it similarly concludes that no reasonable jury could find that UCP had satisfied the third element of a tortious interference with prospective economic advantage claim—requiring "a plaintiff to show, 'as a general rule,' that 'the defendant's conduct . . . amount[ed] to a crime or an independent tort.'" *Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 220 (S.D.N.Y. 2019) (quoting *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015)). "'When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'" *Id.* (quoting *16 Case Duse*, 791 F.3d at 262).

In addition, UCP's fifth counterclaim fails due to a lack of causal connection between the alleged interference and the alleged injury. Pike argues in its motion that Tri-Krete won the bid for Phase II before Pike shared the photographs with it, and thus there is no issue of fact that Pike's sharing of the photographs did not result in UCP's failure to successfully bid on Phase II. (Dkt. 68-4 at 30). In response to this argument, which appears

supported by the undisputed facts in the record, UCP argues in a conclusory manner that it can be reasonably inferred that Pike's actions damaged UCP.  (Dkt. 78-7 at 17).  UCP cites no evidence in support of this argument, and indeed, the undisputed facts establish otherwise.  UCP cannot survive summary judgment based on conjecture and speculation.  Under the circumstances, summary judgment is warranted in favor of Pike on the fifth counterclaim.

**CONCLUSION**

For the foregoing reasons, UCP's motion to strike Mr. Merkhofer's expert report is denied, UCP's motion for summary judgment is denied except as to Pike's fifth cause of action seeking to declare UCP's mechanic's lien invalid which is dismissed because of the pending state court action on the same issue, and Pike's motion for partial summary judgment in its favor on UCP's fourth and fifth counterclaims is granted.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

DATED:      March 10, 2021
                 Rochester, New York